Filed 5/24/18 (unmodified opn. attached)

<u>CERTIFIED</u> <u>FOR</u> <u>PARTIAL</u> <u>PUBLICATION</u>[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>v.<br><br>ANTOINE LAMAR BLESSETT,<br><br>      Defendant and Appellant. | C074267<br><br>(Super. Ct. No. 12F01121)<br><br>ORDER MODIFYING OPINION AND DENYING PETITION FOR REHEARING [NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the opinion filed herein on April 30, 2018, be modified as follows:

1. On page 45, second full paragraph, beginning with "The prosecution's gang" insert "the November 1991 incident when defendant was shot in the back allegedly in

---

[*] Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for publication with the exception of parts II., III., IV., V., VI., VII., VIII., IX., X., and XI. of the Discussion.

1

relation to a rivalry between the Oak Park Bloods and the Meadowview Bloods;" after the colon (":") so the sentence reads:

> The prosecution's gang expert testified about the following events, which served as part of the basis for his opinion concerning defendant's gang membership: the November 1991 incident when defendant was shot in the back allegedly in relation to a rivalry between the Oak Park Bloods and the Meadowview Bloods; the December 1992 incident where defendant was arrested for a felony warrant and admitted possession of rock cocaine found at the location; the June 1993 incident when he was in a car with others where a firearm was found; an incident in October 1993 when, while running from the police, he displayed a firearm and was shot by the officer; the January 1995 police contact involving a domestic violence call; his commission of armed robbery in September 1995; and his commission of unspecified gang crimes in April 2002 with a Del Paso Heights Blood.

2. On page 53, delete the entire paragraph at the top of the page, beginning: "Defendant also contended."

3. On page 54, third sentence of the first paragraph, the word "substantial" is changed to "compelling" so the sentence reads:

> But the evidence showed defendant did not act in either complete self-defense or imperfect self-defense, and there was compelling evidence of planning, motive, and manner of killing.

4. On page 54, first sentence of the third paragraph, beginning "With regard to planning" is deleted and the following sentences are inserted in its place:

> With regard to planning, the trial evidence demonstrated that defendant walked out from the recessed entry where he had been standing to the sidewalk in front of the entry as Sisoukchaleun and Thammavongsa approached from one direction and Manivong and Ketphanh approached from the opposite direction. There on the sidewalk, defendant exchanged words with the group. He then followed some of the group back into the recessed entry. When the truck pulled up, defendant turned and left the entryway, unimpeded, leaving Sisoukchaleun's group in the entryway.

5. On page 54, fourth sentence of the third paragraph, beginning "The video shows" the word "still" is to be inserted between the words "was" and "in" so that the sentence reads:

The video shows that at this point, Sisoukchaleun's group was still in the recessed entryway of the liquor store while defendant was on the sidewalk some distance away.

6. At the end of the last paragraph starting on page 54 and continuing on the top of page 55, the sentence beginning "Evidence showing defendant's" is deleted and the following two sentences are inserted in its place:

Defendant then walked toward the street, away from the cab of the truck, and out of the camera frame. Evidence showing defendant retrieving the gun, reengaging Sisoukchaleun, refusing to disengage, and walking into the street toward Sisoukchaleun just prior to the shooting was indicative of planning.

7. The paragraph commencing at the bottom of page 56 with "Defendant contends that the jury" and ending at the top of page 57, after the sentence ending "lethal force," add as footnote 24 the following footnote, which will require renumbering of all subsequent footnotes:

**24** In a petition for rehearing, defendant asserts the video shows Thammavongsa "raising and lowering his arm in an angry gesture as the group surrounds defendant." (Petn. for rehg., pp. 8-9.) We disagree. At the point defendant cites in the video, defendant walked out from the recessed entry to meet Sisoukchaleun's group on the sidewalk and words were exchanged. Thammavongsa walked into the recessed entry followed by defendant. Thammavongsa, who had his back to his group and to defendant and was facing the glass window of the store, gestured to someone or something in the store with his right arm. Because defendant joined Sisoukchaleun's group in the entryway, they were around him, but the video does not show Thammavongsa making the gesture towards defendant he describes.

8. The paragraph commencing at the bottom of page 62, beginning "Even if we were" and ending on page 63, delete the word "probability" with "possibility" in the sentence starting with "To determine whether" so the sentence reads:

To determine whether the People have satisfied their burden of proving the error was harmless beyond a reasonable doubt, "we examine the entire record and must reverse if there is a ' " 'reasonable possibility' " ' that the error contributed to the verdict."

3

9.  On page 90, second sentence of first paragraph, beginning with "We note that" the number "32" is changed to "33" so the sentence reads:

> We note that, in *Ford*, the trial court had the obligation under statute (see fn. 33, *ante*) to give the instruction, a factor that undoubtedly led to the reversal.

The petition for rehearing is denied.  There is no change in judgment.

BY THE COURT:


      MURRAY      , J.


We concur:


      BLEASE      , Acting P., J.


      NICHOLSON      , J.*

---

*  Retired Associate Justice of the Court of Appeal, Third Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Filed 4/30/18 (unmodified version)

<u>CERTIFIED</u> <u>FOR</u> <u>PARTIAL</u> <u>PUBLICATION</u>*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C074267 |
| Plaintiff and Respondent, | (Super. Ct. No. 12F01121) |
| v. | |
| ANTOINE LAMAR BLESSETT, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Sacramento County, Michael W. Sweet, Judge. Affirmed as modified.

Ann Hopkins, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris and Xavier Becerra, Attorneys General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Carlos A. Martinez, Chung Mi (Alexa) Choi, Catherine Tenant Nieto, Deputy Attorneys General, for Plaintiff and Respondent.

---

* Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for publication with the exception of parts II., III., IV., V., VI., VII., VIII., IX., X., and XI. of the Discussion.

1

After an argument precipitated by references to their respective gangs, the victim Christopher Sisoukchaleun, took off his shirt to fight defendant Antoine Lamar Blessett. Instead, defendant followed Sisoukchaleun into the street and shot him between the eyes at nearly point-blank range with a firearm he had retrieved only moments earlier from his pickup truck, which was parked nearby. Defendant then fired a second close-range shot, striking Sisoukchaleun in the torso.

A jury found defendant guilty of the first degree murder (Pen. Code, §§ 187, subd. (a), 189)[1] and possession of a firearm by a felon (§ 29800, subd. (a)(1)). The jury also found true enhancements that defendant personally used a firearm and proximately caused death or great bodily injury (§ 12022.53, subd. (d)), that he personally used a firearm in the commission of a felony (§§ 12022.5, subd. (a), 12022.53, subd. (b)), and that he committed the murder for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)). Defendant now appeals claiming numerous trial errors and that the 10-year sentence imposed pursuant to section 186.22 must be struck. Additionally, we granted defendant's request for supplemental briefing on the impact of Senate Bill No. 620 and whether the matter must be remanded for the trial court to consider whether to exercise its discretion to strike the section 12022.5 and 12022.53 firearm enhancements.

In the published portion of this opinion we conclude that defendant's confrontation clause violation contentions under *Crawford v. Washington* (2004) 541 U.S. 36 [158 L.Ed.2d 177] (*Crawford*) and *People v. Sanchez* (2016) 63 Cal.4th 665 (*Sanchez*) are forfeited because trial counsel failed to make a specific objection in the trial court concerning the confrontation clause violation theories he now advances regarding the gang expert testimony. The boilerplate in limine motions filed prior to trial containing only a vague reference to the confrontation clause and the oral arguments

---

[1] Further undesignated statutory references are to the Penal Code in effect at the time of the charged offenses.

made during the in limine motion hearing, in which no confrontation clause claim was made, were insufficient to preserve the contentions defendant now makes on appeal. Moreover, numerous decisional authorities published prior to defendant's trial made the imminent change in law ultimately announced in *Sanchez* reasonably foreseeable, alerting competent and knowledgeable counsel to the need to register appropriate objections. We further conclude that defendant has failed to establish that he received constitutionally ineffective assistance of counsel based on the forfeiture. As we explain, it was not unreasonable of counsel to forego an objection to the *background* hearsay, and, as to the admission of both the background hearsay and the *case-specific testimonial hearsay* relayed to the jury by the prosecution's expert, defendant has not shown prejudice.

In the unpublished portion of this opinion, we agree with defendant that the 10-year term for the gang enhancement must be struck. We further conclude that defendant's other claims of trial error are forfeited, without merit, or pertain to errors that were harmless or did not prejudice defendant. However, we shall remand for the trial court to consider whether to exercise its discretion to strike the section 12022.5 and 12022.53 firearm enhancements, and, in the event that the court declines to exercise that discretion, for the court to impose sentences on the section 12022.5, subdivision (a), and 12022.53, subdivision (b), firearm enhancements and then stay execution of those sentences pursuant to section 12022.53, subdivision (f). We otherwise affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### The Prosecution's Case

#### The Shooting and Investigation

On the night of February 8, 2012, Weena Vue travelled to Sacramento from the Merced area with four girlfriends to hang out. They went to Casino Royale to eat. There they met the victim Christopher Sisoukchaleun (also known as Bud), Jack Thammavongsa, Sunny Manivong, Roger Bouriboune, Udom Ketphanh, and an

3

individual named Lou. After leaving Casino Royale, the group drove in several cars to the Sunland Liquor store (Sunland), the location where the murder later occurred. Thammavongsa (Sisoukchaleun's cousin) drove Sisoukchaleun's car because Sisoukchaleun was drunk. The group arrived at Sunland at approximately 1:55 a.m.

As they started walking from their parked car toward Sunland, Sisoukchaleun or Thammavongsa made a hand gesture. Manivong testified that Sisoukchaleun was "not throwing up no gang sign." Thammavongsa testified that Sisoukchaleun was "[t]hrowing up a peace sign" to the girls that pulled up in the other car. Manivong, who also made hand gestures, testified that he did not throw up gang signs, but was simply pointing at Sisoukchaleun and Thammavongsa.**2**

As they walked up to Sunland, Thammavongsa and Sisoukchaleun both used the word "cuz" in their conversation, and Thammavongsa said something about wanting to race. According to Vue, an African-American male, 5'6" or 5'7" tall with closely cropped hair and wearing a black leather jacket and blue jeans with a design of wings or flames on them, who was standing near the door to Sunland, responded, " 'Yeah, I know what you mean. [¶] I like that, too, Blood, but you know, this is Blood all the way.' "**3** Vue also testified that the man said, " 'I am a Blood.' " According to Thammavongsa, after he said, " 'Cuz, get some drink,' " the man standing near Sunland, whom he identified as defendant, said, " 'Blood, Meadowview, Meadowview bloods' " or " 'Blood, Meadowviews, 69.' " Vue testified that Sisoukchaleun responded, " 'Yeah, this

---

**2** Manivong testified that he was not a gang member, and he did not "represent nothing."

**3** At trial, Vue did not identify the African-American male she observed on the night of the shooting. However, according to a former Sacramento Police Department sergeant, on February 15 or 16, 2012, Vue identified defendant in a photo lineup as the shooter.

4

is LAC, Little Asian Crip.' "[4] Thammavongsa acknowledged that such an exchange would amount to "[f]ighting words" because Bloods and Crips do not get along. According to Vue, while the conversation had not been aggressive at its inception, at this time, the African-American man "got into [Sisoukchaleun]'s face." According to Thammavongsa, Sisoukchaleun "got tired of hearing" defendant say " 'Blood, Meadowview.' " Vue became scared and went to her girlfriend's car.

According to Manivong, defendant walked to a white pickup truck parked nearby, opened a tool box, grabbed something, and put it in his back pocket. Sisoukchaleun removed his shirt and it appeared that he and defendant would fight. Sisoukchaleun and defendant walked into the street. Thammavongsa followed. The other guys in their group were "[r]ight there with us" according to Thammavongsa. Thammavongsa acknowledged that he would have intervened if Sisoukchaleun was getting beaten up.

According to Thammavongsa, Sisoukchaleun was saying, " 'Let's fight,' " but defendant "didn't really say nothing" and was not squaring up to fight. Sisoukchaleun took a swing at defendant, but defendant dodged the blow. Defendant pulled out a gun. Manivong heard a woman say, " 'He's got a gun.' " Defendant then shot Sisoukchaleun in the face. Manivong, Thammavongsa, and Sisoukchaleun started running. Defendant fired a second shot and Sisoukchaleun fell, gasping for air, and then Manivong heard two more shots. Someone called 911. Defendant got into the passenger side of the pickup and was driven away by a woman. Manivong provided the pickup's license plate number to the police when they arrived approximately five minutes later.

---

[4] Only Vue used the term " 'Little Asian Crip.' " Thammavongsa testified that both he and Sisoukchaleun were "affiliated" with LGC, or Lao Gangster Crips. Neither Thammavongsa nor Manivong said they recalled hearing anyone say "LGC" or "Little Gangster Crip." However, Thammavongsa testified that a possible response if defendant said, " 'Meadowview Blood' " would be to say, " 'No, this is LGC.' "

Thammavongsa and Manivong both testified that no one in their group had any weapons that night. Vue never observed Sisoukchaleun or any of the other guys in their group with any weapons. Manivong informed the police that the gun that was used was a .38-caliber revolver.

The parties stipulated that a video recording of the scene in the vicinity of the shooting recorded by a surveillance camera owned by the City of Sacramento accurately depicted that location on February 9, 2012, and the recording was introduced into evidence. We have reviewed the video. There is no sound, and the actual shooting takes place out of the camera view, but events before and after the shooting can be seen on the recording.

In the events as shown on the video recording, defendant was standing outside of Sunland when Thammavongsa and Sisoukchaleun, identified at trial on the video by Thammavongsa, arrived and approached the store. Manivong, who identified himself in the video, and Ketphanh approached from the other direction. Both Sisoukchaleun and Manivong made hand gestures. As the group approached, defendant emerged from Sunland's recessed entry and stood in front of the store. Defendant was briefly among Thammavongsa, Manivong, and an unidentified individual in front of the recessed entry. Thammavongsa almost bumped into defendant as he passed. It appears that defendant spoke with members of the group.[5] Defendant, Thammavongsa, Sisoukchaleun, Manivong, Vue, and others all crowded in the recessed store entry. Vue began to walk away from the storefront just as a white pickup truck driven by a woman parked in front

_____

[5] When viewing the surveillance video during her testimony, Vue initially pointed to a different unidentified African-American individual as being the person who spoke with Sisoukchaleun and who subsequently walked over to the white pickup truck. Defendant's trial counsel argued in closing that it was not clear defendant was the individual who spoke with Sisoukchaleun. Nonetheless, ultimately, at trial and on appeal, defendant does not dispute he was the individual who interacted with, and ultimately shot and killed, Sisoukchaleun.

of Sunland. Defendant walked to the white pickup, where it is undisputed he retrieved a handgun from a toolbox in the truck bed. The woman got out of the truck and walked around the back of the truck toward defendant who was on the passenger side. She and defendant then approached the store. The woman walked into the recessed entry while defendant stayed back on the sidewalk gesticulating with his arms, bobbing his head toward the entryway and appearing to speak angrily to the people therein. Sisoukchaleun, identified at this point in the video by Manivong and Thammavongsa, removed his outer shirt and handed it to an unidentified individual. As defendant and Sisoukchaleun appeared to confront each other, Sisoukchaleun walked off of the sidewalk, into the street, and out of camera view while defendant can still be seen on the periphery of the frame. An unidentified African-American individual walked from the recessed entry and approached defendant with his arm extended. He then placed his arm over defendant's chest, appearing to speak to him and hold him back from the confrontation. At this time, Thammavongsa and Manivong gathered near defendant. Defendant appeared to speak somewhat animatedly with the unidentified African-American individual who had placed his arm over defendant's chest, pointing his finger at this person's chest. Thammavongsa and Manivong looked on. Defendant then walked around the African-American individual, off of the sidewalk in the direction Sisoukchaleun had walked, and out of the frame. In the meantime, the woman who had parked the truck walked behind the group and followed defendant out of the frame. Thammavongsa followed defendant out of the frame. A moment later, the unidentified individual who took Sisoukchaleun's shirt can be seen ducking suddenly and retreating behind the white pickup truck. Most of the individuals in the vicinity then scattered. Sisoukchaleun himself can briefly be seen running away. The woman then walked back into the store entryway, received a package or bag, ran to the driver's door of the pickup, and got in. Defendant got in the passenger side of the pickup and left the scene, driven by the woman.

7

Officer Paul Fong, who arrived at the scene shortly after 2:00 a.m. was the first officer on the scene. Manivong relayed to Fong the license plate number of the pickup, and Fong broadcast that information immediately.

Later in the morning, Officer Konrad Von Schoech stopped a Kia in which defendant was a passenger. Von Schoech transported defendant to the police station. There, Detective Thomas Shrum intended to swab defendant's hands for gunshot residue. However, after his arrest, defendant asked to use the restroom. He was accompanied by Detective Shrum. As defendant was walking to the sink after urinating, Detective Shrum told defendant not to wash his hands. Defendant put his hands on the soap dispenser, looked at Shrum, soaped up his hands, and washed them anyway. Thereafter, Detective Shrum interviewed defendant briefly. During the interview, defendant claimed someone had stolen his truck.

Detective Bryan Alonso participated in a search of the Kia the following day. Alonso discovered a set of license plates under blankets in the rear of the vehicle. Additionally, a bag in the Kia contained a rolled-up pair of jeans with a red design.

Alonso also participated in a search at a residence. In the backyard, police discovered a white F-150 pickup truck without license plates. The vehicle identification number of the truck corresponded to the license plates discovered earlier inside the Kia. In the truck, police found an empty prescription bottle bearing defendant's name and address.

Alonso participated in a search at defendant's apartment. Police discovered items bearing defendant's name. Additionally, police discovered a suitcase in the living room containing .380-caliber auto and nine-millimeter ammunition. Behind a television in the bedroom, police discovered a .40-caliber magazine and a black holster. Police also discovered a box of Remington .357-caliber ammunition containing 10 rounds and a box of Remington .38-caliber ammunition containing 33 rounds.

According to the forensic pathologist who conducted the autopsy on Sisoukchaleun, he sustained one gunshot wound "pretty much on the bridge of the nose, near the center of his face," and another on the left side of his torso. Sisoukchaleun died as a result of these gunshot wounds. The muzzle of the gun was approximately six inches away when it fired the shot that struck Sisoukchaleun in the face. The muzzle was approximately eight to ten inches away, possibly as little as six inches, when the bullet was fired that struck Sisoukchaleun in the torso. The bullet recovered from Sisoukchaleun's torso was a .38-caliber round. Sisoukchaleun's blood alcohol level was 0.28 percent.

**Recorded Phone Calls from the Jail**

Excerpts of recorded phone calls defendant made from the county jail were played for the jury. In a phone conversation later in the day after his arrest with someone he referred to as "Momma," defendant responded to a question about whether he committed the murder by repeating the claim that someone stole his truck. He said, "Somebody stole my damn truck man and they went and did a crime man. Momma, now it - it just looks like I'm guilty."

In a phone conversation a day later with someone defendant identified as Grandma, he again said somebody had used his truck to commit a crime. When asked what kind of crime, defendant replied, "I think murder." He said he did not report his truck stolen because he had been drinking that night.

In a second call that day, defendant spoke with a male. The conversation begins after the male accepted the collect call from defendant.

"Male: What's up *cuz*? What's happening with it?

"Defendant: Man, it's looking all bad for the home team *blood*.

"Male: *Blood*, come on now.

"Defendant: Yep. It's real bad.

"Male: I'm hella mad b- I'm hella mad at you *blood*. I'm hella mad but, uh.

9

"Defendant: [¶] . . . [¶] . . . I don't even know what to do, man. I don't even know what to do. Right now it's just hush mode and wait until they say something to me, you dig what I'm saying?

"Male: Well, that's what you do then, *blood*. . . .

"Defendant: [¶] . . . [¶] . . . I mean somebody stole my shit man. And I [¶] . . . [¶] I was too drunk to even call the police. I was too drunk, nigga. I had drunk two fifths to myself man." (Italics added.)

The following day, defendant had a phone conversation with a woman, during which she informed him that she had heard on the news that there was video of the shooting. Defendant's response was: "Are you serious?" He asked if his picture was on the video and then said again somebody had stolen his truck. He said he was too drunk to report it to the police and then said, "Shit. That's my story and I'm sticking with it." In discussing people with whom he was housed at the jail, defendant said, "They had a Crip in here. Long as that nigga don't say nothing crazy to me. [¶] . . . [¶] Yeah and they forget. They remember when a mother fucker shot me in my back. That's why I can't be associated with no Crip. Because they - they remember when they - I got shot in my back. [¶] . . . [¶] . . . But when they shot me in my back, I was a youngster but I went to jail too. [¶] . . . [¶] Because I was in sort of a gang shooting."

Defendant did not claim that he shot Sisoukchaleun out of fear for his safety or in self-defense during any of the recorded phone conversations.

**Gang Expert Testimony**

Detective Justin Saario testified as an expert in African-American criminal street gangs. According to Saario, respect is the ultimate driving force in gang culture. However, respect to gang members is not the same as respect understood by members of society at large. In gang culture, respect is forced by instilling fear in rival gang members and in the community. For gang members, respect and fear are roughly synonymous. If a gang member is disrespected, there is an expectation that the situation "is dealt with,"

10

because disrespect shown to the gang member reflects poorly both on the gang member and the gang itself. In the absence of a response to a showing of disrespect, the individual and the gang will be perceived as weak.

Saario testified that Meadowview Bloods are a subset of the Bloods criminal street gang. They identify with the color red. Crip gangs, rivals to the Bloods, identify with the color blue. Crips use the term "cuz" in referring to one another, whereas Bloods use the term "Blood."

LGC, or Lao Gangster Crip, is a North Sacramento Asian gang. Saario testified that Asian gangs emulate or "copycat" African-American gangs.

According to Saario, the primary activities of the Meadowview Bloods are robbery, burglary, narcotic sales, weapons possession, and assaults with deadly weapons, which have led to murders. Saario testified about predicate offenses involving three Meadowview Blood gang members, occurring on one occasion. He testified that they beat a Crip gang member and when the Crip fled, one of the three Bloods attempted to follow the Crip into his house armed with a firearm. The Crip obtained a gun, came out and shot one of the three Bloods. One of the Bloods was convicted of active participation in a criminal street gang, specifically the Meadowview Bloods; another was convicted of active participation in a criminal street gang, specifically the Meadowview Bloods, and felony battery; and the third was convicted of residential burglary, assault with a with force likely to cause great bodily injury, and being a felon in possession of a firearm and ammunition. Certified court records of these convictions were admitted into evidence. None of these individuals were involved in defendant's trial.

Saario testified about a series of prior crimes and contacts defendant previously had with law enforcement that aided in his opinion about defendant's gang affiliation. This testimony is the primary subject of defendant's confrontation clause claim.

In November 1991, defendant was walking in South Sacramento when a vehicle occupied by several African-American males drove by. One of the individuals shot at

11

defendant, striking him in the back. At the time, defendant was wearing a red 49ers jacket and a red 49ers hat. Defendant initially denied being a gang member, but then acknowledged that "sometimes people think that he is with the Meadowview Bloods." According to defendant's friend or cousin, defendant was shot by a member of the Oak Park Bloods because of a rivalry that existed between the Meadowview Bloods and the Oak Park Bloods.

In December 1992, police officers went to an address in response to a narcotics complaint. They discovered that there were several people at that location who were on searchable probation. Police came into contact with defendant, who was the subject of a felony warrant at the time. Police searched the residence and discovered 10 pieces of rock cocaine in a bedroom associated with a Mr. Wormley. As police were leaving the residence with defendant, Wormley entered the apartment. In his pocket, police discovered a "photograph of a male black individual and on the back of that photograph, it said, 'AY.B. from the M.V.B., bka des.' " Saario stated that M.V.B. stood for Meadowview Bloods. Defendant later confessed that, as police approached the apartment, he hid the rock cocaine in Wormley's bedroom.

On June 2, 1993, police stopped a vehicle occupied by defendant and the driver, Oscar Daniels, a "Blood associate." In the vehicle, police discovered a .22-caliber semiautomatic handgun in the driver's door.

On October 26, 1993, a police officer observed defendant riding a bicycle. The officer attempted to stop defendant, but defendant dismounted from the bicycle and ran. As the police officer chased defendant, defendant pulled out a rifle which he had concealed in his pants, and the officer shot defendant. At the time, defendant was wearing a red bandana. According to Saario, at that time, gang members commonly identified themselves with red or blue bandanas depending upon their affiliation. Defendant was identified in the police system as a Meadowview Blood, and police noted the "Meadowview" tattoo on his left arm.

12

On January 11, 1995, police contacted defendant in connection with a domestic violence call. Defendant was wearing burgundy pants and was described as a Meadowview Blood.

On September 2, 1995, defendant and Daniels, wearing ski masks, drove up to a male who was in a parking lot placing his daughter into his vehicle. Either defendant or Daniels pulled out a gun and demanded the victim's wallet and keys. The victim ran away, and defendant and Daniels drove off. Sheriff's deputies—responding to this incident—stopped the vehicle defendant was driving. In the vehicle, officers discovered a red ski mask under the driver's seat and another ski mask under the passenger seat. Officers also discovered a .41-caliber Smith and Wesson revolver on the passenger's side of the vehicle. Defendant and Daniels were identified in a showup.

In April 2002, defendant committed gang-related crimes with Lawrence Barnett, a Del Paso Heights Blood.

Saario also relied upon the recorded phone call defendant made from the jail to the woman in which defendant said there was a Crip in custody with him, but that as, " '[l]ong as that nigga don't say nothing crazy,' " defendant did not care. Saario testified that defendant went on to say, " '[t]hey remember when motherfucker shot me in my back. That's why I can't be associated with no Crip, because they remember. They remember when they -- I got shot in my back. '" Saario testified defendant further said, "it was 'because it was sort of a gang shooting.' "

On cross-examination, the defense asked Saario about the phone conversation defendant had with the male the previous day, during which the male initially referred to defendant as " 'cuz.' " Saario stated that, while it was unusual for a Blood to call another Blood "cuz," these rules were not "etched in stone." Saario also noted that, during the conversation, the male speaking to defendant referred to defendant as " 'Blood' " multiple times and defendant also referred to the male as " 'Blood.' "

13

Saario testified that it is common for gang members to obtain tattoos identifying themselves. Saario personally observed a tattoo on defendant's left arm that said "Meadowview," and testified that this also weighed into his opinion regarding defendant's gang affiliation.

Based on defendant's background, his prior contacts with law enforcement, his Meadowview tattoo, and his statements about the Bloods and Meadowview just prior to shooting Sisoukchaleun, Saario opined that defendant was a member of the Meadowview Bloods.

Saario further opined that, in a hypothetical situation mirroring the facts of this case, the shooter's actions would benefit the Bloods. Saario elaborated: "That benefits the Bloods, based on the fact that the individual, the Blood gang member when being -- it goes to the whole respect and disrespect aspect of a Crip gang member calling out using Crip terminology, and the [B]lood gang member taking offense to that, and challenging the Crip by saying, 'No, this is Bloods.' That puts everybody on notice. Crip gang member and anybody else that is there, that by you doing that, that is disrespectful to me being a Blood gang member. And by me saying, No, it's Bloods. This is Meadowview. I'm announcing that I'm a Blood gang member. And what you're doing is disrespect. [¶] There's two ways that it can go right there. The Crip can, 'Hey, man, sorry. You know, it all cool. Let's just hang out' or take offense to the challenge of him not respecting and challenging him by saying 'It's Blood' thing. And it's that drastic escalation at that point based on disrespect from rival gangs, being Crips and Bloods." Saario further testified that "[t]his is Meadowview" puts everyone on notice, "I'm Meadowview. This is what it's about. And basically, that's not gonna be allowed. You can't throw out Crip stuff when I'm a Blood." The reference to Meadowview communicated, "I represent Meadowview. I am Meadowview."

With regard to hypothetical conduct mirroring defendant's actions in retrieving the gun from his truck, Saario testified, "At that point, the individual -- once he puts out, 'I'm

14

a Blood,' you know that that's just gonna -- this is not gonna go anywhere good. And the individuals[] involved in it know that as well. [¶] . . . [T]here's an ultimate sign of power within the gang culture, and that's a firearm. Individuals that are armed are more confident because they know that there's nothing more that anybody can have other than a firearm. There's not bazookas or anything like that around. So if you're armed, you have the ultimate weapon of power or item of power. [¶] So by going and getting that, that weapon, he knows that no matter what happens, there's nothing that I can be outdone with. So if I'm gonna go back and confront this person -- there's a term, it's called, 'caught slipping.' Individuals that are caught slipping are individuals that engage in a confrontation without a weapon. Commonly people will say, I was caught slipping, you know, at a house party. You know, I didn't have a gun on me. I'm a gang member in a certain area. I didn't have my gun on me. I was caught slipping. [¶] So by him having his gun, he's not caught slipping. He knows that no matter what, he's got that -- that back up, being the gun. No matter what happens, he's able to use it."

Saario testified that the hypothetical scenario was a typical gang escalation; "[w]e see it all of the time."

### Defense Case

Defendant did not testify and the defense presented no witnesses. Trial counsel argued to the jury that defendant acted in self-defense or imperfect self-defense.

### Verdict and Sentencing

The jury found defendant guilty of murder in the first degree (§§ 187, subd. (a), 189) and possession of a firearm by a felon (§ 29800, subd. (a)(1)). The jury also found all three firearm enhancements true (§§ 12022.5, subd. (a), 12022.53, subd. (b), 12022.53, subd. (d)), as well as the gang enhancement (§ 186.22, subd. (b)(1)).

The court sentenced defendant to a term of 85 years to life, calculated as follows: 25 years to life for murder in the first degree, doubled to 50 years to life for a prior strike conviction; a consecutive term of 25 years to life for the personal use of a firearm

15

enhancement pursuant to section 12022.53, subdivision (d); and a consecutive term of 10 years on the gang enhancement (§ 186.22, subd. (b)(1)(C)). The trial court stayed imposition of sentence on the section 12022.5, subdivision (a), and section 12022.53, subdivision (b), enhancements.[6] The court imposed a term of two years on count two, possession of a firearm by a felon (§ 29800, subd. (a)(1)), and stayed execution of that sentence.

## DISCUSSION

### I. Confrontation Clause Claim

Defendant contends that the trial court impermissibly allowed the prosecution's gang expert to relay testimonial hearsay to the jurors in violation the confrontation clause and *Crawford, supra*, 541 U.S. 36. In his original briefing, defendant argued that, under the then-recent United States and California Supreme Court case law, the practice of permitting a gang expert to convey testimonial hearsay statements to jurors in discussing the bases for the expert's opinion had lost its viability. While this appeal was pending, our high court decided *Sanchez, supra*, 63 Cal.4th 665, and we granted defendant's motion for supplemental briefing.

We agree with the People that defendant forfeited these claims. Contrary to defendant's contention, his failure to raise the *Crawford* issue before the trial court is not excused on the ground that such an objection would have been futile. We further conclude that defendant has not met his burden in establishing ineffective assistance of counsel because he has not established that the failure to object to background hearsay was unreasonable, and, with respect to both the background hearsay and the case-specific testimonial hearsay that is the focus of his confrontation clause claim, he has failed to

---

[6] Although not raised by the parties, we address the trial court's failure to impose a sentence on each of these enhancements and then stay execution thereof in part X. of the Discussion, *post*.

16

establish prejudice under the test in *Strickland v. Washington* (1984) 466 U.S. 668 [80 L.Ed.2d 674] (*Strickland*). In light of the dissent, we further conclude that, even if defendant had not forfeited his *Crawford/Sanchez* claims, any error in admitting the inadmissible testimony was harmless under *Chapman v. California* (1967) 386 U.S. 18 [17 L.Ed.2d 705] (*Chapman*).

## A. Additional Background

Trial counsel filed two sets of written in limine motions on behalf of defendant. In one of the filings, counsel sought various in limine rulings not specific to the gang evidence (general in limine motions). One such motion in the general in limine motions requested the court to exclude evidence of prior crimes not "specifically noticed by the prosecution,"[7] citing Evidence Code sections 210 (Relevant evidence), 350 (Only relevant evidence is admissible), 352 (Discretion of court to exclude evidence) and 1101 (Evidence of character to prove conduct). In this same motion, trial counsel stated, without analysis: "This evidence would additionally violate defendant's rights to due process and confrontation under the Fifth, Sixth and Fourteenth Amendments to the United States Constitution and article I, sections 7 and 15 of the California Constitution." Counsel's motion was generic in nature and did not specifically reference the gang expert's anticipated testimony. Nor was the United States Supreme Court's landmark decision in *Crawford* mentioned.

In a separate filing, defendant's trial counsel requested that the court exclude specific testimony of the prosecution's gang expert (gang-specific in limine motions).[8]

_____

[7] The record does not reflect what crimes, if any, the gang expert testified about that were not "specifically noticed by the prosecution."

[8] In the gang-specific in limine motions, trial counsel asked the court to "place reasonable and appropriate limits on the gang expert's testimony." Under the heading "Issues to be Addressed," counsel contended the following aspects of Saario's anticipated testimony should not be admitted: (1) Saario's opinion that defendant had the intent to

17

In the "Law and Argument" section of this filing, trial counsel argued, among other things,[9] that "the gang expert's opinions regarding the defendant's participation in a gang, the pattern of gang activity, the defendant's knowledge and the defendant's intent are inadmissible because they are hearsay and lack foundation." (Capitalization omitted.) However, this section contained little "hearsay" or "foundation" analysis; nor did it identify any specific testimony (from the preliminary hearing or discovery) that was objectionable on hearsay grounds. Rather, counsel spent four pages discussing case law pertaining to section 186.22, subdivision (a), active participation in a criminal street gang, an offense for which defendant was not charged.[10] As for hearsay and foundation,

promote or assist the gang; (2) that defendant actively participates in the Meadowview Bloods because such would be "unfounded speculation"; (3) the primary activities of the Meadowview Bloods, purportedly because Saario had insufficient knowledge upon which to base an opinion; (4) "hearsay statements about [d]efendant's association with the Meadowview Bloods because he explicitly states that his opinion is not based in any way on such information" (boldface omitted); (5) an incident that took place on January 11, 2012, when defendant was visiting a residence where a search warrant was served and he resisted handcuffing, resulting in a struggle where the officers choked defendant.

[9] The other arguments counsel made in the gang-specific in limine motions were: the trial court is the "gatekeeper regarding the admissibility of expert opinion," (uppercase omitted) citing cases pertaining to the Federal Rules of Evidence, including *Daubert v. Merrell Dow Pharmaceuticals, Inc.* (1993) 509 U.S. 579 [125 L.Ed.2d 469] and *Kumho Tire Co., Ltd. v. Carmichael* (1999) 526 U.S. 137 [143 L.Ed.2d 238]; the gang expert's opinion that the behavior of gang members is predictable and subject to a set of rules is inadmissible unless a "*Kelly-Frye*" foundation is established (see *People v. Kelly* (1976) 17 Cal.3d 24, 30; *Frye v. United States* (D.C. Cir. 1923) 293 F. 1013, 1014); the gang expert's opinion was based on "inadmissible profile evidence" (uppercase omitted) and the court should limit the expert's testimony "so that profile evidence is not proffered to the jury"; "the gang expert's testimony that saying Meadowview Bloods make you a member of that gang is not the proper subject of expert opinion under [Evidence Code] section 801" (uppercase omitted); and "whether defendant 'actively participates' in a criminal street gang is not the proper subject of expert opinion" (uppercase omitted).

[10] In later arguing, "whether defendant 'actively participates' in a criminal street gang is not the proper subject of expert opinion," (uppercase omitted) counsel cited some of the same decisional law pertaining to section 186.22, subdivision (a).

counsel merely stated: "In assessing the foundation for the opinion of an expert witness, it is fundamental that the opinion cannot be based on unreliable hearsay, speculation, or the mere conclusions of other experts. These rules of evidence apply to a law enforcement witness whom the prosecutor seeks to qualify as a 'gang expert.' " Setting forth a quote purportedly found in three cases, counsel went on to state, " 'Conclusional testimony that gang members have previously engaged in the enumerated offenses, based on nonspecific hearsay and arrest information which does not specify exactly who, when, where and under what circumstances gang crimes were committed, does not constitute substantial evidence.' " As is obvious, the quote pertains to the question of whether in the cited cases there was substantial evidence to support aspects of the gang enhancement. No analysis concerning expected gang expert testimony in the instant case was offered.

Trial counsel's gang-specific in limine motion contained no confrontation clause analysis and did not specifically object to any aspect of the gang expert's anticipated testimony on *Crawford* grounds. Indeed, again counsel did not even cite *Crawford*. Nor did counsel cite and discuss the then-evolving case law on the admissibility of expert opinion basis testimony we discuss *post*.

During oral argument on the in limine motions, defense counsel did not mention the boilerplate confrontation clause claim, the separate hearsay objection, or the generic Evidence Code sections 1101 and 352 objections made in the written in limine motions.[11] Instead, counsel requested that the trial court bifurcate the gang enhancement allegation,

---

[11] Defendant does not contend on appeal that the trial court abused its discretion in admitting the gang expert's testimony concerning any or all of the events over his written Evidence Code sections 1101 and 352 objections, but he does assert that counsel's failure to register specific and timely objections on those statutory grounds amounted to constitutional ineffective assistance of counsel. We reject that contention for failure to show prejudice in the unpublished portion of this opinion, *post*.

contending the testimony about defendant's past would be inflammatory and unduly prejudicial. The trial court, having previously read the prosecution's trial brief, stated that the gang evidence was "inextricably entwined with the very purpose for the murder" as evidence of motive and without the gang evidence, the jury "would not have any context in which to evaluate the mens rea, mental state, of [defendant]." Defense counsel argued that the motive could be proved through the testimony of the witnesses and the video surveillance recording and that the evidence the prosecution planned to admit would do nothing more than make defendant look "dirty." The prosecutor reiterated what he had argued in his trial brief, that the enhancement should not be bifurcated because the gang evidence would prove motive and evidence concerning the motive was "inextricably entwined with the gang evidence." The trial court denied the bifurcation motion, noting that the theory of the case was that this was a gang killing, "the evidence would come in anyway" because it was "cross-admissible," and the probative value outweighed any prejudice.[12]

Regarding the gang expert's testimony, trial counsel also contended that evidence underlying defendant's then-pending separate prosecution for violating section 69, obstructing or resisting an executive officer, should not be admitted. Counsel contended there were no gang overtones associated with that case. The prosecution agreed not to introduce evidence of that matter in its case-in-chief.

Thereafter, the trial court asked trial counsel, "So then on the gang expert, [defense counsel], is there anything else?" Counsel replied there was not. The court then asked, "Anything you want me to decide before he testifies?" Again, counsel said there was not.

---

[12] Defendant does not challenge the trial court's ruling on the oral bifurcation motion in this appeal.

20

In arguing the in limine motions orally, and in a subsequent colloquy concerning the gang expert's testimony,[13] defense counsel never asserted that the evidence of defendant's prior crimes and police contacts should not be introduced through the expert's testimony based on hearsay or confrontation clause grounds. Again, counsel did not cite *Crawford*. Nor did counsel cite any of the then-evolving case law on the admissibility of expert opinion basis testimony we discuss *post*. Defendant acknowledges as much on appeal.

## B. *Crawford* and *Sanchez*

In *Crawford*, the United States Supreme court held that the admission of testimonial hearsay violates the confrontation clause unless the declarant is unavailable for trial and the defendant had a prior opportunity to cross-examine the declarant. (*Crawford, supra*, 541 U.S. at pp. 53-54, 59.) However, the court further stated that the confrontation clause does prohibit the admission of testimonial statements for purposes other than establishing the truth of the matter asserted. (*Id*. at p. 59, fn. 9.)

In *Sanchez,* our high court considered "the degree to which the *Crawford* rule limits an expert witness from relating case-specific hearsay content in explaining the basis for his opinion," and held that "case-specific statements related by the prosecution expert concerning defendant's gang membership constituted inadmissible hearsay under California law." (*Sanchez, supra*, 63 Cal.4th at p. 670.) "Case-specific facts are those relating to the particular events and participants alleged to have been involved in the case being tried." (*Id*. at p. 676.) The *Sanchez* court further held that some of the hearsay statements in that case were also testimonial and should have been excluded under

---

[13] Trial counsel clarified an apparent agreement between her and the prosecutor that the gang expert would not mention defendant's 2002 conviction for pimping and pandering. Rather, the expert would simply say that "on 4/22/02, [defendant] was committing a gang-related crime with Lawrence Barnett, who is a Del Paso Heights Blood."

*Crawford*. (*Sanchez*, at pp. 670-671.) Our high court "adopt[ed] the following rule: When any expert relates to the jury case-specific out-of-court statements, and treats the content of those statements as true and accurate to support the expert's opinion, the statements are hearsay. It cannot logically be maintained that the statements are not being admitted for their truth. If the case is one in which a prosecution expert seeks to relate *testimonial* hearsay, there is a confrontation clause violation unless (1) there is a showing of unavailability and (2) the defendant had a prior opportunity for cross-examination, or forfeited that right by wrongdoing." (*Sanchez*, at p. 686, fn. omitted.) In adopting these rules, the *Sanchez* court disapproved of its pre-*Crawford* decisions which held that the matters upon which an expert relied as the bases of the expert's opinion were not offered for their truth, and rejected the notion that a limiting instruction coupled with an Evidence Code section 352 balancing analysis was sufficient to allay hearsay and confrontation clause concerns. (*Sanchez*, at p. 686, fn. 13.) The *Sanchez* court specifically disapproved of *People v. Gardeley* (1996) 14 Cal.4th 605, 618-619 (*Gardeley*) inasmuch as "it suggested an expert may properly testify regarding case-specific out-of-court statements without satisfying hearsay rules." (*Sanchez*, at p. 686, fn. 13.)

### C. Forfeiture, Foreseeability, and Futility

We conclude that defendant forfeited the confrontation clause contention he belatedly makes on appeal by failing to make specific objections in the trial court. Requiring a timely, specific objection on confrontation clause grounds in the trial court would not have placed an unreasonable burden on defendant to anticipate an unforeseen change in the law. To the contrary, as we will discuss, the change in the law was foreseeable given the state of the decisional law prior to the introduction of the evidence at trial.

"[A]s a general rule, 'the failure to object to errors committed at trial relieves the reviewing court of the obligation to consider those errors on appeal.' [Citations.] This

22

applies to claims based on statutory violations, as well as claims based on violations of fundamental constitutional rights." (*In re Seaton* (2004) 34 Cal.4th 193, 198.) As noted by the United States Supreme Court, states may apply this rule to federal confrontation clause objections. (*Melendez-Diaz v. Massachusetts* (2009) 557 U.S. 305, 313, fn. 3 [174 L.Ed.2d 314, 323, fn. 3] ["The right to confrontation may, of course, be waived, including by failure to object to the offending evidence; and States may adopt procedural rules governing the exercise of such objections"].) Such a rule can be found in Evidence Code section 353,[14] and our high court has repeatedly noted that a timely and specific objection on confrontation grounds is required to preserve confrontation clause violation theories on appeal. (*People v. Redd* (2010) 48 Cal.4th 691, 729, citing Evid. Code, § 353; see also *People v. D'Arcy* (2010) 48 Cal.4th 257, 290; *People v. Waidla* (2000) 22 Cal.4th 690, 726, fn. 8; *People v. Dennis* (1998) 17 Cal.4th 468, 529; *People v. Alvarez* (1996) 14 Cal.4th 155, 186 (*Alvarez*).) The requirement of an objection on specific grounds "gives both parties the opportunity to address the admissibility of the evidence so the trial court can make an informed ruling, and creates a record for appellate review." (*People v. Davis* (2008) 168 Cal.App.4th 617, 627 (*Davis*).) Making the objection in the trial court also gives the proponent of the evidence an opportunity to cure the defect in the evidence if possible (*People v. Pearson* (2013) 56 Cal.4th 393, 438 (*Pearson*)), or forgo introducing all or some of the evidence. In other words, a specific objection gives the proponent of the evidence the opportunity to take "steps designed to minimize the prospect of reversal." (*People v. Morris* (1991) 53 Cal.3d 152, 187-188 (*Morris*), disapproved on other grounds in *People v. Stansbury* (1995) 9 Cal.4th 824, 830, fn. 1.) "

---

[14] In pertinent part, Evidence Code section 353 provides: "A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous admission of evidence unless: [¶] (a) There appears of record an objection to or a motion to exclude or to strike the evidence that was timely made and so stated as to *make clear the specific ground of the objection* or motion." (Italics added.)

'[I]t is *unfair to the trial judge and to the adverse party* to take advantage of an error on appeal when it could easily have been corrected at the trial.' " (*Davis*, at p. 627, quoting 9 Witkin, Cal. Procedure (4th ed. 1997) Appeal, § 394, pp. 444-445.)

Here, the boilerplate claim in trial counsel's general in limine motions that unspecified other crimes evidence not specifically noticed by the prosecution would violate defendant's rights to due process and confrontation under the Fifth, Sixth and Fourteenth Amendments to the United States Constitution and article I, sections 7 and 15 of the California Constitution was insufficient to preserve the more specific *Crawford*-based argument that defendant makes now—that hearsay used by the gang expert to explain his opinion regarding defendant's gang membership, as well as the hearsay concerning the predicate felonies, consisted of testimonial statements admitted for the truth. The motion made in the trial court here was similar to the motion made in *Alvarez, supra*, 14 Cal.4th 155. There, the defendant made a "bare reference" to the confrontation clause in his moving papers, and the *Alvarez* court held this was insufficient to preserve the claim for review. (*Alvarez*, at p. 186.) The court observed, "[t]here was neither a 'specific' nor 'timely' objection below predicated on the Sixth Amendment's confrontation clause. True, there was a bare reference to the 'confrontation rule' (capitalization deleted) in moving papers submitted by defendant. But that was all. And that was not enough." (*Alvarez*, at p. 186.)

Similarly, defendant's bare reference to the confrontation clause in his general in limine motions, without reference to the gang expert testimony, is not enough here. A specific objection identifying a specific constitutional theory is required. (See *People v. Williams* (2010) 49 Cal.4th 405, 435 [a defendant ordinarily forfeits specific involuntariness theories regarding a defendant's statements to law enforcement that were not raised below]; *People v. Ray* (1996) 13 Cal.4th 313, 339 [claim of delay in *Mirandizing* the defendant did not preserve for review a claim that an offer of benefit rendered the defendant's statement involuntary; "the parties had no incentive to fully

24

litigate this theory below, and the trial court had no opportunity to resolve material factual disputes and make necessary factual findings"].)

On appeal, defendant does not claim trial counsel's boilerplate objection sufficed to preserve his confrontation clause arguments; he acknowledges that that the claim was not raised in the trial court and that key cases we discuss *post* concerning the emerging law on testimonial hearsay were not cited by trial counsel. Instead, defendant contends that he has not forfeited his claim because any objection would have been futile under case law as it existed at the time. Defendant points out that the decisional law at the time provided that an expert witness may testify as to the material that forms the basis of his or her opinion, even if it would otherwise be inadmissible. (*Gardeley, supra*, 14 Cal.4th at pp. 618-619; *People v. Thomas* (2005) 130 Cal.App.4th 1202, 1209-1210 (*Thomas*).) Defendant further notes that decisional law also held that because such testimony is not offered for the truth of the matter, but rather to explain the gang expert's testimony, it does not violate the confrontation clause. (*Thomas*, at pp. 1209-1210.) According to defendant, any attempt to register a specific confrontation clause objection would have been futile and, as a consequence, the failure to do so should be excused.

However, it has long been the rule that reviewing courts excuse a failure to object when requiring the objection " 'would place an unreasonable burden on defendants *to anticipate unforeseen changes* in the law and encourage fruitless objections in other situations where defendants might hope that an established rule of evidence would be changed on appeal.' " (*People v. De Santiago* (1969) 71 Cal.2d 18, 23, italics added (*De Santiago*), quoting *People v. Kitchens* (1956) 46 Cal.2d 260, 263 (*Kitchens*); accord *People v. Rangel* (2016) 62 Cal.4th 1192, 1216 (*Rangel*); *People v. Edwards* (2013) 57 Cal.4th 658, 704-705 (*Edwards*).)

The foreseeability rule was recently discussed by our high court in *Rangel*, *supra*, 62 Cal.4th 1192. There, the court addressed the question of whether a confrontation clause objection grounded on *Crawford* was forfeited. The defendant objected on appeal

25

to the admissibility of statements under the adoptive admissions hearsay exception on confrontation clause grounds.  (*Rangel*, at p. 1215.)  Before the trial was conducted in 1998, the California Supreme Court had squarely held that statements qualifying for admissibility under the adoptive admissions exception were admissible over a confrontation clause objection based on the analysis in *Ohio v. Roberts* (1980) 448 U.S. 56, 65-66 [65 L.Ed.2d 597, 607-608].  (*Rangel*, at p. 1215.)  The *Rangel* court noted that *Crawford* is " 'flatly inconsistent' " with that prior governing precedent and reasoned that the failure to object on confrontation clause grounds was excusable because the " ' "governing law at the time . . . afforded *scant grounds* for objection." ' "  (*Rangel*, at p. 1215, italics added; see also *Edwards*, *supra*, 57 Cal.4th at pp. 704-705 [given the existing case law, "defendant's failure to object [on confrontation clause grounds] during his 1996 trial 'was excusable, since governing law at the time . . . afforded *scant grounds* for objection' " (italics added)].)  Citing other California Supreme court cases holding that trial counsel "could not have anticipated *Crawford*'s sweeping changes to federal confrontation clause case law," and that *Crawford* represented " 'an *unforeseen change in the law* "that competent and knowledgeable counsel reasonably could [not] have been expected to have anticipate[]" at defendant's [pre-*Crawford*] trial,' " the *Rangel* court held that the defendant in that case did not forfeit a *Crawford* challenge.  (*Rangel*, at pp. 1215-1216, citing *People v. Chism* (2014) 58 Cal.4th 1266, 1288, fn. 8, & *Pearson, supra,* 56 Cal.4th at p. 462.)  The *Rangel* court concluded its discussion on the doctrine of forfeiture by emphasizing that "the relevant question is whether requiring . . . an objection ' " ' "would place an unreasonable burden on defendants to anticipate *unforeseen changes* in the law." ' " ' "  (*Rangel*, at p. 1217, italics added.)  It then added, "[b]ecause *that standard* is satisfied here, we conclude that defendant has not forfeited his *Crawford* claim."  (*Rangel*, at p. 1217, italics added.)

Here, that standard was not satisfied and consequently, the failure to object is not excused.  As we shall discuss, the grounds for objecting were far from "scant."  Rather,

26

the legal writing was on the wall and key changes in the law discussed in *Sanchez* were *not unforeseeable*. Thus, we conclude that the answer to the relevant question of whether requiring the objection would have placed an unreasonable burden on defendant to anticipate an unforeseen change in the law is no, it would not. Instead of relying on boilerplate motions with vague objections not specific to the case, trial counsel was required to make objections on specific grounds related to the foreseeable changes in confrontation clause law based on the decisional law in existence at the time.

We are not the first among the Courts of Appeal to reach this conclusion since our high court decided *Sanchez*. The foreseeability standard was recently applied to a *Crawford/Sanchez* claim similar to that in the instant case by our colleagues in Division Two, of the Fourth Appellate District in *People v. Perez* (Apr. 12, 2018, E060438) ___ Cal.App.5th ___ [2018 Cal.App. Lexis 321] (*Perez*). Like us, that court held that the defendant forfeited any objection to a gang expert's testimony to case-specific hearsay, which is inadmissible under *Sanchez*, by failing to make the appropriate objection in the trial court. (*Perez*, at *2-3, *6, citing *Edwards*, *supra*, 57 Cal.4th at p. 705.) Like us, the court concluded that, for the most part,[15] the change effected by *Sanchez* was foreseeable. (*Perez*, at *17.)

At the time of defendant's trial, issues involving the confrontation clause— specifically the admission of hearsay evidence as the bases for experts' opinions and whether that evidence is admitted for its truth—could no longer be considered settled as defendant suggests. It is true that in 1996, our high court in *Gardeley* held that experts may relate to the jury hearsay statements that were part of the basis of their opinion when

---

[15] We acknowledge, as did the *Perez* court, that "*Williams*, *Dungo*, and *Mercado* did not anticipate the distinction that *Sanchez* ultimately drew between case-specific and non-case-specific hearsay." (*Perez, supra*, ___ Cal.App.5th ___ [2018 Cal.App. Lexis at *16].) Rather, those cases "suggested that *any* hearsay that is offered as the basis for an expert's opinion testimony is *necessarily* offered for its truth." (*Ibid*.)

such information was the type of information reasonably relied upon by experts in the field.  (*Gardeley, supra*, 14 Cal.4th at pp. 618-619.)  However, *Gardeley*, which predated *Crawford* by eight years, did not address the confrontation clause implications of the admission of such hearsay and as of the time of defendant's trial, the California Supreme Court had never expressly addressed whether hearsay statements relied upon by a gang expert were admissible over a confrontation clause objection.  However, as defendant points out, the Court of Appeal in *Thomas, supra*, 130 Cal.App.4th at pages 1208-1210, did.

Addressing the confrontation clause question not presented in *Gardeley*, the *Thomas* court reasoned that *Crawford* did not undermine the established rule that gang experts can testify about the information and sources upon which they rely in forming their opinions.  (*Thomas, supra*, 130 Cal.App.4th at p. 1210.)  This was so, according to the *Thomas* court, "because an expert is subject to cross-examination about his or her opinions and additionally, *the materials on which the expert bases his or her opinion are not elicited for the truth of their contents*; they are examined to assess the weight of the expert's opinion.  *Crawford* itself states that the confrontation clause 'does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted.' " (*Thomas*, at p. 1210, italics added.)  Several cases subsequently cited *Thomas* for this proposition in varying contexts.  (See *People v. Sisneros* (2009) 174 Cal.App.4th 142, 153-154 [noting the holding from *Thomas* in the context of a gang expert testifying about witness intimidation by the gang and the expert's consideration of the fact that an accessory refused to take the oath and testify in front of the jury; the court observed that the accessory "never offered any statement, much less a testimonial statement," and rejected the confrontation clause claim on this basis]; *People v. Ramirez* (2007) 153 Cal.App.4th 1422, 1427 [rejecting defendant's confrontation clause claim concerning gang expert's testimony about predicate offenses based on *Thomas*]; *People v. Cooper* (2007) 148 Cal.App.4th 731, 746-747 [applying *Thomas* to testimony of a

28

mental health expert]; *People v. Fulcher* (2006) 136 Cal.App.4th 41, 57 [applying *Thomas* to testimony of a sexually violent predator expert].)

But the reasoning in *Thomas* was later roundly criticized in *People v. Hill* (2011) 191 Cal.App.4th 1104, 1127-1137 (*Hill*). The *Hill* court noted that, "[c]entral to the reasoning in *Gardeley* and *Thomas* is the implied assumption that the out-of-court statements may help the jury evaluate the expert's opinion without regard to the truth of the statements." (*Hill*, at pp. 1129-1130.) It further noted that the California Supreme Court decisions concluding that basis testimony is not admitted for the truth were decided before *Crawford*, and since *Crawford* there has been a "heightened concern regarding an expert's disclosure of basis evidence consisting of out-of-court statements." (*Hill*, at p. 1131.) Given the then-existing law, the *Hill* court was compelled to follow *Gardeley*. (*Hill*, at pp. 1127, 1132.) It nevertheless observed: "There is some reason to believe that the California Supreme Court may be prepared to recognize the logical error in *Gardeley* and *Thomas*." (*Hill*, at p. 1131, fn. 18.) *Hill* predated defendant's trial by over two years.

In defendant's original briefing on appeal, he relied on *Williams v. Illinois* (2012) 567 U.S. 50 [183 L.Ed.2d 89] (*Williams*) in support of his confrontation clause claim, but his reliance on that case is misplaced because it only helps illustrate why much of the opinion in *Sanchez* concerning expert witness basis testimony was foreseeable and that it was not futile to make the objection he claims was not forfeited here. In *Williams*, Cellmark laboratory produced a DNA profile from semen recovered from a rape victim which was purported to be an accurate profile of an unknown donor (*Williams*, at p. 59), but nobody from Cellmark testified at trial about the analysis that resulted in the profile. A prosecution expert testified she compared the defendant's known DNA profile to the Cellmark profile and opined that the two matched. The defendant objected on confrontation clause grounds. (*Id.* at p. 62.) Five justices, consisting of the four-justice plurality and Justice Thomas concurring, concluded that there was no confrontation

clause violation because the report was nontestimonial.[16]  However, on the question of whether the Cellmark report was offered for the truth of the statements contained therein, five justices of the high court agreed that they were (Justice Thomas in his concurring opinion and Justice Kagan in her dissent, in which Justices Scalia, Ginsburg, and Sotomayor joined).  (See *Williams*, at pp. 108-109 (conc. opn. of Thomas, J.); *id*. at pp. 129-130 (dis. opn. of Kagan, J.).)  Justice Kagan reasoned that when an expert repeats an out-of-court statement as the basis for a conclusion, the statement's utility is then dependent on its truth.  (*Id*. at p. 126 (dis. opn. of Kagan, J.).)  "If the statement is true, then the conclusion based on it is probably true; if not, not.  So to determine the validity of the witness's conclusion, the factfinder must assess the truth of the out-of-court statement on which it relies."  (*Ibid*.) Justice Thomas noted that the validity of the expert opinion "ultimately turned on the truth of Cellmark's statements."  (*Id*. at p. 108 (conc. opn. of Thomas, J.).)  *Williams* was decided nearly a year before defendant's trial.

Defendant also relied on *People v. Dungo* (2012) 55 Cal.4th 608 (*Dungo*) in his original briefing for the proposition that statements relied upon by experts are, in fact, admitted for their truth and that the California rule permitting experts to convey otherwise inadmissible hearsay for the purpose of explaining their opinions was no longer viable.  Like *Williams*, the reasoning and holding in *Dungo* demonstrates why much of *Sanchez* was foreseeable and why it would not have been futile to make the objection defendant asserts on appeal.  The *Dungo* court discussed *Williams* extensively and specifically noted that five justices of the high court rejected the notion that the Cellmark report was not introduced for the truth of the matter asserted therein.  (*Dungo*, at p. 635 &

---

[16]  The four-justice plurality concluded that the report was nontestimonial because the report was not made for the primary purpose of targeting a specific individual or to create evidence for use at trial.  (*Williams, supra*, 567 U.S. at p. 84.)  Justice Thomas, who concurred, agreed that the report was nontestimonial, but for the reason that the report lacked indicia of solemnity.  (*Id*. at p. 111 (conc. opn. of Thomas, J.).)

fn. 3.)  Six justices in *Dungo* agreed, signing opinions indicating that statements admitted to explain an expert's opinion are admitted for their truth.  (See *id.* at pp. 627 (conc. opn. of Werdegar, J.); *id.* at p. 635, fn. 3 (dis. opn. of Corrigan, J.).)  However, the *Dungo* court concluded the evidence upon which the expert relied—the autopsy report of another pathologist—did not violate the confrontation clause because the report was not testimonial.  (*Dungo*, at pp. 620-621.)  The *Dungo* court acknowledged that the United States Supreme Court had not agreed on a definition of "testimonial," but further noted "two critical components" had emerged.  (*Id.* at p. 619.)  "First, to be testimonial the statement must be made with some degree of formality or solemnity.  Second, the statement is testimonial only if its primary purpose pertains in some fashion to a criminal prosecution."  (*Ibid.*)  The *Dungo* court reasoned that the autopsy report was not so formal and solemn as to be considered testimonial for purposes of the Sixth Amendment's confrontation clause, and criminal prosecution was not the primary purpose for recording the facts in the report.  (*Dungo*, at pp. 620-621.)  Thus, the *Dungo* court settled on an approach to determine when a statement is testimonial, and six of our high court's members disagreed with the notion that hearsay statements admitted to explain an expert's opinion are not admitted for their truth.  *Dungo* was decided seven months before defendant's trial.

Defendant also cited *People v. Mercado* (2013) 216 Cal.App.4th 67 (*Mercado*) in his original briefing in support of his confrontation clause claim.  Like *Williams* and *Dungo*, *Mercado* shows why *Sanchez* was foreseeable and an objection in the trial court was not futile.  In *Mercado*, a pathologist based part of his expert opinion on a witness statement in a coroner's report.  (*Mercado*, at pp. 82-84.)  Following *Williams* and *Dungo*, the *Mercado* court concluded that the statements did not violate the confrontation clause because they failed both the formality and primary purpose tests and thus did not qualify as testimonial.  (*Mercado*, at p. 90.)  However, the *Mercado* court also noted that " '[A] five justice majority of the high court and at least six of the seven justices on the

California Supreme Court appear to agree that, for purposes of the confrontation clause, out-of-court statements admitted as basis evidence during expert testimony are admitted for their truth if treated as factual by the expert and, thus, implicate confrontation rights if the statements are testimonial.' " (*Mercado*, at p. 89, fn. 6.) *Mercado* was published two days before the in limine motions were argued in defendant's trial, and nine days before the gang expert's trial testimony.

*Williams*, *Dungo*, and *Mercado* all point to the inescapable conclusion that the confrontation clause analysis had changed since *Gardeley*, *Thomas*, and *Hill*, and that it was going to continue to change. Well before defendant's in limine motions were filed and argued, five justices of the United States Supreme Court and six justices of the California Supreme court agreed that hearsay statements upon which experts base their opinions are admitted for the truth. Additionally, our Supreme Court in *Dungo* looked to the formality in which the statements were made and the primary purpose of those statements to determine whether such hearsay is testimonial. (*Dungo, supra*, 55 Cal.4th at pp. 620-621.) The *Mercado* court did the same. (*Mercado*, *supra*, 216 Cal.App.4th at p. 90.)

Thus, by the time of defendant's in limine motion and well before the gang expert here testified, it was reasonably foreseeable that our state's high court would hold: (1) statements upon which a gang expert relies in forming his or her opinion are offered for the truth of the matter, a viewpoint that is directly contrary to the *Thomas* court's observation that allowing the jury to hear such statements did not violate the confrontation clause because such statements are "not elicited for the truth of their contents" (*Thomas*, *supra*, 130 Cal.App.4th at p. 1210); (2) the admission of such statements violates the confrontation clause if the statements are testimonial; and (3) whether a statement is testimonial turns on (a) the formality or solemnity of the circumstances in which it was made, and (b) whether the primary purpose for the statement "pertains in some fashion to a criminal prosecution." (*Dungo, supra*, 55

32

Cal.4th at p. 619; *Mercado, supra*, 216 Cal.App.4th at p. 90.)  These criteria for determining whether a statement is testimonial did not exist when *Thomas* was decided. Because the hearsay statements upon which the gang expert here relied in rendering an opinion about defendant's gang affiliation may very well have had the requisite formality and criminal prosecution may have been the primary purpose of those statements, we cannot agree a *Crawford*-based objection on the grounds that the evidence was testimonial hearsay and violated the confrontation clause would have been futile.  Trial counsel would not have borne an unreasonable burden by making the objection citing *Crawford*, *Williams*, *Dungo* and *Mercado* as appellate counsel did in the original briefing in this case before *Sanchez* was issued.  To the contrary, as the court in *Perez* observed, these cases "alerted competent and knowledgeable counsel to the need to object to [expert basis testimony] on hearsay and *Crawford* grounds.  [These cases] also meant that such objections would not have been futile." (*Perez, supra*, ___ Cal.App.5th ___ [2018 Cal.App. Lexis at *16].)

Had defendant made the objection in the trial court, the prosecution would have been on notice of the need to establish the non-hearsay, non-testimonial nature of the statements upon which the gang expert relied if it could, or perhaps determine whether the expert could base his opinion solely on matters that were not hearsay and not testimonial.  Indeed, faced with the objection defendant makes here on appeal along with citations to *Crawford*, *Williams*, *Dungo*, and *Mercado*, the prosecutor could have decided it prudent to forgo some or all testimony about the prior police contact events the expert related to the jury, or attempt to bring in witnesses who could competently testify to relevant parts of the more pertinent events.  As a result of the failure to make specific objections, the People and the trial court were deprived of the opportunity to address the issue.  As we have noted, " 'it is *unfair to the trial judge and to the adverse party* to take advantage of an error on appeal when it could easily have been corrected at the trial.' " (*Davis*, *supra*, 168 Cal.App.4th at p. 627.)

33

Defendant argues that he should be excused from failing to object. He asserts that any objection would have been futile because *Gardeley* and *Thomas* were binding on the trial court. He relies essentially on two cases, *Kitchens, supra*, 46 Cal.2d at pages 262-263, and a footnote in *People v. Sandoval* (2007) 41 Cal.4th 825 (*Sandoval*). Neither case helps defendant because neither case involves changes in the law that were foreseeable based on the state of the decisional law in existence at the time.

In *Kitchens*, the defendant contended on appeal that drug evidence was obtained during an illegal search, but his case was tried when illegally obtained evidence was admissible, and the search was not challenged in the trial court. (*Kitchens, supra*, 46 Cal.2d at p. 262.) Our high court held that, under the circumstances, the traditional rule prohibiting review on appeal of the admissibility of evidence where no objection was made in the trial court should not apply to appeals in cases tried before the California Supreme Court's decision excluding illegally obtained evidence. (*Ibid.*) The court reasoned: "A contrary holding would place an unreasonable burden on defendants to anticipate *unforeseen changes* in the law and encourage fruitless objections in other situations where defendants might hope that an established rule of evidence would be changed on appeal." (*Id.* at p. 263.) The court observed that, in view of its prior decisions, an objection would have been futile and the law does not require idle acts. (*Ibid.*)

In *Sandoval*, the defendant contended on appeal that the upper term sentence imposed by the trial court violated her constitutional right to a jury trial as explained in *Cunningham v. California* (2007) 549 U.S. 270 [166 L.Ed.2d 856]. (*Sandoval, supra*, 41 Cal.4th at p. 831.) In *Cunningham*, the high court held that California's determinate sentencing law (DSL) violated the defendant's right to a jury trial by assigning to the trial judge, rather than to the jury, the authority to find facts supporting imposition of upper term sentences. (*Cunningham*, at pp. 274-275.) Prior to *Cunningham*, in *People v. Black* (2005) 35 Cal.4th 1238, 1244 (*Black I*), our high court had held that the DSL did not

violate the right to jury trial, rejecting application of *Blakely v. Washington* (2004) 542 U.S. 296 [159 L.Ed.2d 403] to the DSL.  The People argued in *Sandoval* that the defendant forfeited her jury trial right claim by failing to object to the sentencing proceedings.  (*Sandoval*, at p. 837, fn. 4.)  The *Sandoval* court noted in a footnote that a request for a jury trial on the aggravating circumstances would have been futile because *Black I* was binding on the lower courts until overruled by the high court.  (*Sandoval*, at p. 837, fn. 4.)

But the situation presented here is different from *Sandoval*.  First, unlike in *Black I* where the California Supreme Court previously had squarely addressed the constitutional objection at issue, our high court had not yet addressed the constitutionality of admitting gang expert basis testimony when faced with a confrontation clause objection.  As we noted, *Gardeley* did not address the constitutional implications of expert opinion basis testimony.  Second, although *Thomas* and other Court of Appeal cases had held that admission of hearsay statements upon which experts rely in forming their opinions did not violate the confrontation clause on the theory that such statements are not admitted for the truth, more recently, our high court had specifically addressed expert opinion basis testimony in *Dungo* and six justices agreed that such testimony was indeed admitted for the truth of the matter.

In referencing the futility rule in its footnote, the *Sandoval* court cited *People v. Welch* (1993) 5 Cal.4th 228 (*Welch*).  (*Sandoval, supra*, 41 Cal.4th at p. 837, fn. 4.)  The defendant in *Welch* contested on appeal the reasonableness of probation conditions. (*Welch*, at p. 230.)  An established line of Court of Appeal decisions had held a defendant was not required to object in the trial court to preserve such a contention on appeal.  (*Id*. at pp. 231-233.)  The *Welch* court abolished this rule, holding that an objection in the trial court to probation conditions is required, and disapproved of the contrary Court of Appeal decisions.  (*Id*. at pp. 234-235, 237.)  But the *Welch* court declined to apply the rule to the defendant.  (*Id*. at p. 237.)  The court noted that "[r]eviewing courts have

traditionally excused parties for failing to raise an issue at trial where an objection would have been futile or *wholly unsupported by substantive law* then in existence." (*Ibid.*, italics added.) The court reasoned that, by the same token, "[i]t would be unfair to effectively bar any review of defendant's claims where the rule requiring their preservation in the trial court was adopted in the context of her own appeal." (*Id.* at p. 238.)

*Kitchens*, *Sandoval*, and *Welch* have one thing in common that made application of the futility rule appropriate in those cases—the law regarding the specific objection at issue was settled prior to the change in the law, and the change in the law was unforeseeable based on the existing decisional law. However, based on *Rangel*, *Edwards*, *De Santiago*, and *Perez*, we must look *first* to whether the change in the law was foreseeable based on the state of the law at the time an objection could have been made before we can excuse the failure to object on grounds of futility. If futility as that term is used by defendant would excuse the failure to object without regard to foreseeable changes in the law, our high court's decisions in *Rangel* and the earlier cases would have simply held that the objections in those cases would have been futile without mentioning foreseeability or excusing the failure to object when the " ' "governing law at the time . . . afforded *scant grounds* for objection." ' " (*Rangel, supra*, 62 Cal.4th at p. 1215, italics added, quoting *Edwards, supra*, 57 Cal.4th at p. 705.) Instead, as we have noted, our high court has said the relevant question is whether requiring defense counsel to raise an objection " ' " ' "would place an unreasonable burden on defendants to anticipate *unforeseen* changes in the law." ' " ' " (*Rangel*, at p. 1217, italics added, quoting *Edwards*, at p. 705.)

Indeed, when there is a reasonably foreseeable change in the law, it can hardly be said that an objection based on decisional law from which the change will result is futile or that such an objection would be an idle act. Even if the trial court is bound to follow previous precedent, it may exercise its discretion differently when considering the

implications of more recent developments in the decisional law. Here, this may have resulted in the trial court giving greater scrutiny to the number and nature of defendant's previous contacts related to the jury by the prosecution's gang expert.[17] Moreover, making a specific objection to a specific body of evidence should result in the creation of a better record. And with a better record, a defendant's chances of prevailing on appeal may be enhanced on the issue of evidentiary error and on the determination of whether such error is harmless. (See *People v. Ochoa* (2017) 7 Cal.App.5th 575, 584 (*Ochoa*) [defendant's confrontation clause argument rejected on appeal because defendant's failure to object to the expert's testimony on confrontation clause grounds resulted in an "undeveloped record" about the testimonial nature of the statements upon which the prosecutor's gang expert relied].) Furthermore, as we note *post*, when an evidentiary error is forfeited and an ineffective assistance of counsel claim has been made, we apply the less burdensome *Strickland* standard for prejudice instead of the stricter *Chapman* harmless error standard applicable to evidentiary error based on constitutional claims.

The dissent rejects our analysis, reasoning that foreseeability of changes in the law is not the test for forfeiture and asserting that the *Rangel* court never mentions such a rule. (Dis. opn., *post*, at p. 6.) We respectfully disagree. As we have noted, the *Rangel*

---

**17** While the *Gardeley* court allowed hearsay as basis testimony, it cautioned that admission of otherwise inadmissible hearsay is not automatic. "A trial court . . . 'has considerable discretion to control the form in which the expert is questioned to prevent the jury from learning of incompetent hearsay.' [Citation.] *A trial court also has discretion 'to weigh the probative value of inadmissible evidence relied upon by an expert witness . . . against the risk that the jury might improperly consider it as independent proof of the facts recited therein.'* [Citation.] This is because a witness's on-the-record recitation of sources relied on for an expert opinion does not transform inadmissible matter into 'independent proof' of any fact." (*Gardeley, supra*, 14 Cal.4th at p. 619, italics added.) In addition to not specifically objecting on the grounds defendant now asserts on appeal, trial counsel did not ask the trial court to engage the weighing process suggested in *Gardeley*.

court referred to unforeseeability as a "standard," stating "the relevant question is whether requiring defense counsel to raise an objection ' " ' "would place an unreasonable burden on defendants to anticipate *unforeseen changes* in the law," ' " ' " and then concluding, "[b]ecause *that standard* is satisfied here, we conclude that defendant has not forfeited his *Crawford* claim." (*Rangel, supra*, 62 Cal.4th at p. 1217, italics added.)

The dissent relies upon *People v. Gallardo* (2017) 4 Cal.5th 120 (*Gallardo*) in an effort to demonstrate that foreseeability of changes in the law is not the relevant test for forfeiture. But *Gallardo* suggests otherwise. In *Gallardo*, our high court disapproved of the rule in *People v. McGee* (2006) 38 Cal.4th 682 (*McGee*), allowing trial courts to review a defendant's record of conviction to determine whether a prior conviction qualifies as a serious felony offense for purposes of recidivist enhancements. (*Gallardo*, at p. 124.) The *Gallardo* court reasoned that *Descamps v. United States* (2013) 570 U.S. 254 [186 L.Ed.2d 438] (*Descamps*), clarified that when added punishment is imposed based on findings of fact underlying the prior conviction, the Sixth Amendment requires that a jury, not the court, determine whether the prior conviction qualifies. (*Gallardo*, at p. 124.) The People had argued that defendant's constitutional claim was forfeited, noting that *Descamps* was decided prior to the defendant's sentencing. The *Gallardo* court noted the foreseeability rule in prior California Supreme Court cases we discussed *ante*. The *Gallardo* court wrote: "We have previously ' "excused . . . failure[s] to object [on a particular ground] where to require defense counsel to raise [that] objection 'would place an unreasonable burden on defendants to anticipate *unforeseen* changes in the law and encourage fruitless objections in other situations where defendants might hope that an established rule ... would be changed on appeal.' " ' " (*Gallardo*, at p. 127, italics added.) With that standard in mind, and noting that the *Descamps* court had discussed Sixth Amendment principles "only en route to" interpreting the federal statute at issue, the *Gallardo* court stated that it was "at least questionable whether defendant should be

made to bear the burden of anticipating potential changes in the law based on the reasoning of a United States Supreme Court opinion *addressed to the proper interpretation of a federal statute not at issue here*." (*Gallardo*, at p. 128, italics added.) Thus, the *Gallardo* court did not conclude foreseeability is irrelevant, as the dissent seems to imply. Rather, it reaffirmed that foreseeability is the test. The court merely suggested, without deciding, that the rejection of *McGee* might not have been foreseeable based on the opinion in *Descamps* and the issue addressed therein.[18]

Here, unlike in *Gallardo*, the change in the law was foreseeable based not only the reasoning of five of the nine justices of the United States Supreme Court, but also on opinions signed off on by six of the seven justices on our high court. Added as components of the foreseeability equation here are the observations of the court in *Mercado* and the court's earlier prediction in *Hill* that "[t]here is some reason to believe that the California Supreme Court may be prepared to recognize the logical error in *Gardeley* and *Thomas*." (*Hill, supra*, 191 Cal.App.4th at p. 1131, fn. 18.)

The dissent actually appears to concede that the change in the law here was foreseeable, acknowledging that "*Williams* and *Dungo* suggested that *if* called upon to decide the issue, a majority of justices on the United States Supreme Court and our Supreme Court, as *then constituted*, would likely find that the extrajudicial basis of an expert's opinion is necessarily considered for its truth for confrontation purposes." (Dis. opn., *post*, at p. 7.) However, the dissent contends that because there was no indication that either court would reach the issue in the foreseeable future at the time of defendant's trial, somehow the change in the law was therefore unforeseeable for forfeiture purposes.

---

[18] The court concluded it need not resolve the question of the defendant's forfeiture because the People had forfeited the forfeiture argument by failing to raise it in the Court of Appeal. (*Gallardo*, *supra*, 4 Cal.5th at p. 128.) Thus, the *Gallardo* court never expressly stated whether *Descamps* made rejection of *McGee* foreseeable or not.

(Dis. opn., *post*, p. 7.) We disagree, but also note that the timing of when the issue would be reached seems beside the point. What is relevant is the foreseeability of how the court would decide the issue whenever it was presented. As we see it, if *Sanchez* was never decided, the instant case could have been the case upon which our high court reached the issue.

Also, while it could not be foreseen with precision that all six justices in *Dungo* would still be sitting when the issue percolated up to our high court, the objection should have been made nevertheless. Given the underlying reasoning of the *Dungo* justices, it was reasonably foreseeable that whoever was on our high court would adopt the more modern thinking of the justices in *Williams*. And as Justice Kagan pointed out, the *Williams* justices were not alone in rejecting the theory that hearsay basis evidence is not admitted for the truth. The "principal modern treatise on evidence," Justice Kagan noted, had called "the idea that . . . 'basis evidence' comes in not for its truth, but only to help the factfinder evaluate an expert's opinion 'very weak,' 'factually implausible,' 'nonsense,' and 'sheer fiction.' " (*Williams, supra*, 567 U.S. at pp. 126-127 (dis. opn. of Kagan, J.), citing D. Kaye, D. Bernstein, & J. Mnookin, The New Wigmore: Expert Evidence (2d ed. 2011) § 4.10.1, pp. 196-197; *id.* (Supp. 2012) § 4.11.6, p. 24.)

The dissent states that our invocation of the forfeiture rule is premised on the requirement that a defendant create a record in support of an objection for use on appeal and suggests that the record here would have been the same if defendant had objected. (Dis. opn., *post*, at pp. 1, 5.) Again, we respectfully disagree. It is true that a defendant's failure to object can result in an undeveloped record. We also note again that one court has already rejected a defendant's confrontation clause objection because he failed to make the objection in the trial court, resulting in an undeveloped record as to the testimonial nature (solemnity and primary purpose) of the hearsay statements. (*Ochoa, supra*, 7 Cal.App.5th at p. 584 [noting that "[h]ad defendant lodged contemporaneous objections during trial, the People, as the proponent of the evidence, would have had the

40

burden to show the challenged testimony did not relate testimonial hearsay"].) Nevertheless, underlying our decision are the other purposes of the forfeiture rule and Evidence Code section 353: giving the trial court an opportunity to make an informed decision to avoid prejudice (*Davis, supra*, 168 Cal.App.4th at p. 627), and giving the proponent of the evidence the opportunity to cure the defect or take other steps designed to minimize the prospect of reversal. (*Pearson, supra,* 56 Cal.4th at p. 438; *Morris, supra*, 53 Cal.3d at pp. 187-188.)

We also disagree with the dissent's conclusion that the record would have been the same if defendant objected. (Dis. opn., *post*, at pp. 1, 5.) In our view, the record is enhanced by timely, specific objections to each piece of objectionable testimony, highlighting trial counsel's position that the evidence is inadmissible testimonial hearsay, even if the prosecution does not provide rebuttal. The dissent is also critical of our observation that the trial court might have exercised its discretion differently had specific objections been made to specific evidence, and *Williams*, *Dungo*, and *Mercado* been cited. (Dis. opn. *post*, at p. 5.) While the dissent dismisses our observation as speculation, we see this as the role of the trial court in the exercise of its discretion. As our high court has noted in a case cited by the dissent, the requirement to make a specific and timely objection "allows the trial judge to consider excluding the evidence *or limiting its admission* to avoid possible prejudice." (*Morris*, *supra*, 53 Cal.3d at pp. 187-188, italics added; see also fn. 17, *ante*.)

Defendant and the dissent note that some courts have rejected the forfeiture argument made here on the grounds that any objection would have been futile. They cite a footnote in *People v. Meraz* (2016) 6 Cal.App.5th 1162, review granted March 22, 2017, S239442 (*Meraz*), where that court wrote: "Any objection would likely have been futile because the trial court was bound to follow pre-*Sanchez* decisions holding expert 'basis' evidence does not violate the confrontation clause." (*Meraz*, at p. 1170, fn. 7,

41

review granted.) However, there is no indication the *Meraz* court considered our Supreme Court's opinions concerning foreseeability.

Defendant and the dissent also rely upon *People v. Jeffery G.* (2017) 13 Cal.App.5th 501, where the court rejected the People's forfeiture contention related to a *Crawford* confrontation clause claim concerning mental health experts who testified during a hearing on a petition for transfer from a state hospital to a conditional release program. (*Jeffery G.*, at pp. 503-504, 508.) *Sanchez* was issued a short time after the transfer hearing. (*Jeffery G.*, at p. 504.) In response to the People's argument that trial counsel should have anticipated the change *Sanchez* brought based on the "Supreme Court's docket" and "developments in the law . . . from other jurisdictions," the *Jeffrey G.* court stated, "[w]e decline to require such prescience." (*Jeffery G.*, at p. 508, fn. omitted.) We respectfully disagree. First, the *Jeffery G.* court made no reference to *Dungo* or the fact that six California Supreme Court justices had rejected the not-for-the-truth theory. Nor did the *Jeffery G.* court note the court's observations in *Hill* and *Mercado*. *Rangel* was not discussed either, so the *Jeffery G.* court never considered the "the relevant question" of whether requiring defense counsel to raise an objection would have placed an unreasonable burden on defendants to anticipate unforeseen changes in the law. (*Rangel, supra*, 62 Cal.4th at 1217.)

In our view, *Rangel* and the other cases stating that failure to object is excused where requiring an objection would place an "unreasonable burden on defendants to anticipate unforeseen changes in the law" necessarily contemplates the inverse, requiring defendants to make timely and specific objections where the change in law *is* reasonably foreseeable. Such a requirement is not onerous and serves the purposes of requiring specific and timely objections we have discussed. When one considers *Dungo*, and *Mercado*, and the opinions in *Williams* and the authorities cited therein, the change *Sanchez* brought was foreseeable and making the objection did not present an unreasonable burden.

42

We conclude the failure to object is excused when the objection " ' "would place an unreasonable burden on defendants to anticipate *unforeseen changes* in the law." ' " (*Rangel, supra*, 62 Cal.4th at p. 1217, italics added; *Edwards, supra*, 57 Cal.4th at p. 705; *Perez, supra*, ___ Cal.App.5th ___ [2018 Cal.App. Lexis at *6].)  In determining whether the significance of a change in the decisional law excuses counsel's failure to object at trial, we consider the state of the decisional law as it would have appeared to competent and knowledgeable counsel at the time of the trial.  (*Perez*, at *6-7.)  To be clear, we do not mean to suggest that counsel should make frivolous objections contrary to settled law in the unjustified hope the argument might stick on appeal.  Rather, competent and knowledgeable counsel need only make timely and specific objections when there are reasonably foreseeable changes in the law on the horizon based on the existing decisional law at the time, such as here.

Defendant's contentions premised on the specific confrontation clause claims he makes on appeal have been forfeited.

### D.  Ineffective Assistance of Counsel Claim Related to the Failure to Object on Specific Confrontation Clause Grounds

Defendant contends that counsel was ineffective for failing to adequately object on confrontation clause grounds to the prior crimes and police contact evidence about which the prosecution's gang expert testified as part of the basis of his opinion concerning defendant's Meadowview Bloods gang membership.  Defendant also argues on appeal that the admission of the expert's testimony about the predicate felonies offered to prove that the Meadowview Bloods are a criminal street gang and defendant's phone conversations from the jail violated his confrontation clause rights, but does not specifically argue that trial counsel's failure to object to those parts of the expert's testimony amount to ineffective assistance of counsel.  We shall, nevertheless, address those contentions to forestall future claims of ineffective assistance of trial and appellate counsel.

## 1. Ineffective Assistance of Counsel Principles

To prevail on a claim of ineffective assistance of counsel, a defendant must show (1) counsel's performance fell below an objective standard of reasonableness under prevailing professional norms, and (2) the deficient performance prejudiced defendant. (*Strickland, supra*, 466 U.S. at pp. 688, 691-692; *People v. Ledesma* (1987) 43 Cal.3d 171, 216-217 (*Ledesma*); *People v. Rogers* (2016) 245 Cal.App.4th 1353, 1367 (*Rogers*).) " 'Surmounting *Strickland*'s high bar is never an easy task.' " (*Harrington v. Richter* (2011) 562 U.S. 86, 105 [178 L.Ed.2d 624, 642] (*Richter*), quoting *Padilla v. Kentucky* (2010) 559 U.S. 356, 371 [176 L.Ed.2d 284, 297].) The reason why *Strickland*'s bar is high is because "[a]n ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the *Strickland* standard must be applied with scrupulous care, lest 'intrusive post-trial inquiry' threaten the integrity of the very adversary process the right to counsel is meant to serve. [Citation.] . . . It is 'all too tempting' to 'second-guess counsel's assistance after conviction or adverse sentence.' " (*Richter*, at p. 105.)

To establish prejudice, "[i]t is not enough 'to show that the errors had some conceivable effect on the outcome of the proceeding.' " (*Richter, supra*, 562 U.S. at p. 104.) To show prejudice, defendant must show a reasonable probability that he would have received a more favorable result had counsel's performance not been deficient. (*Strickland, supra*, 466 U.S. at pp. 693-694; *Ledesma, supra*, 43 Cal.3d at pp. 217-218.) "A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland*, at p. 694; accord, *Ledesma*, at p. 218.) "*The likelihood of a different result must be substantial*, not just conceivable." (*Richter*, at p. 112, italics added; *Rogers, supra*, 245 Cal.App.4th at p. 1367; *People v. Jacobs* (2013) 220 Cal.App.4th 67, 75; *In re M.P.* (2013) 217 Cal.App.4th 441, 457, fn. 10.) *Strickland*'s prejudice standard applies even when defense counsel's alleged error involves the failure to preserve the defendant's federal constitutional rights. (*People v. Mesa* (2006) 144

44

Cal.App.4th 1000, 1008-1009 (*Mesa*) [noting that had defendant not forfeited his constitutional claim, the appellate court would have reviewed whether any such error was harmless under the standard set forth in *Chapman* but instead must review the matter under the standard in *Strickland* for ineffective assistance of counsel].)

### 2. The Gang Expert's Testimony

We now turn to the expert's testimony to consider what portions of this testimony should not have been relayed to the jury, because the failure to object to that evidence bears on the first prong of the ineffective assistance of counsel test—whether trial counsel's performance was deficient. We first look at his testimony regarding the prior crimes and contacts defendant had with law enforcement used as part of the basis for the expert's opinion that defendant was a member of the Meadowview Bloods.

The prosecution's gang expert testified about the following events, which served as part of the basis for his opinion concerning defendant's gang membership: the December 1992 incident where defendant was arrested for a felony warrant and admitted possession of rock cocaine found at the location; the June 1993 incident when he was in a car with others where a firearm was found; an incident in October 1993 when, while running from the police, he displayed a firearm and was shot by the officer; the January 1995 police contact involving a domestic violence call; his commission of armed robbery in September 1995; and his commission of unspecified gang crimes in April 2002 with a Del Paso Heights Blood. These events each had gang overtones related to the people with whom defendant was associated at the time, the nature of the crime being consistent with the primary activities of the Meadowview Bloods, defendant's identification as a Meadowview Blood at the time, the color of the clothes defendant was wearing, or the

45

discovery of gang writing and defendant's tattoo. The People concede that this testimony was hearsay, testimonial, and case-specific under *Sanchez*.[19]

In addition to the hearsay upon which the expert relied in opining about defendant's gang membership, defendant also now objects on *Crawford*/*Sanchez* grounds to the expert's testimony concerning the predicate offense testimony offered to establish that the Meadowview Bloods is a criminal street gang. To establish that an organization is a criminal street gang, the prosecution must prove, among other things, that the group has engaged in a pattern of criminal conduct, and this requires a showing that the group has engaged in the requisite number of enumerated predicate offenses. (§ 186.22, subd. (e).) On this issue, we note that case-specific facts must be distinguished from matters that are within a gang expert's general knowledge based on training, education, and experience and about which the expert may testify notwithstanding the fact that such matters are, technically, hearsay. (*Sanchez, supra*, 63 Cal.4th at pp. 676, 685.)

*Sanchez* did "not affect the traditional latitude granted to experts to describe background information and knowledge in the area of his [or her] expertise." (*Sanchez, supra*, 63 Cal.4th at p. 685.) As the *Sanchez* court observed, "an expert's background knowledge and experience is what distinguishes him [or her] from a lay witness, and, as

---

[19] In beginning the direct examination concerning defendant's prior crimes and police contacts, the prosecutor asked the expert whether he "had an opportunity to review [defendant]'s background and a number of the contacts that he's had." The expert said he had. The prosecutor did not ask whether the expert reviewed police reports and/or similar materials, and the expert did not volunteer as much. However, the expert did not begin working with the police department until 2000 and was not assigned to the problem-oriented policing team addressing gang activity until three years later. Consequently, the expert's knowledge of virtually all of these matters could not have been based on firsthand knowledge or anything other than police reports and the like. Also, on this record, there is no indication that any of the statements qualified under any exception to the hearsay rule. Furthermore, these matters all related to defendant and were thus case-specific facts since they related to a "participant[] alleged to have been involved in the case being tried." (*Sanchez, supra*, 63 Cal.4th at p. 676.)

46

noted, testimony relating such background information has never been subject to exclusion as hearsay, even though offered for its truth." (*Ibid*.) A gang expert may relate such background information regarding his or her knowledge and expertise, as well as premises generally accepted within his or her field, even though such testimony is offered for its truth. (*Ibid*.) Thus, a gang expert may testify concerning general background information relating to gang culture and the "*history* and general operations" of a specific gang. (*Id*. at p. 698, italics added.) Applying this rule to the facts in *Sanchez*, our high court noted that the gang expert's testimony about "general gang behavior or descriptions of the . . . gang's *conduct* and its territory" was "background testimony." (*Id*. at p. 698, italics added.) Such testimony is based on well-recognized sources in the expert's area of expertise. (*Ibid*.) As the court recognized in *Meraz*, *Sanchez*'s reference to general background testimony "plainly includes the general background testimony [the gang expert gives] about [the gang's] operations, *primary activities*, and *pattern of criminal activities*, which was unrelated to defendants or the current" crimes. (*Meraz, supra*, 6 Cal.App.5th at p. 1175, review granted, italics added; accord, *People v. Vega-Robles* (2017) 9 Cal.App.5th 382, 411 (*Vega-Robles*).) Thus, a gang expert is properly "permitted to testify to non-case-specific general background information about [the gang], its rivalry with [another gang], its *primary activities*, and *its pattern of criminal activity*, even if it was based on hearsay sources." (*Meraz*, at p. 1175, italics added.)

Defendant, asserted in his original briefing that admission of the gang expert's testimony relaying the facts of the predicate offenses required to prove the gang enhancement violated his confrontation clause rights. The expert's testimony on the predicate offenses here included the gang membership of the people involved in those prior offenses. In his supplemental reply brief, defendant asserts that the facts necessary to prove a pattern of criminal gang activity pursuant to section 186.22 are case-specific facts within the meaning of *Sanchez* because they are facts used to prove the gang enhancement which is charged in the particular case. Citing *Sanchez, supra*, 63 Cal.4th

at page 676, defendant claims "[w]hen, as here, the prosecution has *charged* a gang enhancement, testimonial hearsay concerning the incidents and participants offered to prove the *charged* gang enhancement 'relat[e] to the particular events and participants alleged to have been involved in the case being tried.' " We disagree.

*Sanchez* did not address facts underlying predicate offenses; rather, the court's focus was on facts used by the gang expert to establish the defendant's gang membership. (*Sanchez, supra*, 63 Cal.4th at p. 670 ["We hold that the case-specific statements related by the prosecution expert *concerning defendant's gang membership* constituted inadmissible hearsay under California law" (italics added)].) As we have noted, our high court defines case-specific facts to be facts "relating to the particular events and participants alleged to have been involved in the case being tried." (*Id*. at p. 676.) The predicate offenses used in this case do not fall within this definition; they did not involve the particular events or participants involved in the case being tried.[20] Rather, they are historical facts related to the gang's conduct and activities. These facts pertain to the gang as an organization and are not specific to the case being tried. They establish that the "organization, association, or group" has engaged in a "pattern of criminal gang activity" and is thus a criminal street gang (§ 186.22, subd. (f)) *irrespective of the events and participants in the case being tried*. A predicate offense and the underlying events are essentially a chapter in the gang's biography. Thus, they are relevant to a gang expert's opinion about whether a group has engaged in a pattern of criminal gang activity and is a criminal street gang under the statutory definition. Moreover, predicate offenses are specific examples of the gang's primary activities and thus such evidence is relevant to the gang expert's opinion about the primary activities of the gang. Consequently, the facts related to the predicate offenses here are more appropriately characterized as

---

[20] We do not address in this case a situation where a predicate offense was committed by a defendant charged in the case being tried.

background information relevant and admissible to the past "conduct" of the Meadowview Bloods and the gang's "history and general operations." (*Sanchez*, at p. 698.) We agree with the courts in *Vega-Robles* and *Meraz* that a gang's " 'operations, *primary activities, and pattern of criminal activities*' " are background facts, not case-specific facts, under *Sanchez* and a gang expert is permitted to testify about such things, even if that testimony is based on hearsay sources. (*Vega-Robles, supra*, 9 Cal.App.5th at p. 411, italics added, quoting *Meraz, supra*, 6 Cal.App.5th at p. 1175.) The expert's testimony about the predicate offenses here did not violate the rules in *Sanchez*.[21]

---

[21] The court in *Ochoa* appears to have treated all predicate offense information as case-specific hearsay. (*Ochoa*, *supra*, 7 Cal.App.5th at pp. 583, 588-589.) In *Ochoa*, the expert testified that people involved in the predicate offenses had admitted their gang membership. The *Ochoa* court concluded that these admissions were case-specific facts. The totality of the court's analysis on this is as follows: "It seems clear the hearsay at issue in the present case—out-of-court statements by individuals admitting being members of the [gang]—are case-specific hearsay rather than general background information about the [gang]. *Sanchez* gave the following as one in a series of examples of the distinction: 'That an associate of the defendant had a diamond tattooed on his arm would be a case-specific fact that could be established by a witness who saw the tattoo, or by an authenticated photograph. That the diamond is a symbol adopted by a given street gang would be background information about which a gang expert could testify. The expert could also be allowed to give an opinion that the presence of a diamond tattoo shows the person belongs to the gang.' [Citation.] *By analogy, that someone admitted being a gang member is also a case-specific fact.*" (*Ochoa*, at pp. 588-589, italics added.) But in the *Sanchez* court's example, it is not clear whether the court was referencing a hypothetical associate who was a participant in the events "involved in the case being tried" (*Sanchez, supra*, 63 Cal.4th at p. 676) or a fellow gang member not involved in the case, but who had otherwise committed an unrelated predicate offense. We think the *Sanchez* court meant the former, not the latter, as an example of a case-specific fact. We arrive at this conclusion because: (1) the issue before the *Sanchez* court did not relate to facts underlying predicate offenses, but rather related to facts establishing the defendant's gang membership (gang experts often look to past and current occasions when a defendant was in the company of gang members as indicia of the defendant's gang membership), and (2) the court's explanation of background facts includes facts related to the conduct, history and operations of the gang. Consequently, we do not agree with the *Ochoa* court's conclusion that the *Sanchez* example has application to predicate offenses. Accordingly, to the extent that *Ochoa* can be read as

49

### 3. Deficient Performance

Having outlined the applicable confrontation clause principles and the body of evidence to which defendant now objects on *Crawford*/*Sanchez* grounds, we now address whether defendant has met his burden of showing trial counsel's performance was deficient, the first prong of the *Strickland* test for ineffective assistance of counsel. (*Strickland, supra*, 466 U.S. at pp. 688, 691-692; *Ledesma, supra*, 43 Cal.3d at p. 216.) The deficient performance prong of the ineffective assistance of counsel test " 'is necessarily linked to the practice and expectations of the legal community:  "The proper measure of attorney performance remains simply reasonableness under prevailing professional norms." '  [Citations.] 'In any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances.' " (*Hinton v. Alabama* (2014) ___ U.S. ___ [188 L.Ed.2d 1, 8-9].)

Prevailing professional standards dictate that competent counsel are required to know the state of the law applicable to issues in their cases.  (See *Harris v. Thompson* (7th Cir. 2012) 698 F.3d 609, 644 [a " 'reasonably competent attorney patently is required to know the state of the applicable law' "].)  And as this court long ago observed, counsel is expected to " 'discover those additional rules of law which, although not commonly known, may readily be found by standard research techniques.' " (*People v. McCary* (1985) 166 Cal.App.3d 1, 8.)  While trial counsel cannot be faulted "when the pertinent law later changed so unforeseeably that it is unreasonable to expect trial counsel to have anticipated the change" (*People v. Turner* (1990) 50 Cal.3d 668, 703), well before defendant's trial, much of *Sanchez* was reasonably foreseeable.

We conclude that counsel's performance in failing to object to the introduction of defendant's prior crimes and contacts with law enforcement on the specific confrontation

---

holding that all predicate offense testimony is case-specific hearsay, we respectfully disagree.

50

clause grounds defendant asserts on appeal fell below an objective standard of reasonableness under prevailing professional norms. (*Strickland, supra*, 466 U.S. at p. 688; *Ledesma, supra*, 43 Cal.3d at p. 216.) Trial counsel did not cite *Crawford*, *Williams*, *Dungo*, or *Mercado* in writing prior to the in limine hearing or orally during the in limine hearing. Indeed, counsel never even mentioned *Crawford*, one of the most important confrontation clause cases ever decided by the United States Supreme Court. At no time did counsel argue that the gang expert's basis testimony was testimonial hearsay and therefore violated the confrontation clause. As we have said, given *Crawford*, *Williams* and *Dungo*, it was reasonably foreseeable that our high court would reject *Gardeley* and the confrontation clause reasoning in cases like *Thomas*. The rejection of the not-for-the-truth theory by justices in *Williams* and *Dungo* and the *Dungo* court's adoption of the primary purpose and formality/solemnity criteria for determining whether statements are testimonial signaled that the reasoning in *Thomas* immunizing such expert testimony from confrontation clause challenges was no longer viable. All of this was presaged by the court in *Hill* long before defendant's trial and reinforced by the opinion in *Mercado*, two days before the hearing on defendant's in limine motion and nine days before the expert here testified.

The prior crime and police contact testimony relevant specifically to defendant here, which our high court now characterizes as case-specific testimonial hearsay, supported the prosecution's position that defendant was an active member of the Meadowview Bloods, that, when he shot Sisoukchaleun, he did so for the benefit of that particular criminal street gang, and that he had the specific intent to assist, further, or promote criminal conduct by gang members within the meaning of section 186.22. In our view, given the evolution of the decisional law prior to defendant's trial and the foreseeable analytical path our high court would take on gang expert opinion basis testimony when presented with that issue post-*Dungo*, there was no satisfactory explanation for trial counsel's failure to object to the introduction of this evidence.

51

Indeed, even if the trial court had overruled the objection, in the environment where the analytical rules concerning confrontation clause violations were so obviously and quickly evolving, the objection would have served the useful purpose of preserving the contention for appeal, as the defendant in *Sanchez* apparently did, thus requiring application of the *Chapman* harmless beyond a reasonable doubt standard,[22] a much more difficult standard for the People to overcome than the prejudice analysis required under the *Strickland* reasonable probability test. (*Mesa, supra*, 144 Cal.App.4th at pp. 1008-1009.) Thus, under prevailing professional norms it was unreasonable for trial counsel to fail to make the confrontation clause objection defendant now makes on appeal concerning his prior law enforcement contacts and to fail to cite the then-existing case law supporting the changes in confrontation clause analysis.

However, the expert's testimony concerning the underlying facts of the predicate offenses did not violate defendant's confrontation clause rights. As we have said, this evidence was general background information about the gang's history and prior conduct. (See *Sanchez, supra*, 63 Cal.4th at p. 685.) It is information upon which experts in the field can rely in opining whether the organization in question is a criminal street gang within the meaning of section 186.22. Moreover, such information is not considered testimonial for confrontation clause purposes. (See *People v. Valadez* (2013) 220 Cal.App.4th 16, 32-36 [general background information obtained from gang members, other officers, and written materials on the history of the gang used by experts in the field is not testimonial].) Forgoing an objection to this evidence was not deficient performance.

---

[22] "A violation of the Sixth Amendment's confrontation right requires reversal of the judgment against a criminal defendant unless the prosecution can show beyond a reasonable doubt that the error did not contribute to the verdict obtained." (*People v. Pettie* (2017) 16 Cal.App.5th 23, 64.)

Defendant also contended in his original briefing that the gang expert's testimony about defendant's phone conversations from the jail violated his confrontation clause rights. But these statements were admissions (see Evid. Code, § 1220), and, as we have noted, the recordings were introduced into evidence, so there was no multi-level hearsay problem. (See *Sanchez*, *supra*, 63 Cal.4th at pp. 674-675.) Moreover, the statements made by the other party in the phone conversations were not admitted for the truth of the matter asserted therein, but rather to establish that certain words were used by those persons during defendant's conversation with them and to provide context to defendant's statements. (See *People v. Maciel* (2013) 57 Cal.4th 482, 524 [officer's statements were not inadmissible hearsay, but instead served the nonhearsay purpose of giving context to defendant's responses]; *People v. Riccardi* (2012) 54 Cal.4th 758, 801-802, fn. 21 (*Riccardi*), overruled on other grounds in *Rangel, supra*, 62 Cal.4th at p. 1216 [same].) Counsel's performance related to the gang expert's testimony about the phone conversations was not constitutionally deficient.

### 4. Prejudice

We turn to the question of whether what we have concluded to be deficient performance by trial counsel prejudiced defendant. (*Strickland, supra*, 466 U.S. at pp. 691-692.) To demonstrate prejudice, defendant must show a reasonable probability that he would have received a more favorable result had counsel's performance not been deficient. (*Id*. at pp. 693-694; *Ledesma, supra*, 43 Cal.3d at pp. 217-218.) Our review requires that we address prejudice as to each count and enhancement.

#### a. Ineffective Assistance Prejudice—First Degree Murder (§§ 187, 189)

Given the admissible evidence heard by the jury, we conclude that defendant has not suffered *Strickland* prejudice. There is no reasonable probability defendant would have received a more favorable result on the murder charge had the gang expert been precluded from providing testimonial hearsay basis testimony about his prior contacts with the police.

53

At trial, defendant did not dispute that he shot Sisoukchaleun twice, once in the face and once in the side, and that Sisoukchaleun died as a result. Defendant's theory at trial was that he had acted in self-defense or imperfect self-defense. But the evidence showed defendant did not act in either complete self-defense or imperfect self-defense, and there was substantial evidence of planning, motive, and manner of killing. Courts look to evidence of planning, motive, and manner of killing as guidelines to assess the sufficiency of evidence establishing deliberation and premeditation (see generally *People v. Sandoval* (2015) 62 Cal.4th 394, 424; *People v. Anderson* (1968) 70 Cal.2d 15, 26-27), and we find it useful to apply those guidelines here in our review of prejudice as to the murder charge.

The jury heard evidence from Vue, Thammavongsa, and Manivong concerning the circumstances leading up to the altercation, culminating in defendant shooting Sisoukchaleun. Their testimony was augmented by the surveillance video.

With regard to planning, the trial evidence demonstrated that after an initial exchange, defendant walked away from Sisoukchaleun and his group, all of whom remained in the recessed entryway. Defendant then went to his pickup truck and retrieved a gun. Instead of getting in his truck and leaving the scene, defendant chose to re-engage Sisoukchaleun's group. The video shows that at this point, Sisoukchaleun's group was in the recessed entryway of the liquor store while defendant was on the sidewalk some distance away. Defendant's demeanor is animated and he appears to be angry. The video shows Sisoukchaleun taking off his shirt. He then walked toward defendant, momentarily confronted him, and then walked into the street. Vue testified that, while the conversation had not been aggressive at its inception, as it proceeded, the African-American man "got into Bud's face." After Sisoukchaleun walked into the street, an unidentified African-American man approached defendant with his arm extended, placed his arm over defendant's chest, and appeared to speak to defendant in an effort to get defendant to disengage. Evidence showing defendant's retrieval of the gun,

54

reengagement of the victim, and refusal to disengage just prior to the shooting was indicative of planning.

As for motive, the jury properly had before it witness testimony that defendant invoked the name of the Meadowview Bloods criminal street gang after Sisoukchaleun and Manivong walked up making hand gestures and Thammavongsa and Sisoukchaleun uttered the term "cuz." After defendant invoked the name of Meadowview Bloods, Sisoukchaleun invoked the name of the LGC or Lao Gangster Crip, with which both Thammavongsa and Sisoukchaleun were affiliated. Thammavongsa acknowledged that such an exchange amounted to "fighting words" because Bloods and Crips do not get along. Based on a hypothetical set of facts, the gang expert properly testified that the exchange would constitute a "drastic escalation at that point based on disrespect from rival gangs, being Crips and Bloods." The expert also testified: "At that point, the individual -- once he puts out, 'I'm a Blood,' you know . . . this is not gonna go anywhere good."

Additionally, the expert testified that he personally observed defendant's "Meadowview" tattoo at trial. This was further evidence of defendant's gang affiliation, and this evidence was admissible under *Sanchez*. (*Sanchez, supra*, 63 Cal.4th at p. 677 [a defendant's tattoo is a case-specific fact that may be established by a witness who saw the tattoo and the fact that the tattoo's design is a symbol that has been adopted by a criminal street gang is background information about which a gang expert may testify].)

The jury also heard defendant's jail phone conversations. In one conversation, he and the person with whom he spoke referred to each other as "blood" several times. As the gang expert explained, Blood gang members commonly refer to one another by the word, "blood." In another conversation, defendant talked about having previously been shot by a Crip " 'because it was sort of a gang shooting' " and that he was housed near a Crip in the jail, but he did not care " '[l]ong as that nigga don't say nothing crazy.' " What can be inferred from this evidence is that, unlike the Crip with whom defendant

was housed in the jail, Sisoukchaleun had said something crazy to defendant by disrespecting defendant and his criminal street gang. The motive here was quite obviously gang related, even without the case-specific testimonial hearsay in the gang expert's testimony.

As for manner of killing, after defendant retrieved his firearm from the truck and re-engaged Sisoukchaleun, he followed Sisoukchaleun into the street where Sisoukchaleun apparently thought they would engage in a fist fight. Instead, defendant shot Sisoukchaleun twice after Sisoukchaleun threw one wild punch. The first shot was aimed at Sisoukchaleun's face, right between the eyes, and was fired at almost point-blank range. Defendant fired a second shot into the side of his Sisoukchaleun's torso, also from close range. The parts of the body defendant targeted showed a cold, calculated, and deliberate effort to end Sisoukchaleun's life.

In addition to the very strong evidence of planning, motive, and manner of killing, there was also evidence evincing defendant's consciousness of guilt. When he was arrested later in the day, the pants with the distinctive red design he had worn earlier during the shooting were in a bag. Also found in the car in which defendant was riding were the license plates from his truck. After he finished urinating at a police facility restroom, he was told not to wash his hands. Defendant looked at the detective and washed them anyway. As a consequence, a gunshot residue test could not be done. When interviewed by the police, defendant claimed someone had stolen his truck. He repeated that lie to others. He said that was his story and he was "sticking with it."

Defendant contends that the jury rejected self-defense and imperfect self-defense because of the testimony concerning his prior law enforcement contacts. The trial court instructed the jury with CALCRIM No. 505 on complete self-defense and imperfect self-

56

defense.  Instead of leaving after the initial confrontation,[23] defendant retrieved the gun from his pickup.  There was no evidence that Sisoukchaleun or anyone in his group had any weapons or threatened to use weapons.  Nor was there any evidence of a threat to inflict great bodily injury upon defendant or to use any type of lethal force.  The only force defendant faced is evidenced by Sisoukchaleun's challenge, " 'Let's fight' " and his preparation to do so by taking off his shirt.  As we have noted, the video shows an unidentified person tried to get defendant to disengage just moments before defendant took Sisoukchaleun's life.  During his interview with the police and the numerous phone conversations defendant had with people from the jail, he never made any claim of self-defense or indicated in any way that he felt threatened.  Defendant's lies, concealment, and destruction of evidence evinced not only his general consciousness of guilt, but more particularly, that he knew he had not acted in self-defense.  Given the evidence, we conclude that a reasonable jury would have rejected defendant's self-defense and imperfect self-defense arguments even if it had not heard the testimony concerning defendant's prior law enforcement contacts.

Based on the totality of the evidence, we conclude that, had the gang expert's objectionable case-specific testimonial hearsay testimony not been allowed, the jury would have still found defendant guilty of first degree murder.  There is no reasonable probability that defendant would have achieved a more favorable result on the murder charge had defense counsel objected at trial, preventing the gang expert from testifying

---

[23] We realize, of course, that an assailed person has no duty to retreat and is entitled to stand his ground or pursue the assailant until the danger of bodily injury or death has passed, even if safety could have been achieved by retreating.  (*People v. Hughes* (1951) 107 Cal.App.2d 487, 494; see also CALCRIM No. 505.)  Nevertheless, we may consider defendant's failure to leave when he had a chance, his re-engagement with the victim, his refusal to disengage and his conduct in following the victim into the street instead of leaving as evidence that defendant did not shoot the victim because he was in fear of the immediate use of deadly force against him.

about defendant's prior crimes and contacts with law enforcement. (*Strickland, supra*, 466 U.S. at pp. 693-694; *Ledesma, supra*, 43 Cal.3d at pp. 217-218.)

### b. Ineffective Assistance Prejudice—Possession of a Firearm by a Felon (§ 29800, subd. (a)(1))

The parties stipulated that defendant previously had been convicted of a felony. There is no dispute that defendant possessed a firearm. The video shows defendant going to the pickup truck to retrieve it. Witnesses testified that, in the midst of the altercation with Sisoukchaleun in the street, defendant pulled out a gun. Manivong heard a woman say, " 'He's got a gun.' " Defendant then shot Sisoukchaleun twice.

This evidence established a violation of section 29800, subdivision (a)(1). There is no reasonable probability that the jury would have found defendant not guilty on count two, possession of a firearm by a felon, if the objectionable testimonial hearsay evidence from the gang expert had been precluded.

### c. Ineffective Assistance Prejudice—Firearm Enhancements (§§ 12022.53, subds. (b), (d), 12022.5, subd. (a))

In the commission of murder, defendant personally and intentionally discharged a firearm causing Sisoukchaleun's death. Again, defendant did not dispute shooting Sisoukchaleun. He only maintained that he did so in self-defense or imperfect self-defense. Subdivision (*l*) of section 12022.53 provides that "[t]he enhancements specified in this section shall not apply to the lawful use or discharge of a firearm . . . by any person in lawful self-defense, lawful defense of another, or lawful defense of property, as provided in Sections 197, 198, and 198.5." However, as can be readily seen, the jury appropriately rejected defendant's claims of self-defense and imperfect self-defense and would have done so without the inadmissible basis testimony given the evidence we recounted in our discussion of defendant's ineffective assistance of counsel claim related to his first degree murder conviction.

We conclude there is no reasonable probability that, but for of the objectionable gang expert testimony, the jury would have found the firearm allegations not true.

### d. Ineffective Assistance Prejudice—Criminal Street Gang Enhancement (§ 186.22, subd. (b)(1))

To prove the section 186.22, subdivision (b)(1), enhancement, the People were required to prove that the defendant committed the murder for the benefit of a criminal street gang, and that he had the specific intent to assist, further, or promote criminal conduct by gang members. (§ 186.22, subd. (b)(1); CALCRIM No. 1401; *Gardeley, supra*, 14 Cal.4th at pp. 616-617.) Before discussing whether defendant was prejudiced under *Strickland* as to the gang enhancement, it is important to note that the case-specific testimonial hearsay concerning defendant's prior crimes and law enforcement contacts was introduced to show that defendant was a Meadowview Bloods gang member. Yet, the prosecution need not prove that a defendant is an active or current member of the gang to establish the enhancement under section 186.22, subdivision (b)(1). (*Sanchez, supra*, 63 Cal.4th at p. 698; *People v. Bragg* (2008) 161 Cal.App.4th 1385, 1402; *In re Ramon T.* (1997) 57 Cal.App.4th 201, 207.) Evidence of gang membership helps establish a defendant's intent to assist, further, or promote criminal conduct by gang members, but it is not an element of the enhancement. (*Sanchez*, at pp. 698-699.)

In considering whether defendant suffered *Strickland* prejudice as to the gang enhancement, we shall exclude the testimonial hearsay, specifically the gang expert's case-specific testimony concerning defendant's prior crimes and contacts with law enforcement as indicators of defendant's involvement in the Meadowview Bloods criminal street gang. After excluding that evidence from the calculus, we consider what evidence is left to prove the section 186.22, subdivision (b)(1), enhancement.

As we have noted, Sisoukchaleun and Manivong both made hand gestures as they walked up to Sunland, and they can be seen doing so on the surveillance video. Thammavongsa and Sisoukchaleun both uttered the term " 'cuz.' " According to

59

Thammavongsa, after he said, " 'Cuz, get some drink,' " defendant said, " 'Blood, Meadowview, Meadowview bloods' " or " 'Blood, Meadowviews, 69.' " According to Vue, the man who was involved in the confrontation with Sisoukchaleun said, " 'I am a Blood.' " Vue also testified that, after Thammavongsa said something about wanting to race, the man fitting defendant's description and whom she identified in a photographic lineup stated: " 'Yeah, I know what you mean. [¶] I like that, too, Blood, but you know, this is Blood all the way.' " According to Thammavongsa, Sisoukchaleun " 'got tired of hearing' " defendant say " 'Blood, Meadowview' " Sisoukchaleun invoked the name LGC or Lao Gangster Crip, with which both Thammavongsa and Sisoukchaleun were affiliated. Thammavongsa acknowledged that such an exchange would amount to "[f]ighting words" because Bloods and Crips do not get along. The gang expert testified that, in a hypothetical situation mirroring the facts of this case, the shooter's actions would benefit the Bloods. He indicated that by invoking the name of the Blood gang after Sisoukchaleun's group invoked the name of the Crips, defendant "put[] everyone on notice" that what they were doing was "disrespectful to [him] being a Blood gang member. . . . [¶] There's two ways that it can go right there. The Crip can, 'Hey, man, sorry. You know, it all cool. Let's just hang out' or take offense to the challenge of him not respecting and challenging him by saying 'It's Blood' thing. And it's that drastic escalation at that point based on disrespect from rival gangs, being Crips and Bloods."

There was additional evidence establishing defendant's gang membership. The use of the word "blood" during the recorded phone conversations and defendant's acknowledgment that he had been previously shot by a Crip in a gang-related shooting tended to establish that defendant was a Meadowview Blood. Additionally, defendant's Meadowview tattoo further proves his gang membership, another fact the gang expert considered in forming his opinion. Lastly, the gang expert opined that defendant was a Meadowview gang member based on the facts of the case.

Based on the foregoing, we conclude that there is no reasonable probability that defendant would have achieved a not true finding on the gang enhancement had counsel made the confrontation clause objection he asserts on appeal and successfully achieved the preclusion of the gang expert's testimony concerning defendant's prior crimes and contacts with law enforcement.[24] (*Strickland, supra*, 466 U.S. at pp. 693-694; *Ledesma, supra*, 43 Cal.3d at pp. 217-218.) While the expert's basis testimony concerning defendant's prior crimes and police contacts may have bolstered the conclusion that defendant was a Meadowview Bloods gang member who murdered Sisoukchaleun for the benefit of his gang, and that, in doing so, he had the specific intent to further or promote criminal conduct by his fellow gang members, we conclude that there is no reasonable probability that excluding that evidence would have resulted in a more favorable outcome for defendant on the gang enhancement. As we have noted, while the likelihood of a different outcome may be *conceivable*, that likelihood must be *substantial* to establish *Strickland* prejudice. (*Richter, supra*, 562 U.S. at p. 112.) In our view, the likelihood of a more favorable outcome on the gang enhancement here was neither conceivable nor substantial.

### 6. Ineffective Assistance Claim—Conclusion

We conclude that trial counsel's failure to register specific objections to the gang expert's case-specific testimonial hearsay testimony on *Crawford*/*Sanchez* grounds resulted in no prejudice to defendant as to any of the charges or enhancement

---

[24] Additionally, even assuming the predicate offense testimony we discussed *ante* should have been precluded, there is still compelling evidence in the form of the certified court records showing convictions for the predicate offenses the expert testified about. Those records include verdict forms showing two of the defendants were convicted of active participation of a criminal street gang and noted the name of the gang—"Meadowview Bloods."

allegations.[25]  Therefore, we reject his contention that his convictions must be reversed due to constitutionally ineffective assistance of trial counsel on this ground.[26]

### E. *Chapman*

As we have noted, when an evidentiary error is forfeited and a claim of ineffective assistance of counsel has been made, we must review the error under the less burdensome *Strickland* standard for prejudice instead of the stricter *Chapman* harmless error standard related to evidentiary error based on constitutional claims.  The dissent rejects forfeiture and concludes that the error requires reversal of the murder conviction and the firearm and gang enhancement findings based on *Chapman, supra*, 386 U.S.18, 24.

Even if we were to conclude that defendant did not forfeit his confrontation clause contentions, we would conclude that the error in admitting the gang expert's testimony discussed at length here was harmless under *Chapman* as to all of defendant's convictions and enhancement findings.  (See generally *Chapman, supra*, 386 U.S. at pp. 23-24.)  Since *Chapman*, our high court has " 'repeatedly reaffirmed the principle that an otherwise valid conviction should not be set aside if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a

---

[25]  Defendant also claims on appeal that counsel was ineffective for failure to register specific and timely objections to this evidence pursuant to Evidence Code sections 350 (Only relevant evidence admissible), 352 (Discretion of court to exclude evidence), and 1101 (Evidence of character to prove conduct).  " '[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies.' " (*People v. Carrasco* (2014) 59 Cal.4th 924, 982, quoting *Strickland, supra*, 466 U.S. at p. 697.)  Having concluded that defendant did not suffer prejudice as a result of the admission of this evidence, we need not additionally address defendant's contentions that counsel's performance fell below an objective standard of reasonableness based on failure to make timely and specific objections under these provisions of the Evidence Code.

[26]  We discuss and reject defendant's other ineffective assistance claims in the unpublished part of this opinion, *post*.

reasonable doubt.' " (*People v. Geier* (2007) 41 Cal.4th 555, 608 (*Geier*).) "The harmless error inquiry asks: 'Is it clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error?' " (*Ibid.*; *People v. Livingston* (2012) 53 Cal.4th 1145, 1159.) To determine whether the People have satisfied their burden of proving the error was harmless beyond a reasonable doubt, "we examine *the entire record* and must reverse if there is a ' " 'reasonable probability' " ' that the error contributed to the verdict." (*People v. Reese* (2017) 2 Cal.5th 660, 671, italics added, citing *People v. Aranda* (2012) 55 Cal.4th 342, 367.)

For the same reasons we discussed in our *Strickland* prejudice analysis regarding the murder conviction and gang and firearm enhancements, we conclude beyond a reasonable doubt that the constitutional error here did not contribute to the verdict. Given the eyewitness testimony, video surveillance recording, and defendant's post-offense statements and conduct, it is clear beyond a reasonable doubt that a rational jury would have found the defendant guilty of this cold blooded deliberate and premeditated murder and of being a felon in possession of a firearm, and found the enhancement allegations true absent the error. (*People v. Livingston* (2012) 53 Cal.4th 1145, 1159; *Geier, supra*, 41 Cal.4th at p. 608.)

The dissent maintains that an alternative "interpretation" of the video exists that suggests Sisoukchaleun was the aggressor and that the defendant acted in self-defense. According to this interpretation, it is "possible that [defendant] simply returned to pick up his alcohol and Sisoukchaleun and his friends re-engaged defendant" (Dis. opn., *post*, at p. 17) as opposed to our view that defendant re-engaged the group after retrieving his gun from his truck. Without going back over the detail of the video again, suffice it to say that we simply disagree with the dissent's view of the sequence of events reflected therein. Moreover, in arriving at the interpretation where Sisoukchaleun was the aggressor, the dissent overlooks the fact that an unidentified individual walked out from the recessed entryway to where defendant was standing on the sidewalk and put his arm

63

out to stop defendant from following Sisoukchaleun into the street.  Defendant pointed his finger at that person's chest, appeared to argue with him, then stepped around him, and went into the street where the other evidence shows defendant ultimately aimed his gun between Sisoukchaleun's eyes and pulled the trigger.  Also, in rejecting our *Chapman* conclusion, the dissent fails to address the statements defendant made to others where he never claimed self-defense or that he was in fear, and further fails to address the evidence of defendant's consciousness of guilt.

The error here did not contribute to the first degree murder verdict or the enhancement findings and thus the People have satisfied their burden of establishing that the error was harmless beyond a reasonable doubt.

## II.  Instructional Error Claim—Prior Uncharged Misconduct

Defendant contends that the trial court's instructions allowed the jurors to consider evidence of his prior offenses as substantive evidence, and invited the jurors to employ this evidence to draw impermissible inferences of intent and motive as well as criminal propensity.  Defendant argues limiting instructions were required.  He asserts that these errors were prejudicial and rendered his trial fundamentally unfair.

We conclude that the trial court was not required to provide additional limiting instructions sua sponte, and the instructions it provided were correct on the law.

### A.  CALCRIM Nos. 332 and 1403 and Defendant's Contentions

Defendant's contentions focus on the language we have italicized below in two jury instructions, CALCRIM No. 332 on evaluating expert testimony, and CALCRIM No. 1403 on the limited purpose of gang evidence.

Regarding CALCRIM No. 332, in pertinent part the court told the jury:  "In evaluating the believability of an expert witness, follow the instructions about the believability of witnesses generally.  In addition, consider the expert's knowledge, skill,

experience, training, and education, the reasons the expert gave for any reason, [*sic*][27] and the facts or information on which the expert relied in reaching that opinion.  [¶]  *You must decide whether information on which the expert relied was true and accurate*.  You may disregard any opinion that you find unbelievable, unreasonable, or unsupported by the evidence."  (CALCRIM No. 332, as given, italics added.)

Regarding CALCRIM No. 1403, in pertinent part, the court instructed the jury: "*You may consider evidence of gang activity only . . . for the limited purpose of deciding whether the defendant acted with the intent, purpose and knowledge that are required to prove the gang-related enhancement charged or that the defendant had a motive to commit the crime charged*.  [¶]  You may also consider this evidence when you evaluate the credibility or believability of a witness and when you consider . . . the facts and information relied on by an expert witness in reaching his opinion.  [¶]  You may not consider this evidence for any other purpose.  You may not conclude from this evidence that the defendant is a person of bad character or that he has a disposition to commit crime."  (Italics added.)

Defendant contends that the combined effect of CALCRIM Nos. 332 and 1403 was to invite the jury to consider the gang expert's basis testimony regarding defendant's prior crimes and police contacts as substantive evidence to establish the gang enhancement mens rea elements and motive to commit the crime.  This, according to defendant, is the combined effect of the language in CALCRIM No. 332 telling the jurors to "decide whether information on which the expert relied was true and accurate" and language in CALCRIM No. 1403 telling the jurors they could consider gang activity

---

**27**  The written instructions provided to the jury accurately states:  "the reasons the expert gave for any *opinion* . . . ."  (Italics added.)  Defendant appropriately does not complain about this discrepancy on appeal.  " 'To the extent a discrepancy exists between the written and oral versions of jury instructions, the written instructions provided to the jury will control.' "  (*People v. Mills* (2010) 48 Cal.4th 158, 201.)

evidence for the purposes of determining defendant's intent, purpose, and knowledge required for the gang enhancement or motive to commit the crime, coupled with the failure to instruct the jurors that they could not consider the expert's basis testimony for the truth. Defendant complains the jury should not have been allowed to use the expert's basis testimony related to the prior crimes in which defendant was involved for either of the purposes mentioned in CALCRIM No. 1403 because the evidence was not admitted for these purposes. Rather, the expert's testimony concerning defendant's prior crimes was allowed only to show the information upon which the expert's opinion regarding defendant's gang affiliation was based. Defendant also contends the instructions invited the jury to use other crimes evidence to draw an impermissible propensity inference about his character. We address the latter contention first.

## B. Analysis

### 1. Propensity Contention

Defendant appears to complain that the jury should have been instructed that it could not infer from the expert's prior crime testimony that defendant acted in conformity with a character trait for violence. However, as defendant acknowledges, the trial court was not required to give an " 'other crimes' " evidence instruction sua sponte. (*People v. Cottone* (2013) 57 Cal.4th 269, 293; *People v. Nottingham* (1985) 172 Cal.App.3d 484, 497 (*Nottingham*).) The California Supreme Court has " 'consistently held that where . . . a defendant fails to request an instruction, a trial court "generally [has] no duty to instruct on the limited admissibility of evidence." ' " (*People v. Maciel, supra*, 57 Cal.4th at p. 529, quoting *People v. Valdez* (2012) 55 Cal.4th 82, 139, *People v. Lang* (1989) 49 Cal.3d 991, 1020, & Evid. Code, § 355 ["When evidence is admissible . . . for one purpose and is inadmissible . . . for another purpose, the court *upon request* shall restrict the evidence to its proper scope and instruct the jury accordingly," (italics added)].)

Nevertheless, as defendant correctly notes, "[e]ven if the court has no sua sponte duty to instruct on a particular legal point, when it does choose to instruct, it must do so

correctly." (*People v. Castillo* (1997) 16 Cal.4th 1009, 1015.) Further, "[e]ven if such an instruction is not required, when a trial court does undertake to give a limiting instruction specifically calling attention to the significance of the substantially prejudicial evidence of prior bad acts, it should do so accurately." (*Nottingham, supra*, 172 Cal.App.3d at p. 497.) Defendant implies the instructions provided here were inaccurate. We disagree. The limiting instruction in CALCRIM No. 1403 was not inaccurate or incorrect on the law.

The case on which defendant relies as an example of inaccurate instructions allowing a jury to draw an impermissible inference of criminal propensity is not helpful to him. In *People v. Garceau* (1993) 6 Cal.4th 140, 156, 163 (*Garceau*), disapproved on other grounds in *People v. Yeoman* (2003) 31 Cal.4th 93, 117-118, evidence was introduced that the defendant, charged with killing Maureen Bautista and her son Telesforo, also committed the uncharged murder of the defendant's associate, Greg Rambo. (*Garceau*, at pp. 163-165.) The trial court instructed the jury that it could consider the other crimes evidence, if believed, " 'for any purpose, including but not limited to any of the following: [¶] [Defendant's] *character or any trait of his character. . . .*' " (*Id.* at pp. 185-186, italics omitted & italics added.) On appeal, the People conceded that this instruction was "overbroad." (*Id.* at p. 186.) The California Supreme Court concluded that the trial court erred in giving the italicized portion of the instruction, observing that, subject to certain inapplicable exceptions, "evidence pertaining to a defendant's character is inadmissible when offered to prove the defendant's conduct on a specific occasion." (*Ibid.*, citing Evid. Code, § 1101, subd. (a).) Our high court stated that this instruction "impermissibly invited the jury to consider certain evidence (e.g., that defendant killed Rambo) for the purpose of establishing defendant's propensity to commit murder." (*Garceau*, at p. 186.) The court continued: "Assuming the jury considered such evidence in that context, the jury arguably might have inferred that because defendant had killed Rambo, defendant also was capable of

killing other friends, such as Maureen and Telesforo Bautista. If the jury drew that inference, the prosecution's burden of proof as to the central issue in the case, the identity of the Bautistas' slayer, arguably was lightened, thus raising the possibility that defendant's constitutional right to due process of law was impaired." (*Ibid.*)

The instruction given in *Garceau* expressly invited the jury to consider evidence of uncharged crimes as proof of the defendant's character and his propensity to commit murder. Here, no such instruction was given; the jury was not told it could consider any evidence to establish defendant's criminal propensity to commit murder or any other crime.

CALCRIM No. 1403 did not focus on *other crimes evidence*; rather, the focus was more broadly related to *gang activity evidence*. The evidence of gang activity included the testimony of the witnesses, including their testimony about the gang-related statements defendant made prior to the murder, defendant's phone conversations while he was in jail, his tattoo, and the gang expert's testimony about gang culture. The gang activity evidence, of course, also included the expert's opinion about defendant's Meadowview Bloods membership, which was based, in part, on the circumstances of defendant's prior crimes. CALCRIM No. 1403 limited the purpose for which the jury could consider the totality of the gang activity evidence to a determination of the intent, purpose and knowledge required to prove the gang-related enhancement, the motive to commit the murder, an evaluation of the credibility of witnesses and a consideration of the facts and information relied on by the expert witness in reaching his opinion. The instruction expressly told the jury: "You may not consider this evidence for any other purpose. *You may not conclude from this evidence that the defendant is a person of bad character or that he has a disposition to commit crime.*" (Italics added.) Thus, as the italicized text reflects, the jury was expressly told not to draw an impermissible criminal propensity inference from any of the gang activity evidence. This necessarily included the expert's basis testimony. We presume the jury followed these instructions. (*People*

*v. Letner and Tobin* (2010) 50 Cal.4th 99, 196 (*Letner and Tobin*).) Accordingly, we reject defendant's contention that the instructions impermissibly directed the jurors to consider the other crimes evidence upon which the expert relied in opining that defendant was a Meadowview Blood as evidence that defendant had criminal propensities and that he acted in conformity therewith on this particular occasion.

To the extent that these proper instructions somehow could have been understood to allow the jury to draw an impermissible criminal propensity inference from the gang expert's basis testimony about defendant's prior crimes and such an inference could have been prevented by an additional limiting instruction, it was incumbent upon the defense to request that such an instruction be provided. A party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language. (*People v. Jones* (2013) 57 Cal.4th 899, 969 [to the extent court's instruction on other crimes evidence was incomplete, defendant may not be heard to complain because he did not request clarifying language].) Thus, any instruction specifically telling the jury not to infer criminal propensity from the gang expert's basis testimony about defendant's prior crimes and police contacts was one that the defense should have requested. The trial court was not required to provide such an instruction sua sponte.

### 2. Other Crimes Evidence and Proof of Mens Rea Elements and Motive

Defendant contends that, based on the instructions given and the absence of an additional limiting instruction, the jurors were permitted to use the other crimes evidence as substantive evidence of the gang enhancement mens rea elements and motive. As we understand the argument, defendant essentially contends that the gang expert's basis testimony regarding defendant's prior offenses was allowed to be used as Evidence Code section 1101, subdivision (b), evidence. We disagree. The jury was properly permitted to consider the evidence of gang activity, including the expert's opinion that defendant was a member of a criminal street gang, as evidence that defendant "acted with the intent,

69

purpose and knowledge that are required to prove the gang-related enhancement charged; [¶] OR [¶] [that] the defendant had a motive to commit the crime charged."

Defendant's contention appears to be grounded on a combination of the fact that the jury was not instructed that the gang expert's basis testimony could not be considered for the truth, but was instructed, as set forth in CALCRIM No. 332, to decide whether information upon which the expert relied was true and accurate. But defendant ignores the limited purpose for which the jury was instructed to consider the truth and accuracy of the information upon which the expert relied. CALCRIM No. 332 expressly relates to evaluating the believability and credibility of expert testimony. The instruction told the jury to "consider the expert's knowledge, skill, experience, training and education, the reasons the expert gave for any opinion, *and the facts or information on which the expert relied in reaching that opinion*." (Italics added.) The instruction then told the jury to decide whether the information upon which the expert relied was true and accurate, and ended by telling the jurors they may disregard any opinion they find unsupported by the evidence. CALCRIM No. 332 was given as part of the witness credibility instructions and does not imply application beyond the believability and credibility of the expert witness. It says nothing about the charges or allegations. In light of this, we reject defendant's contention that the instructions allowed the jury to consider the gang expert's basis testimony concerning defendant's prior offenses as substantive evidence that could be used to establish the gang enhancement mens rea elements or defendant's motive for shooting Sisoukchaleun.

### 3. Harmless Error

As we have stated *ante* in our discussion of defendant's ineffective assistance of counsel contention concerning the failure to object on specific confrontation clause grounds to the gang expert's testimony, the evidence against defendant establishing both his motive for the murder and the gang enhancement was very compelling. It is undisputed that defendant shot Sisoukchaleun twice, once at nearly point-blank range

70

between the eyes and once in the side, killing him. The witness testimony established that the shooting was preceded by words amounting to a gang challenge. The primary issue at trial was whether defendant acted in self-defense. The witness testimony and surveillance video completely refuted defendant's claim of self-defense. Defendant denied being involved to the police and people he knew. Instead, he claimed his truck had been stolen and he never said anything about self-defense, even when talking on the phone to people he knew. Under any standard, the purported errors about which defendant complains were harmless.

### 4. Ineffective Assistance of Counsel

Defendant asserts that counsel was ineffective for failing to request a limiting instruction directing the jury that the evidence of his prior offenses on which the gang expert relied in forming his opinion was not to be considered for its truth. He complains that the failure to do so allowed the jury to consider the other crimes evidence for purposes other than the "arguably proper purpose of explaining the basis of the expert's opinion concerning [defendant]'s gang affiliation."

Where we may dispose of a party's ineffective assistance of counsel contention based on the lack of sufficient prejudice, we need not address the deficient performance prong. (*People v. Carrasco, supra*, 59 Cal.4th at p. 982 (*Carrasco*).) Here, we proceed directly to the prejudice prong. For the same reason we conclude that any error was harmless, we also conclude that defendant failed to establish the prejudice prong of his ineffective assistance of counsel claim. In light of the evidence discussed *ante*, as well as the instructions the trial court *did* give to the jury, we conclude that there is no reasonable probability that, had counsel requested a limiting instruction of the type defendant identifies here, defendant would have achieved a more favorable result. Therefore, we conclude that defendant did not suffer prejudice as a result of any deficiency on trial counsel's part in failing to request such a limiting instruction.

71

### III. Mutual Combat/Initial Aggressor Instructions

Defendant contends there is a reasonable likelihood the jury interpreted the self-defense instructions related to mutual combat and initial aggressor status in a legally incorrect manner. He also contends there was insufficient evidence to support the instruction. We disagree.

### A. CALCRIM No. 3471 and Defendant's Contentions

CALCRIM No. 3471, as given by the trial court here, instructed, in pertinent part, that a "person who engages in *mutual combat or who starts a fight*,[28] has a right to self-defense only if, One, he actually and in good faith, tried to stop fighting. [¶] Two, he indicated by word or by conduct, to his opponent in a way that a reasonable person would understand, that he wanted to stop fighting, and that he had stopped fighting. [¶] Three, he gave his opponent a chance to stop fighting. [¶] If the defendant meets these requirements, he then had a right to self-defense, if the opponent continued to fight. [¶] A fight is mutual combat when it began or continued by mutual consent or agreement. [¶] That agreement may be expressly stated or implied and must occur before the claim to self-defense arose." (Italics added.)

Defendant contends that it is reasonably likely the jury interpreted the court's instruction on self-defense "in a legally incorrect manner that impaired [defendant]'s claim of self-defense and lowered the prosecution's burden of proof." Specifically, defendant claims that the jury could have interpreted the portion of CALCRIM No. 3471 that reads " '*who starts a fight*' " to mean starting a verbal argument or quarrel, as opposed to a physical fight. If the jury misinterpreted the instruction in this manner, then the jury could have concluded, contrary to law, that defendant had no right of self-

---

**28** The language "engages in mutual combat" and "starts a fight" is optional in CALCRIM No. 3471. One term can be used without the other or the two terms can be used together.

defense because he initiated a verbal argument. Defendant also asserts that substantial evidence did not support the conclusion that he initiated a physical fight, and, therefore, that portion of the instruction should not have been given. According to defendant, by erroneously instructing the jury on self-defense, the court impaired his right to present a defense and lowered the prosecution's burden of proof.

## B. Analysis

### 1. Forfeiture

At trial, defendant did not request language to clarify the self-defense instruction. He also did not object to the proposed instruction. By failing to either object to the proposed instruction or request that clarifying language be added, defendant has forfeited his claim on appeal. (*People v. Valdez* (2004) 32 Cal.4th 73, 113 (*Valdez*).) We are not persuaded by defendant's argument in his reply brief that he did not forfeit his claim because the instruction given by the trial court contained an incorrect statement of law; CALCRIM No. 3471 as given was a correct statement of law. In any event, as we shall discuss, defendant's contentions fail on the merits.

### 2. Substantial Evidence Supporting the Instruction

As defendant notes, "instructions not supported by substantial evidence should not be given." (*People v. Ross* (2007) 155 Cal.App.4th 1033, 1050 (*Ross*); *People v. Marshall* (1997) 15 Cal.4th 1, 39-40.) " 'It is error to give an instruction which, while correctly stating a principle of law, has no application to the facts of the case.' " (*Ross*, at p. 1050, quoting *People v. Guiton* (1993) 4 Cal.4th 1116, 1129.) Defendant contends there was no evidence to support giving CALCRIM No. 3471.

There was substantial evidence that defendant and Sisoukchaleun exchanged gang-related fighting words near the entrance to Sunland. After obtaining his gun from his pickup, defendant then returned to sidewalk facing the crowd near the front of Sunland where he resumed and escalated his confrontation with Sisoukchaleun and his group. Sisoukchaleun removed his outer shirt, apparently believing the two would fight.

73

According to Thammavongsa, as matters escalated and Sisoukchaleun took his shirt off, Sisoukchaleun said, " 'What's up? Let's fight. Let's fight.' " Defendant did not say anything in response. After walking around a person who tried to stop him, defendant followed Sisoukchaleun into the street. Sisoukchaleun took a swing at defendant, who dodged the blow. Defendant then shot Sisoukchaleun.

As the People assert, if defendant did not start the fight within the meaning of CALCRIM No. 3471, substantial evidence supports the premise that he engaged in mutual combat. "Evidence is '[s]ubstantial' . . . if it is 'sufficient to "deserve consideration by the jury," that is evidence that a reasonable jury could find persuasive.' " (*Ross, supra*, 155 Cal.App.4th at pp. 1050-1051.) It could be reasonably inferred from the evidence that "both combatants actually consented or intended to fight before the claimed occasion for self-defense arose." (*Id.* at p. 1047, italics omitted.) Thus, substantial evidence supported the instruction.

### 3.  CALCRIM No. 3471

Defendant contends there is a reasonable probability the jurors interpreted the word "fight" in CALCRIM No. 3471 to be synonymous with the word "quarrel." " 'The meaning of instructions is no[t] . . . determined under a strict test of whether a "reasonable juror" *could* have understood the charge as the defendant asserts, but rather under the more tolerant test of whether there is a "reasonable likelihood" that the jury misconstrued or misapplied the law in light of the instructions given, the entire record of trial, and the arguments of counsel.' " (*People v. Mathson* (2012) 210 Cal.App.4th 1297, 1312 (*Mathson*).)  This review requires that we look not only at the challenged instruction, but also at the instructions as a whole in the context of the entire trial record. (*People v. Mejia* (2012) 211 Cal.App.4th 586, 617.)  " ' "Instructions should be interpreted, if possible, so as to support the judgment rather than defeat it if they are reasonably susceptible to such interpretation." ' " (*Mathson*, at p. 1312.)

We first look to the other parts of CALCRIM No. 3471 and how the word "fight" is used therein. In context, it is unreasonable to read the word "fight" to mean an argument or verbal quarrel. The instruction lists three conditions when a person who engages in mutual combat or *starts a fight* has the right to use self-defense: "1. He actually and in good faith tried to *stop fighting*; [¶] 2. He *indicated*, by word or by conduct, to his opponent, in a way that a reasonable person would understand, that *he wanted to stop fighting* and that *he had stopped fighting*; [¶] AND [¶] 3. He gave his *opponent a chance to stop fighting*." (Italics added.) The instruction goes on to say: "If the defendant meets these requirements, he then had a right to self-defense if *the opponent continued to fight*." (Italics added.) The instruction further states that "[a] *fight* is mutual combat when it began or continued by mutual consent or agreement." (Italics added.) In context, these references to the word "fight" in CALCRIM No. 3471 must be understood to mean a physical fight. No reasonable juror could interpret the word "fight," as used here, to mean a verbal argument.

To test defendant's contention that "fight" could be read to mean "argument," we shall look at how the instruction would read if the word "argue" or a derivative thereof were substituted for the word "fight." This reveals the absurdity of defendant's argument. Substituting the word "fight" with "argue" or a derivative thereof, the instruction would list three conditions when a person who engages in mutual combat or *starts an argument* has the right to use self-defense: "1. He actually and in good faith tried to *stop* [*arguing*]; [¶] 2. He *indicated*, by word or by conduct, to his opponent, in a way that a reasonable person would understand, that *he wanted to stop* [*arguing*], and that *he had stopped* [*arguing*]; [¶] AND [¶] 3. He gave his *opponent a chance to stop* [*arguing*]." (Italics added.) The instruction would then go on to read: "If the defendant meets these requirements, he then had a right to self-defense if *the opponent continued to* [*argue*]." (Italics added.) As for the definition of mutual combat in the instruction, substituting the word "fight" with "argument," mutual combat would essentially be

75

defined: an "*argument*" is mutual combat when it began or continued because the parties agreed to "*argue*." This exercise demonstrates that the word "fight" as used in CALCRIM No. 3471 is obviously not synonymous with "argue" or a verbal quarrel.

Looking at the instructions as a whole, we next look to CALCRIM No. 3472. Whereas CALCRIM No. 3471 does not use the word "argue" or "quarrel" or speak to any such conduct, CALCRIM No. 3472 does use the word "quarrel," and it does so in a way that conveys a different meaning than the word "fight." Per CALCRIM No. 3472, the trial court instructed the jury, "A person does not have the right to self-defense if he provokes a *fight or* a *quarrel* with the intent to create an excuse to use force." (Italics added.) The absence of the word "quarrel" in CALCRIM No. 3471 and the presence of that word in CALCRIM No. 3472 thus signals to reasonable jurors that the word "fight" does not mean an "argument" or "quarrel," and where reference to a verbal altercation is intended, the term "quarrel" is used separately from the word fight.

Indeed, CALCRIM No. 3472 demonstrates that provoking a "quarrel" or "fight" are *two* different acts of conduct. CALCRIM No. 3472 instructs that either or both acts could preclude a claim of self-defense if done with the intent to create an excuse to use force. *People v. Eulian* (2016) 247 Cal.App.4th 1324 (*Eulian*) provides an example of the applicability of the instruction in the context of a quarrel. The *Eulian* court held that CALCRIM No. 3472 was properly given under the facts of that case. (*Eulian*, at pp. 1332-1335.) In doing so, the court reasoned that the jury could have rationally concluded that the defendant had provoked the conflict, and that he continued his verbal aggression until the victim responded with physical force at which point the defendant used physical force, eventually rendering the victim unconscious by delivering a series of punches. (*Id.* at pp. 1328, 1334.)

The incident in *Eulian* began when the defendant started a quarrel. He walked up to the victim's vehicle to confront her about her practice of attracting feral cats by feeding them. During this initial part of the confrontation, the defendant screamed at the

76

victim and jabbed his finger repeatedly toward her face. The victim leaned away, and eventually threw cat food in his direction. (*Eulian, supra*, 247 Cal.App.4th at pp. 1326, 1334.) The defendant tried to grab the victim's arm and pull her out of the vehicle, but lost his grip. (*Id*. at p. 1328.) The defendant continued to argue with the victim and gestured toward her, even as his mother tried to pull him away. (*Id*. at pp. 1328, 1334.) The victim slapped the defendant and then traded slaps with the defendant's mother. The defendant then punched the victim twice, and at that same moment, the victim kicked at the defendant's mother. (*Id*. at p. 1328.) Defendant then yanked the victim out of the car and delivered two punches while she was on the ground, rendering her unconscious. (*Ibid*.) Thus, the defendant initiated a quarrel that escalated into a physical confrontation. The *Eulian* court held: "[a]ssuming defendant is correct that he and his mother were kicked by [the victim], if the jury determined that [the victim] did so in response to defendant's aggressive conduct, defendant did not have the right to use force to settle a physical confrontation he arguably created." (*Id*. at p. 1334.) The court held that the defendant's conduct provided a factual basis for CALCRIM No. 3472.[29] (*Eulian*, at p. 1334.)

Looking at the instructions as a whole and considering the absurd construction defendant advances of the word "fight" in CALCRIM No. 3471, we conclude that no reasonable juror would have interpreted the word "fight" in CALCRIM No. 3471 to be synonymous with the word "quarrel."

### 4. The Prosecutor's Arguments

Our review of the instruction includes an examination of the prosecutor's argument to the jury. (*Mathson, supra,* 210 Cal.App.4th at p. 1330.) The prosecutor did not misuse CALCRIM No. 3471 in closing argument or tell the jury that the conditions in

---

[29] As given, the instruction in *Eulian* was modified in a way not relevant here. (*Eulian, supra*, 247 Cal.App.4th at p. 1333.)

CALCRIM No. 3471 could apply if the jurors concluded defendant simply started an argument or quarrel. Instead, the prosecutor properly argued the principle in CALCRIM No. 3472 that self-defense cannot be contrived by initiating a quarrel with the intent to create an excuse to use force and that self-defense is not available to a person who engages in mutual combat or starts a fight unless the three conditions are met. In discussing self-defense, the prosecutor told the jury: "Not available if you seek a quarrel with the intent to create the necessity for self-defense. And not available to mutual combatants, unless you withdraw. [¶] If you start the fight, if this is mutual combat, you don't get self-defense unless you've satisfied those conditions, which we know didn't happen in this case." The prosecutor then argued: "[S]elf-defense is 100 percent reactionary, right? You can't contrive it. You can't set up the circumstances that then requires you to use self-defense, you can't start the quarrel. It has to be reactionary. And that was not the case here." Thus, the prosecutor said nothing in his argument to cause the confusion defendant claims results from the wording of CALCRIM No. 3471.

### 5. Conclusion

We conclude that defendant's claim of prejudicial error in connection with CALCRIM No. 3471 is without merit.

### IV. Antecedent Threats Instruction

Defendant asserts that the court's instruction on antecedent threats failed to inform the jury that a defendant who reasonably associated the victim with a prior shooting in which the defendant was wounded is justified in acting more quickly and with greater self-defense measures. He claims that he requested such an instruction, but the court failed to include the instruction. According to defendant, the instruction the court gave pertaining to this principle did not conform with the evidence presented to the jury. He further claims that, had an appropriate instruction been given, there is a reasonable probability that the jury would have acquitted him of murder.

78

We conclude that defendant forfeited this claim.  In any event, we conclude that any error was harmless.  We further conclude that defendant has failed to show he received constitutionally ineffective assistance of counsel.

## A.  Additional Background

Defense counsel e-mailed the court and the prosecutor about adding certain language to CALCRIM No. 505 (Justifiable Homicide:  Self-Defense or Defense of Another).  Counsel wanted language added to that instruction to explain that one who has been harmed or threatened by a group will be justified in acting more quickly and taking harsher measures for his or her own protection provided that the person reasonably associated the victim with that harm or threat.[30]

In a reply e-mail, the prosecutor opposed the addition as inapplicable to the circumstances of this case.  Among other things, he noted that there was no evidence that defendant ever knew anyone in Sisoukchaleun's group.  The prosecutor also emphasized that the incident when defendant was shot in the back, allegedly by a Crip, occurred 21 years prior to the events in this case.

The trial court included the following optional bracketed paragraphs in a draft of CALCRIM No. 505 for purposes of discussion with counsel.  "[Someone who has been threatened or harmed by a person in the past, *is justified in acting more quickly or taking greater self-defense measures* against that person.]  [¶]  [If you find that the defendant received a threat from someone else that (he/she) reasonably associated with <insert name of decedent/victim>, you may consider that threat in deciding whether the

---

[30]  The proposed instruction in trial counsel's e-mail read as follows:  "One who has been harmed by or received threats against [his] [her] life or person made by [a group] [or] [a person other than the victim] *is justified in acting more quickly and taking harsher measures* for [his] [her] own protection in the event of assault either actual or threatened, than would be a person who had not received such threats provided the person receiving the threats reasonably associated the victim with those threats."  (Italics added.)

79

defendant was justified in acting in (self-defense/ [or] defense of another).]"  (See CALCRIM No. 505.)

At the instruction conference, the court asked defense counsel about her position on the instruction.  Counsel asked the trial court to give the instruction she had e-mailed to the court based on the evidence indicating that defendant had been shot by a Crip when he was 15 years old, and the victim here having identified himself as a Crip.

The prosecutor asserted that the jury should not be instructed with either paragraph, arguing that these instructions were not warranted based on the facts of this case.  According to the prosecutor, the claim made by defendant on the jailhouse call that he was shot by a Crip when he was 15 could not justify this instruction, so many years later, simply because Sisoukchaleun identified himself as a Crip.  The prosecutor asserted that this connection was too attenuated to warrant the instruction.  Defense counsel countered that the shooting of defendant by a Crip when he was 15 was relevant to defendant's "feeling on that day when he's surrounded by people of a rival gang," and that these circumstances "should allow [defendant] to react more quickly than someone who hadn't been put through that."

The court expressed some reluctance about instructing the jury with these paragraphs from CALCRIM No. 505 because defendant had not received a *threat* from anyone.  However, defense counsel convinced the court that, if a mere past threat from a particular group can be taken into consideration in assessing whether a defendant acted in self-defense, by even greater force of reason, the fact that one had actually been shot by a member of a particular group may be considered.  The court was skeptical as to whether substantial evidence supported the "reasonably associated" portion of the instruction. The court stated that it was inclined to issue the second bracketed paragraph, but not the first.

The following colloquy then took place:

"[DEFENSE COUNSEL]:  But not the one above it?

80

"THE COURT: Yeah, it doesn't seem to make sense. I guess someone who has been threatened --

"[DEFENSE COUNSEL]: And that's fine. I'm not asking for the one above it. I want the second paragraph."

All agreed to the instruction. As given, the instruction did not include the principle that having been harmed in the past by someone reasonably associated the victim, a person is *justified in acting more quickly or taking greater self-defense measures.*[31]

---

[31] The court instructed the jury with CALCRIM No. 505 as follows: "The defendant is not guilty of murder or manslaughter if he was justified in killing someone in self-defense. The defendant acted in lawful self-defense if, Number One, the defendant reasonably believed that he was in imminent danger of being killed or suffering great bodily injury. [¶] Two, the defendant reasonably believed that the immediate use of deadly force was necessary to defend against that danger. [¶] And Three, the defendant used no more force than was reasonably necessary to defend against that danger. [¶] Belief in future harm is not sufficient, no matter how great or how likely the harm is believed to be. The defendant must have believed that there was imminent danger of death or great bodily injury to himself. [¶] Defendant's belief must have been reasonable, and he must have acted only because of that belief. The defendant is only entitled to use that amount of force that a reasonable person would believe is necessary in the same situation. [¶] If the defendant used more force than was reasonable, the killing was not justified. [¶] When deciding whether the defendant's beliefs were reasonable, consider all of the circumstances as they were known to and appeared to the defendant, and consider whether a reasonable person in a similar situation with similar knowledge would have believed. [¶] If the defendant's beliefs were reasonable, the danger does not have to actually exist yet. [¶] *If you find that the defendant received a threat from someone else that he reasonably associated with the victim/decedent, you may consider that threat in deciding whether the defendant was justified in acting in self defense.* [¶] A defendant is not required to retreat. He is entitled to stand his ground and defend himself. And if reasonably necessary, to pursue an assailant until the danger of death or great bodily injury has passed. [¶] This is so, even if safety could have been achieved by retreating. [¶] Great bodily injury means significant or substantial physical injury. It is an injury that is greater than minor or moderate harm. [¶] The People have the burden of proving beyond a reasonable doubt that the killing was not justified. If the People have not met this burden, you must find the defendant not guilty of murder or manslaughter." (CALCRIM No. 505, as given, italics added.)

In closing argument, defense counsel argued self-defense, telling the jury: "one of the most important things, too, you can look at is, if you find the defendant received a threat from someone else that he reasonably associated with the victim, you may consider that threat in deciding whether the defendant was justified." She then went on to talk about the evidence establishing that defendant had been shot by Crips when he was 15 and asserted that when defendant shot Sisoukchaleun, there were five guys associated with Sisoukchaleun standing around defendant.

## B.  Forfeiture

On appeal defendant does not argue that the specific language in the omitted optional paragraph of CALCRIM No. 505 should have been given. Rather, he asserts that the instruction given should have included similar language, to the effect that defendant would have been justified in acting more quickly or taking greater self-defense measures based on prior threats or harm reasonably associated with the victim. However, defendant acquiesced to the omission of nearly identical language to that which he now claims should have issued.

Defendant forfeited his claim. The failure to either object to the proposed jury instruction or request the language defendant suggests on appeal forfeits the claim on appeal that such language should have been included in the instruction. (*Valdez, supra*, 32 Cal.4th at p. 113.) Following the e-mail exchange between the attorneys and the court, at the instruction conference, defense counsel did not object to the CALCRIM No. 505 instruction to be given to the jury. In her e-mail, defense counsel had requested the addition of the language similar to the optional bracketed language in CALCRIM No. 505. However, at the instruction conference, defense counsel:  (1) acquiesced in the omission of the paragraph of CALCRIM No. 505 containing the "acting more quickly or taking greater self-defense measures" language; (2) did not reaffirm her desire for the language proposed in her e-mail; and (3) consented to the CALCRIM No. 505 instruction as given. Having agreed to the instruction and having abandoned the request for

additional language, defendant forfeited his claim on appeal that the jury should have been instructed with the language proposed by defense counsel in her pre-conference e-mail.

## C. Harmless Error

In any event, we conclude that, on this record, there is no reasonable probability that a different result would have been obtained had the jury been instructed on self-defense with the additional language proposed by defendant pertaining to antecedent threats. (*People v. Watson* (1956) 46 Cal.2d 818, 835-836 (*Watson*).) "[T]he *Watson* test for harmless error 'focuses not on what a reasonable jury *could* do, but what such a jury is *likely* to have done in the absence of the error under consideration. In making that evaluation, an appellate court may consider, among other things, whether the evidence supporting the existing judgment is so *relatively* strong, and the evidence supporting a different outcome is so *comparatively* weak, that there is no reasonable probability the error of which the defendant complains affected the result.' " (*People v. Beltran* (2013) 56 Cal.4th 935, 956 (*Beltran*).)

The trial court instructed the jury extensively on self-defense. The trial court specifically instructed the jury: "If you find that the defendant received a threat from someone else that he reasonably associated with the victim/decedent, you may consider that threat in deciding whether the defendant was justified in acting in self defense." Thus, the jury rejected the claim that defendant acted in self-defense based on a threat—his previously being shot by a Crip gang member—that he reasonably associated with Sisoukchaleun.

As we have indicated, the evidence here overwhelmingly showed that defendant did not act in self-defense. There is no evidence that Sisoukchaleun did anything more threatening than taking off his shirt in preparation to engage defendant in a mutual fight. Defendant ignored a person who appeared to try to get him to disengage, followed Sisoukchaleun into the street, and instead of fighting after Sisoukchaleun took one wild

swing, shot Sisoukchaleun in the face at nearly point-blank range with a gun he had retrieved from his vehicle moments before. Given this evidence and the other evidence we have recounted, there is no reasonable probability that defendant would have obtained a more favorable outcome had the jury also been instructed that one who has been harmed by or received threats from a group will be justified in acting more quickly and taking harsher measures for his own protection provided that he reasonably associated the victim with that group. This is so because under the circumstances here, defendant was not reasonably justified in shooting Sisoukchaleun in the face and then again in the side of his torso, even though he had been shot by some unspecified Crip gang when he was a "youngster."

### D. Ineffective Assistance of Counsel Claim

To the extent counsel's performance was deficient for failing to request the instruction, defendant did not suffer any prejudice. For the same reasons we have concluded any error is harmless, it is not reasonably probable that, had the instruction now advocated been given, defendant would have obtained a more favorable outcome. (*Strickland, supra*, 466 U.S. at pp. 693-694; *Ledesma, supra*, 43 Cal.3d at pp. 217-218.)

### V. Instruction on Viewing Testimony about Defendant's Nonrecorded Statements with Caution

Defendant asserts that the trial court erred in failing to instruct with the bracketed paragraph in CALCRIM No. 358 (Evidence of Defendant's Statements). That portion of the instruction essentially tells jurors to view a defendant's non-recorded oral statements with caution. Defendant raises this claim in connection with his statements concerning the Bloods about which Vue and Thammavongsa testified. Defendant asserts that the court's failure to give this portion of the instruction was prejudicial because there was a reasonable probability that, had the jurors been instructed to view these unrecorded statements with caution, the jury would have found him not guilty of murder. The People assert that any error was harmless. We agree with the People.

The court instructed the jury with CALCRIM No. 358, as follows: "You have heard evidence that the defendant made oral statements before the trial. You must decide whether the defendant made any of these statements in whole or in part. If you decide the defendant made such statements, consider the statements along with all of the other evidence in reaching your verdict. It is up to you to decide how much importance to give to the statement." (CALCRIM No. 358, as given.) The court did not instruct the jury with the bracketed paragraph which reads: "Consider with caution any statement made by (the/a) defendant tending to show (his/her) guilt unless the statement was written or otherwise recorded."

"The extrajudicial admission of a party—that is, any statement by a party to an action that is offered against that party—is admissible in evidence regardless of its hearsay character. [Citations.] 'This kind of testimony is considered dangerous, first, because it may be misapprehended by the person who hears it; secondly, it may not be well remembered; thirdly, it may not be correctly repeated.' [Citation.] Even witnesses with the best intentions often cannot report the ' "exact language" ' used by a defendant, and therefore may convey, through errors and omissions, an inaccurate impression of a defendant's statements. [Citation.] ' "No other class of testimony affords such temptations or opportunities for unscrupulous witnesses to torture the facts or commit open perjury, as it is often impossible to contradict their testimony at all, or at least by any other witness than the party himself." [Citation.]' [Citation.] Even if the party testifies, it may be difficult to convincingly dispute evidence of an extrajudicial admission because the party has an obvious interest in the outcome of a case. 'It was undoubtedly such considerations that led the Legislature to make the admitting of extrajudicial admissions into evidence conditional on the giving of a cautionary instruction.' [Citation.] The cautionary instruction 'is designed to aid the jury in determining whether an admission or confession was in fact made.' " (*People v. Diaz* (2015) 60 Cal.4th 1176, 1185 (*Diaz*).)

85

Prior to *Diaz*, trial courts had a duty to provide the cautionary instruction, first under statute, and following the repeal of the statute, based on case law.[32] (*Diaz, supra*, 60 Cal.4th at pp. 1188-1190.) However, in *Diaz*, our high court concluded that, "in light of a change in the law that requires the general instructions on witness credibility to be given sua sponte in every case, the cautionary instruction is not one of the general principles of law upon which a court is required to instruct the jury in the absence of a request." (*Id*. at p. 1189.) The *Diaz* court expressly declined to determine, however, whether the elimination of the sua sponte obligation applied retroactively because it determined that, in the case before it, any error in omitting the cautionary instruction was harmless. (*Id.* at p. 1195; see also *People v. Brooks* (2017) 3 Cal.5th 1, 80 (*Brooks*).)

We likewise conclude that, whether the elimination of the sua sponte obligation to provide the cautionary instruction applies retroactively or not, any error in the omission of that instruction here was harmless as there is no reasonable probability that the jury would have reached a result more favorable to defendant had the instruction been given. (*Diaz, supra*, 60 Cal.4th at p. 1195; *Watson, supra*, 46 Cal.2d at pp. 835-836.) "[T]he purpose of the cautionary instruction is to assist the jury in determining whether the defendant actually made the statement attributed to him." (*Brooks, supra*, 3 Cal.5th at p. 80.) " 'Since the cautionary instruction is intended to help the jury to determine

---

[32] In pertinent part, the former statute read: " 'the testimony of an accomplice ought to be viewed with distrust, and the evidence of the oral admissions of a party with caution.' " (*Diaz, supra*, 60 Cal.4th at p. 1184, citing former Code Civ. Proc., § 2061, subd. 4.) The portion of the statement related to oral admissions of a party was repealed with the adoption of the Evidence Code. (*Diaz*, at p. 1184.) The Law Revision Commission explained that because " 'the section is but a partial codification of the common law, the repeal should have no effect on the giving of the instructions contained in the section or on the giving of any other cautionary instructions that are permitted or required to be given by decisional law,' " and the California Supreme Court so held in subsequent case law (*id*. at pp. 1184-1185), but later took another look at this issue in *Diaz*.

whether the statement attributed to the defendant was in fact made, courts examining the prejudice in failing to give the instruction examine the record to see if there was any conflict in the evidence about the exact words used, their meaning, or whether the [statements] were repeated accurately.' " (*Diaz*, at p. 1195, quoting *People v. Pensinger* (1991) 52 Cal.3d 1210, 1268 (*Pensinger*).)

Again, the unrecorded statements at issue here are statements about which Vue and Thammavongsa testified in which defendant essentially broadcast his status as a member of the Meadowview Bloods and which could be interpreted as a gang challenge. According to Vue, an African-American male responded to Thammavongsa's statement that he wanted to race and his use of the term "cuz" by saying: " 'Yeah, I know what you mean. [¶] I like that, too, Blood, but you know, this is Blood all the way.' " Vue also testified that the man said, " 'I am a Blood.' " According to Thammavongsa, after he and Sisoukchaleun both said the word, " 'cuz' " in their conversation, defendant said, " 'Blood, Meadowview, Meadowview bloods' " or " 'Blood, Meadowviews, 69.' "

Contrary to defendant's contentions, there is no conflict of any significance in the evidence concerning the exact words used, their meaning, or whether they were repeated accurately. (See generally *Diaz, supra*, 60 Cal.4th at p. 1195; *Pensinger, supra*, 52 Cal.3d at p. 1268.) It is true that Vue and Thammavongsa did not testify to hearing exactly the same words. However, the meaning of the words they each heard, which were substantially similar, was clear: defendant was identifying himself as a Blood gang member. And the evidence does not suggest the witnesses made up defendant's invocation of the Meadowview Bloods. There was no apparent way these witnesses would know defendant was associated with the Meadowview Bloods other than by his own statements. In the video, it is clear defendant is wearing a jacket, so the tattoo on his arm could not have been visible. Moreover, on this record, it is possible that these two witnesses in fact heard different statements by defendant; Vue walked away from the confrontation shortly after it began, while Thammavongsa remained nearby throughout,

and, after some time, Sisoukchaleun "got tired of hearing" defendant say "Blood, Meadowview . . . ."

Defendant does argue on appeal that Vue's testimony raised a conflict as to whether it was he who spoke the words at issue. When viewing the video recording during her direct testimony, Vue initially identified a different African-American individual as the one who made the statements at issue here and who then became involved in a confrontation with Sisoukchaleun. Vue's initial confusion appears to have resulted from the fact that she had not seen the video recording prior to testifying. However, her description of the man involved in the altercation with Sisoukchaleun and the clothes he was wearing matched that of defendant, including the defendant's pants which were adorned with a red design. And Vue identified defendant in a photographic lineup as the person in question. In any event, this issue does not amount to a conflict in the evidence as to the words used, their meaning, or whether they were reported accurately. Rather, this is the functional equivalent of a denial by defendant that he was indeed the one who made the statements now attributed to him. As the People observe, where there is "simply a denial by the defendant that he made the statements attributed to him, [the California Supreme Court] ha[s] found failure to give the cautionary instruction harmless." (*People v. Dickey* (2005) 35 Cal.4th 884, 906, citing *People v. Bunyard* (1988) 45 Cal.3d 1189, 1225-1226 (*Bunyard*).)

Defendant asserts on appeal that, to the extent that he made the statements, he was trying to avert a conflict "by trying to ingratiate himself with the approaching young men, who he assumed were Blood gang members," or he made the statements in a last ditch effort to make the youths "back off," which could be consistent with a theory of self-defense.

First, inasmuch as the statements were relevant to defendant's gang membership, whether the statements were made in a hostile, aggressive manner or in a defensive manner is immaterial as to the issue of whether the bracketed portion of CALCRIM

88

No. 358 should have been given. Second, with regard to defendant's intent and self-defense claim, we conclude that it is not reasonably probable that the jury would have reached a result more favorable to him had the court given the cautionary instruction. (See generally *Diaz, supra*, 60 Cal.4th at p. 1195; *Watson, supra*, 46 Cal.2d at pp. 835-836.)

As the People observe, and as our high court relied upon in finding harmless error in *Diaz*, the jury here was charged with CALCRIM No. 226, "which sets out the numerous factors the jury may consider in deciding whether a witness's testimony is credible." (*Diaz, supra*, 60 Cal.4th at p. 1196.) Those factors included, among other things, "how well a witness could 'see, hear, or otherwise perceive the things about which the witness testified,' how well the witness was 'able to remember and describe what happened,' and whether the witness's testimony was influenced by 'bias or prejudice, a personal relationship with someone involved in the case, or a personal interest in how the case is decided.' " (*Id*. at p. 1191.) " '[W]hen the trial court otherwise has thoroughly instructed the jury on assessing the credibility of witnesses, [the California Supreme Court] ha[s] concluded the jury was adequately warned to view their testimony with caution.' " (*Ibid*., quoting *People v. McKinnon* (2011) 52 Cal.4th 610, 680.) Additionally, we note that the portion of CALCRIM No. 358 that was given to the jury specifically instructed: "You must decide whether the defendant made any of these statements in whole or in part. If you decide the defendant made such statements, consider the statements along with all of the other evidence in reaching your verdict." Thus, the jury was on notice to first determine whether defendant made the statements and to do so considering the aforementioned credibility factors. Moreover, beyond the combined impact of the instructions, the jury had the opportunity to assess defendant's intent and state of mind in hearing the testimony of the witnesses and observing his actions on the surveillance video.

Defendant relies principally on *People v. Ford* (1964) 60 Cal.2d 772, 799-800 (*Ford*), a case in which the California Supreme Court determined that the failure to give the cautionary instruction was prejudicial error. We note that, in *Ford*, the trial court had the obligation under statute (see fn. 32, *ante*) to give the instruction, a factor that undoubtedly led to the reversal. (*Id.* at p. 799.) In *Ford*, before the shooting the defendant said that "he 'needed the drink to get up his courage,' " and made pre-offense threats, including " 'they'd better not give me any trouble or they are going to lose' " and " 'that son-of-a-bitch had better not give me any trouble.' " (*Ibid.*) After shooting the victim, the defendant was heard to say, " 'that will be the end of you, you mother-fucker.' " (*Ibid.*) These statements, the *Ford* court observed, "bore *directly* on the issue of [the] defendant's capacity to deliberate and premeditate sufficiently to commit first degree murder." (*Id.* at pp. 799-800, italics added.) Additionally, the statements were reported by witnesses undeniably hostile to the defendant's case, and, perhaps more significantly, whose testimony was conflicting and inconsistent. (*Id.* at p. 800.)

Here, similar to *Ford*, the statements attributed to defendant were important to prove defendant's mental state and motive. Additionally, Thammavongsa Sisoukchaleun's cousin and a self-acknowledged affiliate of LGC, could certainly be deemed hostile to defendant's cause. However, Vue was not a similarly hostile witness. She had only met Sisoukchaleun and his group that night. Further, contrary to defendant's contention, and unlike in *Ford*, Vue's and Thammavongsa's testimony did not "show[] a number of obvious conflicts and apparent inconsistencies." (*Ford, supra*, 60 Cal.2d at p. 800.) In substance, their testimony was in agreement in that it showed that defendant invoked the name of the Bloods. Furthermore, defendant's gang affiliation was before the jury through other evidence, including defendant's tattoo and the jail phone calls interpreted by the prosecution's gang expert.

We " 'focus[] not on what a reasonable jury *could* do, but what such a jury is *likely* to have done in the absence of the error under consideration.' " (*Beltran, supra*, 56

90

Cal.4th at p. 956.) Based on all of the foregoing, we conclude that, even if the trial court erred in failing to give the cautionary instruction, it is not reasonably probable that the jury would have reached a result more favorable to defendant had it been so instructed. (See generally *Diaz, supra*, 60 Cal.4th at p. 1195; *Beltran*, at p. 956; *Watson, supra*, 46 Cal.2d at pp. 835-836.)

## VI. Prosecutorial Misconduct Claims

Defendant asserts that the prosecutor's purported misconduct violated his right to due process. While acknowledging that his trial counsel did not object to any of the remarks now claimed to constitute misconduct, defendant: (1) asserts that trial counsel's conduct was constitutionally ineffective (a contention we address in part VII of the Discussion, *post*), and (2) encourages us to exercise our discretion to reach the merits of his unpreserved claims. Defendant has forfeited his claims. In any event, we conclude defendant's claims are either meritless or did not result in prejudice.

## A. Standard of Review

"The standards governing review of misconduct claims are settled. 'A prosecutor who uses deceptive or reprehensible methods to persuade the jury commits misconduct, and such actions require reversal under the federal Constitution when they infect the trial with such " 'unfairness as to make the resulting conviction a denial of due process.' " [Citations.] Under state law, a prosecutor who uses such methods commits misconduct even when those actions do not result in a fundamentally unfair trial. [Citation.] In order to preserve a claim of misconduct, a defendant must make a timely objection and request an admonition; only if an admonition would not have cured the harm is the claim of misconduct preserved for review.' " (*People v. Parson* (2008) 44 Cal.4th 332, 359; see also *People v. Centeno* (2014) 60 Cal.4th 659, 674.)

"[T]he prosecutor has a wide-ranging right to discuss the case in closing argument. He [or she] has the right to fully state his [or her] views as to what the evidence shows and to urge whatever conclusions he [or she] deems proper." (*People v. Lewis* (1990) 50

Cal.3d 262, 283.)  To prevail on a claim of prosecutorial misconduct in closing argument, the defendant must show a reasonable likelihood that the jury understood or applied the prosecutor's comments in an improper or erroneous manner.  (*People v. Frye* (1998) 18 Cal.4th 894, 970, disapproved on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22 (*Doolin*).)

## B.  Forfeiture

" 'As a general rule a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety.' " (*People v. Hill* (1998) 17 Cal.4th 800, 820.)  Here, as defendant acknowledges, his trial counsel did not object or request an admonition at any time during the prosecutor's closing argument.  Defendant has thus forfeited these claims. (*People v. Dykes* (2009) 46 Cal.4th 731, 757, citing *People v. Stanley* (2006) 39 Cal.4th 913, 952.)  In any event, we will address the merits of defendant's contentions since he raises them in connection with his claim of ineffective assistance of counsel.

## C.  Analysis

### 1.  The Prosecutor's Reference to Information the Trial Court Would Have at Sentencing

Defendant points out that during his initial closing argument, the prosecutor stated that, if defendant was convicted, the judge at sentencing would have "a lot more information than" the jury, and that the court would have "all kinds of information that" the jury did not have.  According to defendant, this constituted an improper reference to matters outside of the record.

Before addressing this contention, we take a moment to put the prosecutor's comments in context.  The comments were an apparent effort to remind the jury to make their decision independent of penalty or punishment.  The prosecutor said, "And as I talked about a little bit in my questioning of you originally, it's not about penalty and

punishment. Okay. You have to absolutely just decide what happened in the case, decide what the act was, what the defendant specifically did, what his mental state was at the time that he did it. And you have to trust that this Judge can do what he needs do to [*sic*], and do his job in terms of penalty and punishment. [¶] *Understanding that in making those decisions, he will have a lot more information than you do.* [¶] Okay. He *will have all kinds of information that you don't have, so you cannot make that decision from the jury deliberation room.* [¶] Okay. So you have to let him make the decision as to penalty and punishment. You guys just make the decision as to the law and the facts." (Italics added.) In context, it appears that the prosecutor's comments related to information the judge would have at sentencing, not information the jury did not have relative to determining the facts in the case.

As a general matter, "[a] prosecutor commits misconduct by referring in argument to matters outside the record." (*People v. Cunningham* (2001) 25 Cal.4th 926, 1026 (*Cunningham*).) Where prosecutorial misconduct occurs, reversal is not required unless there is prejudice. (*People v. Arias* (1996) 13 Cal.4th 92, 161; *People v. Castillo* (2008) 168 Cal.App.4th 364, 386-387.) Unless a prosecutor's misconduct renders the trial fundamentally unfair, misconduct warrants reversal only if it is reasonably probable that the defendant would have obtained a more favorable result absent the misconduct. (*Castillo*, at pp. 386-387 & fn. 9.)

Here, the trial court instructed the jury at the beginning of the trial and again at the end, pursuant to CALCRIM No. 222, that the statements of counsel are not evidence. The jurors were also instructed pursuant to CALCRIM No. 200 that they were to decide the case based solely on the evidence presented, and pursuant to CALCRIM No. 3550 that they were not consider punishment in arriving at their verdict. We presume the jury followed these instructions. (*Letner and Tobin, supra*, 50 Cal.4th at p. 196.) We do not condone the prosecutor's remarks. Although the remarks related to information the judge would have at sentencing, they were unnecessary to describe the jury's duty to make their

93

decision independent of penalty and punishment and ultimately supplied defendant with the argument he makes on appeal.  Nevertheless, given the strength of the evidence in the case, the instructions provided to the jury, and the context in which these statements were made, we conclude it was not reasonably probable that, had the prosecutor not made these remarks, defendant would have obtained a more favorable result.

## 2. Discussion about the Driver of the Pickup Who Did Not Testify

Defendant claims the prosecutor committed misconduct in discussing the fact that the woman who drove him away from the scene in his pickup was not called to testify.[33]

During his closing argument, the prosecutor stated, "Now, I bet you anything that you guys are sitting here going, Wait a minute, where is the woman who's the driver of the truck, right?  I mean, she's the getaway driver.  She was right there driving the truck.  Why didn't she come in and sit up here and testify in this case, right?  Why didn't the getaway driver testify in this case?  [¶]  Okay.  The law says, obviously, that you don't have to call all witnesses to any particular -- in any particular crime.  You have to trust to some extent that if somebody had something to say that's going to impact this case, one way or the other, myself or [defense counsel] would have called them and brought them in here to testify.  [¶]  Okay.  And if, when this trial is over, you're released from your admonition, you want to ask those questions, I would be happy to answer them for you.  If you want to ask me why didn't Catina Barker testify when this trial is over and done with, when you're released from the admonition not to talk about this case, I would be happy to talk to you about it, but right here, as we sit here today, the only thing that's

---

[33]  The trial court did not give CALCRIM No. 373 to the jury.  That instruction reads: "The evidence shows that (another person/other persons) may have been involved in the commission of the crime[s] charged against the defendant.  There may be many reasons why someone who appears to have been involved might not be a codefendant in this particular trial.  You must not speculate about whether (that other person has/those other persons have) been or will be prosecuted.  Your duty is to decide whether the defendant on trial here committed the crime[s] charged."

94

relevant is the witnesses that did testify and what they had to say and what evidence they produced in this case, okay. [¶] So you can't speculate about what someone else would have or might have said had they been here, okay? You just have to trust that the lawyers in this case, that we have put on the evidence in this case that is relevant to this case, and that will assist you as the triers of fact in making the decisions that you have to make in this case."

Defendant contends this line of discussion improperly implied that the prosecutor had knowledge of facts not in evidence. In support of this contention, defendant relies on *People v. Hall* (2000) 82 Cal.App.4th 813 (*Hall*). In *Hall*, the defense counsel, in closing argument, emphasized the fact that Officer Tinsley, one of two arresting officers, was not called by the prosecution to testify, although the prosecution did present the testimony of the other arresting officer, Officer Williams. (*Id.* at p. 816.) In rebuttal, the prosecutor observed that the defense could have called Officer Tinsley to testify. (*Ibid.*) The prosecutor then stated that, had he called Officer Tinsley, his testimony would have been repetitive. (*Ibid.*) On appeal, the *Hall* court held that the prosecutor's argument that the defense could have called Officer Tinsley was proper. (*Id.* at p. 817.) However, the court explained: "the prosecutor went too far when he told the jury the absent witness's testimony would have been repetitive. The effect of this argument was to tell the jury that the witness, if called, would have testified exactly as Officer Williams did, in a manner favorable to the prosecution. This was misconduct." (*Ibid.*) The court added, "[t]he prosecutor, in the guise of closing argument, told the jury what the testimony of an uncalled witness would have been, thus implying that he decided not to call Officer Tinsley as a witness after determining that his testimony would have been the same as and corroborative of Officer Williams's testimony." (*Ibid.*) The *Hall* court held that this denied the defendant his Sixth Amendment rights to confront and cross-examine an uncalled prosecution witness. (*Hall*, at p. 817.)

95

Here, the prosecutor's remarks did not cross this line. Crucially, the prosecutor did not make any representations, express or implied, as to how Barker would have testified. He did not state that her testimony would have been repetitive with that of the other prosecution witnesses. Rather, he stated that the jurors should "trust to some extent that if somebody had something to say that's going to impact this case, one way or the other, myself or [defense counsel] would have called them and brought them in here to testify." This remark was, essentially, content-neutral. In other words, the prosecutor did not impermissibly tell the jury what Barker's testimony would have been, "thus implying that he decided not to call [Barker] as a witness after determining that [her] testimony would have been the same as and corroborative of" the testimony of other prosecution witnesses. (*Hall, supra*, 82 Cal.App.4th at p. 817.)

Accordingly, we reject defendant's contention that the remarks constituted prosecutorial misconduct and deprived him of his Sixth Amendment rights to confrontation and cross-examination.

### 3. Weena Vue's Testimony

Defendant correctly observes that while Vue did not testify that she heard him say "Meadowview," the prosecutor in closing stated, "Remember, Weena Vue said that the defendant responded, 'This is Meadowview,' and he started to get angry?" Thus, the prosecutor misstated that Vue testified she heard defendant say something about Meadowview.

Defendant is correct that "mischaracterizing the evidence is misconduct." (*People v. Hill, supra*, 17 Cal.4th at p. 823.) However, defendant suffered no prejudice from this mischaracterization.

While Vue did not specifically testify that defendant said anything about Meadowview, she did testify that the man who was involved in the confrontation with Sisoukchaleun said, " 'I am a Blood.' " She also testified to hearing the statement: " 'Yeah, I know what you mean. [¶] I like that, too, Blood, but you know, this is Blood

96

all the way.' " Sisoukchaleun responded, " 'Yeah, this is LAC, Little Asian Crip.' "
According to Vue, although the conversation had not been confrontational initially, at
that time, the African-American man "got into Bud's face," and the two men started
behaving more aggressively towards each other.

It is not disputed that, as the gang expert testified, Meadowview Bloods are a
subset of the Bloods criminal street gang. While Vue did not testify that defendant
identified himself as a Meadowview Blood, the words she said she heard indicated that
defendant was affiliated with the Bloods, and it is undisputed that defendant shot and
killed Sisoukchaleun. Additionally, as the People observe, there was evidence before the
jury from Thammavongsa that defendant said he was a Meadowview Blood. Thus, the
jury heard testimony from another witness that defendant identified himself more
specifically as a Meadowview Blood. Moreover, as we have noted, there was no
apparent way these witnesses would know defendant was associated with a Blood gang
other than by his own statements. Consequently, even though the prosecutor misstated
Vue's precise testimony, defendant suffered no prejudice as a result.

To the extent defendant argues that the prosecutor committed misconduct by
misrepresenting Vue's testimony as indicating that defendant was confrontational and
combative immediately, rather than becoming so only after Sisoukchaleun responded to
his remark, defendant's contention is without merit. The prosecutor's remark was not an
outright mischaracterization of Vue's testimony, and the jury was properly instructed that
it must decide the case solely based on the evidence, and the attorney's remarks were not
evidence.

### 4. "Leave it Alone"

In his opening statement at the beginning of the trial, the prosecutor told jurors,
"witnesses also tell you that an individual who appears to know the defendant tries to get
him to calm down and says, 'Hey, leave it alone, leave it alone.' " The prosecutor
reprised this assertion in closing arguments. However, as defendant correctly observes,

97

there was no testimony that any individual told defendant to " 'leave it alone.' " To the extent that the prosecutor's remark constituted a mischaracterization of the evidence and misconduct, defendant suffered no prejudice as a result.

While there was no testimony of this sort, our independent viewing of the surveillance video demonstrates that, as the confrontation escalated, an unidentified African-American man walked towards the group with his arm outstretched, placed his arm over defendant's chest and appeared to talk with defendant. The man appears to attempt to restrain defendant or encourage restraint. Moreover, again, the jury was instructed that it must decide the case solely based on the evidence, and the attorney's remarks were not evidence. In light of this evidence and the court's instructions, defendant suffered no prejudice from the prosecutor's comments.

### 5. Burden of Proof and *Griffin*[34] Error Claim

Defendant contends the prosecutor misstated the law by arguing that reasonable doubt had to be based on " 'some evidence.' " According to defendant, the prosecutor suggested that defendant had a burden to present " 'some evidence' " of what he actually believed relative to the need to defend himself to support his claim of imperfect self-defense.

The prosecutor stated in his closing argument: "The term that we use in the law in this country is 'beyond a reasonable doubt.' And the idea here is that it has a couple of components to it. First of all, it's reasonable and doubt. The idea that it could be open to any doubt is not what the law is. And the jury instruction that the judge read to you, talks about the fact that it's not speculation or possible doubt, because everything in life is open to some possible or imaginary doubt." The prosecutor continued: "So the idea here is that any reasonable doubt you have, would have to be based on the evidence in this

---

[34] *Griffin v. California* (1965) 380 U.S. 609, 615 [14 L.Ed.2d 106, 110] (*Griffin*).

98

case, have to be based on something you heard in this courtroom, something that came from a witness in this chair, a piece of evidence that you received in the trial. The idea would have to be -- that it would have to come from the evidence, not speculation, not a possible doubt, but something from the evidence in this case."

In discussing the concept of imperfect self-defense, the prosecutor stated: "Basically, what it tells us is that a reasonable person would not have believed in the need for self-defense, but the defendant, he did. Here's the problem with that. That particular offense [*sic*] requires an actual -- an actual belief, proof of an actual belief, that the defendant believed that. There is no evidence of what the defendant actually believed. [¶] Okay. We don't have that. [¶] Remember, when we look at the evidence in this case, we make decisions. We only look at the evidence in the case. We don't make -- we don't speculate. We don't have conjecture. We look at the evidence. There's no evidence of that."

Defendant again relies on *People v. Hill, supra*, 17 Cal.4th 800, in which the prosecutor, discussing the reasonable doubt standard, stated: " 'it must be reasonable. It's not all possible doubt. Actually, very simply, it means, you know, you have to have a reason for this doubt. There has to be some evidence on which to base a doubt.' " (*Id*. at p. 831, italics omitted.) After the court overruled defense counsel's objection, the prosecutor in *Hill* continued: " 'There must be some evidence from which there is a reason for a doubt. You can't say, well, one of the attorneys said so.' " (*Ibid*., italics omitted.) The *Hill* court stated, "to the extent [the prosecutor] was claiming there must be some affirmative evidence demonstrating a reasonable doubt, she was mistaken as to the law, for the jury may simply not be persuaded by the prosecution's evidence." (*Ibid*.) However, the court also observed that, "On the other hand, [the prosecutor] may simply have been exhorting the jury to consider the evidence presented, and not attorney argument, before making up its mind." (*Ibid*.) Ultimately, the court concluded that the prosecutor committed misconduct "insofar as her statements could reasonably be

interpreted as suggesting to the jury she did not have the burden of proving every element of the crimes charged beyond a reasonable doubt." (*Ibid.*) While the court characterized the matter as an arguably close question, the court concluded that it was "reasonably likely [the prosecutor]'s comments, taken in context, were understood by the jury to mean defendant had the burden of producing evidence to demonstrate a reasonable doubt of his guilt." (*Id.* at p. 832.)

Here, as the People observe and defendant concedes, the prosecutor did not state that reasonable doubt must be based on " 'some evidence.' " We conclude that the prosecutor here did not commit misconduct by shifting the burden of proof or suggesting that defendant was required to present some evidence or meet some evidentiary threshold. The prosecutor simply told the jury there was no proof of defendant's actual belief regarding the need to defend himself and that in deciding the case, the jury must not speculate about that. Thus, the essence of the prosecutor's remarks was that the jury must make its determinations based on the evidence presented at trial, a legally correct observation. Reasonable doubt, stated by the prosecutor, must arise from the evidence—whether based on what the evidence proved or what it failed to prove—rather than speculation or conjecture.

This case has even less in common with *People v. Woods* (2006) 146 Cal.App.4th 106, another case upon which defendant relies. In *Woods*, the prosecutor, during her rebuttal addressing the defense's attack on a police officer's account of the relevant events, stated: " 'Officer Campbell has a job to do. He has been doing that job for many, many years. [Defense counsel] didn't bring one witness into this courtroom to say that he doesn't do it properly. That he does it in a poor manner, that he does it wrong. That he tramples on anybody's rights. Not one witness came into court to say that but she thinks it's okay for her to stand up here in front of you and say that and that you should take it as gospel. No, she is obligated to put the evidence on from that witness stand.' " (*Id.* at p. 112.) These remarks, clearly misstating the law in claiming that the defendant "bore

100

some burden of proof or persuasion," were plainly improper and constituted misconduct. (*Id*. at p. 113.)  There are no remarks of a similar character here.

Defendant asserts that the prosecutor's comments focused the jury's attention on the fact that defendant did not testify and "suggested that his failure to tell the jury what he actually believed foreclosed his claim of imperfect self-defense."  Defendant contends that because he was the only one who could provide testimony as to what he actually believed, the prosecutor comments violated *Griffin, supra*, 380 U.S. at page 615.  On this point he relies, without analysis, on *People v. Murtishaw* (1981) 29 Cal.3d 733, 757 and footnote 19 (*Murtishaw*), and *People v. Bradford* (1997) 15 Cal.4th 1229, 1339 (*Bradford*).  Citing its earlier decision in *Murtishaw*, our high court held in *Bradford* that a prosecutor commits *Griffin* error "if he or she argues to the jury that certain testimony or evidence is uncontradicted, if such contradiction or denial could be provided *only* by the defendant, who therefore would be required to take the witness stand." (*Bradford*, at p. 1339.)  However, the *Bradford* court also noted, that *Griffin* does not extend to bar prosecution comments based upon the state of the evidence or upon the failure of the defense to introduce material evidence.  (*Bradford*, at p. 1339.)  "A distinction clearly exists between the permissible comment that a defendant has not produced any evidence, and on the other hand an improper statement that a defendant has a duty or burden to produce evidence, or a duty or burden to prove his or her innocence." (*Id*. at p. 1340.) "*Griffin*['s] . . . protection of the right to remain silent is a 'shield,' not a 'sword' that can be used to 'cut off the prosecution's "fair response" to the evidence or argument of the defendant.' " (*People v. Lewis* (2004) 117 Cal.App.4th 246, 257.)

In *Murtishaw*, the prosecutor referred to a witness's testimony about pre-offense statements the defendant had made as "uncontradicted." (*Murtishaw, supra*, 29 Cal.3d at p. 757 & fn. 19.)  However, on appeal, the court did not address the merits, and simply held that defendant forfeited the argument by failing to object in the trial court. (*Id*. at pp. 757-758.)

In *Bradford*, the prosecutor argued the victims had been killed for pleasure and there was no evidence to contrary. (*Bradford, supra*, 15 Cal.4th at p. 1338.) The prosecutor further argued that the defense presented no evidence regarding a blood stain in defendant's vehicle or evidence contradicting the time of death established by the coroner, and presented no alibi witnesses or photographs to prove where he was. (*Id.* at p. 1339.) These comments were not improper. (*Ibid.*)

In the instant case, the prosecutor did not say or even imply defendant was the only source of evidence as to his actual belief; nor did the prosecutor even comment about the failure to call witnesses. And as defendant concedes, a defendant's state of mind may be inferred from sources other than defendant. (*People v. De Leon* (1992) 10 Cal.App.4th 815, 824.) Consequently, defendant was not the only source of evidence establishing his actual belief in the need to defend himself. Here, the prosecutor merely commented on the state of the evidence in that the evidence before the jury did not demonstrate that defendant actually believed in the need for self-defense.

These comments did not amount to prosecutorial misconduct.

**6. Heat of Passion**

Defendant asserts that the prosecutor misstated the law with regard to heat of passion which may serve to reduce murder to manslaughter. According to defendant, the prosecutor's remarks erroneously conveyed to the jury that defendant's specific *conduct of killing* the victim in response to the provocation must be reasonable. On this point, we agree with defendant.

In *Beltran, supra*, 56 Cal.4th 935, the California Supreme Court discussed the history of heat of passion and rejected the People's assertion that the heat of passion standard should require a showing that the provocation must be of a kind that would cause an ordinary person of average disposition to kill. Our high court reaffirmed the proper standard to be applied: "when examining heat of passion in the context of manslaughter, the fundamental 'inquiry is whether or not the defendant's reason was, at

102

the time of his act, so disturbed or obscured by some passion . . . to such an extent as would render ordinary men of average disposition liable to act rashly or without due deliberation and reflection, and from this passion rather than from judgment.' " (*Id.* at pp. 938-939, quoting *People v. Logan* (1917) 175 Cal. 45, 49 (*Logan*).) The *Beltran* court further clarified that "[a]dopting a standard requiring such provocation that the ordinary person of average disposition would be moved to *kill* focuses on the wrong thing." (*Beltran*, at p. 949.) The court continued: "The proper focus is placed on the defendant's state of mind, not on his particular act. To be adequate, the provocation must be one that would cause an emotion so intense that an ordinary person would simply *react*, without reflection. . . . [T]he anger or other passion must be so strong that the defendant's reaction bypassed his thought process to such an extent that judgment could not and did not intervene. Framed another way, provocation is not evaluated by whether the average person would *act* in a certain way: to kill. Instead, the question is whether the average person would *react* in a certain way: with his reason and judgment obscured." (*Ibid.*)

Here, the prosecutor stated in closing arguments: "Sudden quarrel and heat of passion, the definition . . . . The definition is that the defendant was provoked. He acted rashly with intense emotion that obscured reasoning and judgment. [¶] Here's the kicker. *A reasonable person would have acted the same way.* [¶] Okay. There is no such thing as a reasonable gangster standard. You heard that the defendant cannot set up his own standard of reasonableness. This is a reasonable person standard. It is a community standard." (Italics added.) After furnishing an example of provocation, the prosecutor continued, "Okay. So on that concept of reasonableness -- we know, from listening to this case, that there is no way that we can place the defendant in that scenario. *There is no conceivable way that the defendant's actions mirror what we understand as sudden quarrel, heat of passion.* There is no reasonableness standard for what he did. *As a community, we do not look at his conduct and say, That's reasonable, Mr. Blessett.*

103

That's not murder. That's just manslaughter . . . ." (Italics added.) Later, the prosecutor stated: "The victim takes one .28 blood alcohol swing at the defendant. The evidence in this case, uncontroverted evidence, is that he stops right then, takes one swing. Stops. Never connects with anything. Defendant pulls a gun. Puts it point blank to the victim's head and pulls the trigger. Right between the eyes. [¶] But that's not enough, right? Because as he turns around, the defendant turns the gun again and fires a second shot into his side, tearing through his aorta. [¶] And with all of that, a 20-year-old dies in the gutter. *Reasonableness? Is that reasonable?* [¶] *Remember, this is our community standard, right? Is he acting like a reasonable person would act*? No." (Italics added.)

"When a claim of misconduct is based on the prosecutor's comments before the jury, ' "the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion." ' " (*People v. Williams* (2013) 56 Cal.4th 630, 671.) Here, we conclude that the prosecutor misstated the law by focusing not on whether it was reasonable for defendant to react rashly, from passion and not from judgment, but instead on whether defendant acted reasonably by killing. By misstating the law, the prosecutor committed misconduct. (*People v. Boyette* (2002) 29 Cal.4th 381, 435.)

The jury was, however, properly instructed with CALCRIM No. 570 (Voluntary Manslaughter: Heat of Passion—Lesser Included Offense).[35] Thus, the jury was

---

[35] The court instructed the jury: "A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed someone because of a sudden quarrel or in the heat of passion. [¶] The defendant killed someone because of a sudden quarrel or in the heat of passion if, Number One, the defendant was provoked. [¶] Two, as a result of the provocation, the defendant acted rashly and under the influence of intense emotion that obscured his reasoning or judgment. [¶] And Number Three, *the provocation would have caused a person of average disposition to act rashly and without due deliberation, that is from passion, rather than from judgment*. [¶] Heat of passion does not require anger, rage, or any specific emotion. It can be any violent or intense emotion that causes a person to act without due deliberation and reflection. [¶] In order for heat of passion to

104

properly instructed on the reasonableness requirement of heat of passion provocation consistent with *Beltran*. Additionally, the court instructed the jury pursuant to CALCRIM No. 200 that if the jurors believed "that the attorneys' comments on the law conflict with [the court's] instructions, [the jury] must follow [the court's] instructions." "The jury is presumed to have followed the trial court's instructions in the absence of any indication it was unwilling or unable to do so." (*Letner and Tobin, supra*, 50 Cal.4th at p. 196.)

As we have noted, the *Beltran* court explained that the *Watson* standard for harmless error (see *Watson, supra*, 46 Cal.2d at pp. 835-836) focuses on what a reasonable jury is *likely* to have done, not on what a reasonable jury *could* do in the absence of the error, and appellate courts may consider, among other things, "whether the evidence supporting the existing judgment is so *relatively* strong, and the evidence supporting a different outcome is so *comparatively* weak, that there is no reasonable probability the error of which the defendant complains affected the result.' " (*Beltran, supra*, 56 Cal.4th at p. 956.) Given the evidence before the jury, which we have previously outlined, and the instructions provided by the court, we see no reasonable

---

reduce a murder to voluntary manslaughter, the defendant must have acted under the direct and immediate influence of provocation, as I have defined it. While no specific type of provocation is required, slight or remote provocation is not sufficient. [¶] Sufficient provocation may occur over a short or long period of time. [¶] It is not enough that the defendant simply was provoked. The defendant is not allowed to set up his own standard of conduct. You must decide whether the defendant was provoked and whether the provocation was sufficient. [¶] *In deciding whether the provocation was sufficient, consider whether a person of average disposition in the same situation and knowing the same facts would have reacted from passion rather than from judgment.* [¶] If enough time passed between the provocation and the killing for a person of average disposition to cool off and regain his clear reasoning and judgment, then the killing is not reduced to voluntary manslaughter on that basis. [¶] The People have the burden of proving beyond a reasonable doubt that the defendant did not kill as a result of a sudden quarrel or in the heat of passion. [¶] If the People have not met this burden, you must find the defendant not guilty of murder." (Italics added.)

likelihood that the jury construed or applied the complained-of remarks in an objectionable fashion (*People v. Williams, supra*, 56 Cal.4th at p. 671); nor is there a reasonable likelihood the result would have been different in the absence of those remarks. (*Beltran*, at p. 956.)

### 7. Initial Aggressor, Mutual Combat and Self-Defense

Defendant claims that the prosecutor improperly implied in closing argument that the terms " 'quarrel' " and " 'fight' " were synonymous and that therefore a defendant loses the right to act in self-defense if that defendant starts either a fight or a verbal quarrel. Defendant asserts that, because there was purportedly no evidence that he initiated the physical confrontation, the import of the prosecutor's argument was that he lost his right to self-defense even if he merely initiated a verbal quarrel or confrontation.

As we have noted in our discussion of CALCRIM No. 3471, the prosecutor told the jury: "Not available if you seek a quarrel with the intent to create the necessity for self-defense. And not available to mutual combatants, unless you withdraw. [¶] If you start the fight, if this is mutual combat, you don't get self-defense unless you've satisfied those conditions, which we know didn't happen in this case. [¶] What that leaves us with when we look at the outline of self-defense and how the law works, we're left with the concept that self-defense is 100 percent reactionary, right? You can't contrive it. You can't set up the circumstances that then requires [*sic*] you to use self-defense, you can't start the quarrel. It has to be reactionary. And that was not the case here."

The jury was properly instructed on self-defense, including the initial aggressor/mutual combat instruction that says a "person who engages in mutual combat or who starts a fight, has a right to self-defense" only if that person tries to stop fighting, communicates the desire to stop fighting, and affords the other party the opportunity to stop fighting. (CALCRIM No. 3471.) The court further instructed the jury that "[a] person does not have the right to self-defense if he provokes a *fight or a quarrel* with the intent to create an excuse to use force." (CALCRIM No. 3472, italics added.)

Defendant claims that the prosecutor committed misconduct by suggesting the terms " 'fight' " and " 'quarrel' " are synonymous. However, we do not read the prosecutor's argument that way. To the contrary, the prosecutor merely paraphrased CALCRIM Nos. 3471 and 3472 and in doing so did not suggest that fight and quarrel were the same. The prosecutor said that self-defense is not available if a person seeks a quarrel with the intent to create the necessity for self-defense. And then he explained that if a person starts a fight that person is not entitled to self-defense unless he attempts to withdraw by satisfying the conditions set forth in CALCRIM No. 3471.

As we have demonstrated, provoking a quarrel or fight are *two* different acts of conduct. The prosecutor's argument did not confuse the two terms. The prosecutor's comment that self-defense is not available if one "seeks a quarrel with the intent to create the necessity for self-defense" simply focused on one of the two types of conduct that would preclude self-defense when the use of force is contrived by the defendant, quarrel instead of fight. Then the prosecutor discussed the principle that when a person starts a fight or engages in mutual combat, a claim of self-defense is precluded unless the person withdrew from the conflict. Nothing the prosecutor said in this line of argument amounted to misconduct.

**8.** "**Yellow Light" Analogy**

Defendant claims that the prosecutor committed misconduct in attempting to explain the concepts of deliberation and premeditation by analogizing them to deciding to drive one's car through a yellow traffic light.

The prosecutor stated in his closing argument: "We've all had yellow lights, where you make some decisions, right? You weigh -- you weigh the for and against. You think about things like, how long has this light been yellow? Okay. How much traffic is in the intersection? How much is the traffic in front of me stopped. How much traffic is there on the sides? Is the -- is there a police officer anywhere around? We go through all of those things in our head[s]. We weigh all of those considerations. We

107

look at the for and against and sometimes, it's easy. If the light just turned yellow, we go. Sometimes it's been yellow too long, we stop, but we have all been in those situations where it's right on the edge, right? That yellow light has been yellow just long enough. And we make three or four significant decisions, significant to our own safety, significant to the safety of those people around us, and we make those decisions in a split second. [¶] And a lot of us press the accelerator and go, but we've made those decisions. And the reality is, that you have premeditated and deliberated. And like the law tells us, you make that decision quickly. So we do make those decisions in our everyday lives. We make decisions where we impact other people that have large consequences to them. We make them fast and we premeditate and deliberate. [¶] So the idea here, and the law tells us that it's not about the amount of time. One of the things -- some of the things that we're gonna look at, and remember the law tells us we consider all of the circumstances in the weighing of evidence, right?"

There are an increasing number of cases, published and unpublished, discussing whether this particular analogy appropriately illustrates deliberation and premeditation. (E.g., *People v. Avila* (2009) 46 Cal.4th 680, 715; *Drain v. Woods* (E.D. Mich. 2012) 902 F.Supp.2d 1006, 1036; *People v. McBride* (Colo.Ct.App. 2009) 228 P.3d 216, 224-225.) Our state's high court, however, has essentially approved this argument. (*Avila*, at p. 715.) Like our high court, we conclude that the prosecutor used this example, and the number of observations and determinations that must be made in a brief period of time, "as an example of a 'quick judgment' that is nonetheless 'cold' and 'calculated.' " (*Ibid.*) "Premeditation and deliberation do not require an extended period of time, merely an opportunity for reflection." (*People v. Cook* (2006) 39 Cal.4th 566, 603.)

The prosecutor's remarks were not inconsistent with the trial court's instructions. The court instructed the jury with CALCRIM No. 521 (First Degree Murder), which instructed in pertinent part: "The length of time the person spends considering whether to kill does not alone determine whether the killing is deliberate and premeditated. The

108

amount of time required for deliberation and premeditation may vary from person to person and according to the circumstances. A decision to kill made rashly, impulsively, or without careful consideration is not deliberate and premeditated. On the other hand, a cold, calculated decision to kill can be reached quickly. The test is the extent of the reflection, not the length of time." (CALCRIM No. 521.) The prosecutor's use of the yellow light analogy did not constitute misconduct.

### 9. Lesser Included Offenses

Defendant asserts that the prosecutor committed misconduct by stating that the reason the trial court instructed on lesser included offenses was because the court was required to do so. Defendant emphasizes that the prosecutor did not specify that the court was only required to instruct on lesser included offenses if there was substantial evidence supporting the instructions. According to defendant, the prosecutor misstated the law by implying that the court was only instructing on lesser included offenses because it was obligated to do so based on "some legal technicality."

In closing argument, after discussing the elements of first and second degree murder, the prosecutor stated: "Now, the Judge also instructed you on what's called a lesser-included offense. The crime of murder has contained within it another crime. . . . [¶] . . . [¶] . . . The idea of the lesser-included offense is that, if that can occur, if you can take away one element and be left with another separate crime, then the Court has to instruct you on that crime. [¶] Okay. It doesn't mean that the elements of that crime are there. It doesn't mean there's not a murder that was committed. It simply means that it fits that definition. We can take away one element and we're left with another completely contained crime within it. [¶] Okay. So that's what we mean by a lesser-included offense. Okay. *You have to be instructed on it.*" (Italics added.) The prosecutor then went on to discuss voluntary manslaughter.

As defendant observes, the court is required to instruct on a lesser included offense " 'whenever evidence that the defendant is guilty only of the lesser offense is "substantial

109

enough to merit consideration" by the jury.  [Citations.]  "Substantial evidence" in this context is " 'evidence from which a jury composed of reasonable [persons] could . . . conclude[]' " that the lesser offense, but not the greater, was committed.' " (*People v. Romero* (2008) 44 Cal.4th 386, 403, quoting *People v. Breverman* (1998) 19 Cal.4th 142, 162.)

In essence, the prosecutor here described the definition of lesser included offenses. While he did not completely explain the circumstances under which instructions on lesser included offenses are to be given to the jury for consideration, he was not required to do so.  Contrary to defendant's characterization, the prosecutor's remarks were rather neutral; he essentially explained that the fact that the court was instructing on a lesser included offense did not mean that the elements of the greater offense were not present.

We do not agree that the prosecutor's remarks conveyed the message that the court was only instructing on lesser included offenses because it was required to do so based on some legal technicality.  His remarks did not constitute misconduct.

## VII.  Ineffective Assistance of Counsel

We have already addressed several of defendant's ineffective assistance of counsel claims.  Defendant advances additional claims which, he contends, demonstrate that he was denied the effective assistance of counsel at trial.  We conclude that defendant has failed to show he received constitutionally ineffective assistance of counsel.

### A.  Failure to Object to Evidence of Ammunition/Magazines

The People presented evidence concerning ammunition and magazines recovered pursuant to a search warrant which were of different calibers than the weapon used to murder Sisoukchaleun.  Defendant contends that trial counsel should have objected to evidence pertaining to all of the ammunition and magazines, even of the same caliber as the weapon used in the shooting.  He asserts the evidence "was cumulative, as the evidence that [defendant] in fact shot Sisoukchaleun was both overwhelming and undisputed."

110

"When the prosecution relies . . . on a specific type of weapon, it is error to admit evidence that other weapons were found in his possession, for such evidence tends to show, not that he committed the crime, but only that he is the sort of person who carries deadly weapons." (*People v. Riser* (1956) 47 Cal.2d 566, 577 (*Riser*).) However, evidence of ammunition and weapons other than the weapon used in the specific crime is admissible when relevant for other purposes. (*People v. Smith* (2003) 30 Cal.4th 581, 613-614 [relevant to the defendant's state of mind]; *People v. Cox* (2003) 30 Cal.4th 916, 956-957 [guns relevant either as possible murder weapons or as weapons that could have been used to coerce victims into defendant's car or otherwise subdue them in furtherance of the criminal plan to kill them], disapproved on other grounds in *Doolin, supra*, 45 Cal.4th at p. 421, fn. 22.)

While it is clear that some of the ammunition of varying calibers and associated magazines were not related to the handgun with which defendant shot Sisoukchaleun, we conclude that it was not error to admit this evidence on this basis. According to the gang expert, the primary activities of the Meadowview Bloods are robbery, burglary, narcotic sales, *weapons possession*, and assaults with deadly weapons, which have led to murders. Defendant's possession of the ammunition and magazines unrelated to the shooting was relevant to his status as a gang member and to the charged gang enhancement. The possession is conduct consistent with a primary activity of the gang and is evidence from which defendant's "intent to promote, further, or assist in any criminal conduct by gang members" could be inferred. (§ 186.22, subd. (b)(1).) Because this evidence was relevant for other purposes, it was not precluded by the rule in *Riser*. Therefore, trial counsel's performance was not deficient because the objection defendant contends counsel failed to make would have been meritless. (*People v. Ochoa* (1998) 19 Cal.4th 353, 463.) This claim of ineffective assistance of counsel fails for that reason.

## B. The Gang Expert's Opinion of Defendant's Gang Membership as Based "On the Facts of This Case"

Defendant asserts that the gang expert, expressing his opinion that defendant was a Meadowview Blood based on, among other things, *the facts* of this case, invaded the province of the jury. Therefore, according to defendant, defense counsel was ineffective for failing to object to this testimony.

An expert witness may express an opinion that embraces an ultimate issue to be determined by the trier of fact, provided the expert's opinion is otherwise admissible. (Evid. Code, § 805.) Conversely, an expert may not offer an opinion as to how the case should be decided (*People v. Killebrew* (2002) 103 Cal.App.4th 644, 651 (*Killebrew*), disapproved on other grounds in *People v. Vang* (2011) 52 Cal.4th 1038, 1047, fn. 3 (*Vang*)), that a defendant had specific knowledge or intent (*Killebrew*, at pp. 657-658), or as to the defendant's guilt (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 77).

Contrary to defendant's contention, the expert's testimony concerning defendant's status as a member of the Meadowview Bloods, based on "the facts of this particular case," did not invade the province of the fact finder. "The requirements for expert testimony are that it relate to a subject sufficiently beyond common experience as to assist the trier of fact and be based on matter that is reasonably relied upon by an expert in forming an opinion on the subject to which his or her testimony relates. [Citations.] Such evidence is admissible even though it encompasses the ultimate issue in the case." (*People v. Olguin* (1994) 31 Cal.App.4th 1355, 1371.) "[A] n individual's membership in a criminal street gang is a proper subject for expert testimony." (*People v. Duran* (2002) 97 Cal.App.4th 1448, 1464.) Additionally, evidence of the charged offenses may be considered by an expert in forming an opinion as to whether a gang is a criminal street gang with a pattern of criminal gang activity consisting of two or more statutorily enumerated offenses. (*Gardeley, supra*, 14 Cal.4th at p. 625.) While it would have been more accurate for the prosecutor to focus the question on the *evidence* in the case, instead

of the *facts* in the case (see *Vang, supra*, 52 Cal.4th at p. 1043, fn. 1), defendant's trial counsel was not ineffective for failing to object. Had the prosecutor been required to rephrase the question, asking for the expert's opinion based on the *evidence* in the case instead of the *facts* in the case, the expert's answer undoubtedly would have been the same. In addition, the expert would have been allowed to specifically reference the evidence to which the question referred. Where the record sheds no light on why counsel did not object, we reject the claim of ineffective assistance of counsel unless trial counsel failed to provide an explanation at the trial court's request, *or unless there could be no satisfactory explanation.* (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266-267 (*Mendoza Tello*).) " '[D]eciding whether to object is inherently tactical, and the failure to object will rarely establish ineffective assistance.' " (*Carrasco, supra*, 59 Cal.4th at p. 985, quoting *People v. Hillhouse* (2002) 27 Cal.4th 469, 502.) Here, counsel may very well have made a strategic decision to avoid emphasizing the evidence by having the expert itemize it in explaining what evidence supported his opinion or forcing the prosecutor to state another hypothetical question summarizing the facts of this case.

Moreover, even if counsel was constitutionally deficient for failing to object, defendant has not established *Strickland* prejudice. The evidence of defendant's gang membership was overwhelming.

### C. Failure to Object to the Gang Expert's Testimony about the Perpetuation of Gang Membership

The gang expert testified that gang members do not leave the gang unless they are labeled snitches and the gang stops associating with them. Otherwise, there is no mechanism for gang members to leave the gang. Gang activity may drop off, but association with the gang does not end, and there is "not a true stop in them being who they are. It is who they are. That's what they're about."

According to defendant, his trial attorney was ineffective for failing to object to this testimony. Specifically, defendant claims that this testimony lacked any adequate

113

foundation, and invited the jury to conclude, based on factors other than the criminal history evidence, that defendant acted for gang purposes. Defendant maintains that this was improper propensity evidence which violated his right to due process. Defendant also now claims this testimony was speculative and conjectural.

Defendant misreads the record. It was defense counsel that first inquired on this subject. On cross-examination, she asked, "How do you find -- people leave gangs. That does happen. They're drop outs. People walk away from the gang memberships. How do you find that that happens generally or why it would happen?" The testimony about which defendant complains was in response to that question.

We have already noted that where there may be a satisfactory explanation for not objecting, we reject claims of ineffective assistance of counsel. (*Mendoza Tello, supra*, 15 Cal.4th at pp. 266-267.) As the United States Supreme Court has observed, "There are . . . 'countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.' [Citation.] Rare are the situations in which the 'wide latitude counsel must have in making tactical decisions' will be limited to any one technique or approach." (*Richter, supra*, 562 U.S. at p. 106.)

Here, there are potentially satisfactory explanations for defense counsel not objecting. Defense counsel could have elected not to object to the testimony about which he now complains because it seemed inherently incredible, which could, in turn, cause the jury to consider the gang expert's testimony overall with greater skepticism. Indeed, defense counsel made this argument to the jury. Ridiculing the gang expert, defense counsel said, "And the last contact he could say that [defendant] had with any gang member was ten years ago. Most of the things he said was just ridiculous. [¶] No drop outs unless snitches." Further, counsel could have reasonably concluded that had she objected, the prosecution would ask additional questions to further explain the expert's opinion on this matter, which he ultimately did on redirect anyway. On redirect, the gang

114

expert testified that some people do drop out of gangs after being exposed to positive programs, for example church or project Cease Fire, a program that encouraged youth to stop gang banging by giving them resources.

We conclude that defense counsel's performance was not deficient for the mere failure to object to this line of testimony. And as before, defendant has failed to establish *Strickland* prejudice.

## D. Failure to Object to Prosecutorial Misconduct

Defendant asserts that counsel's failure to object to the alleged instances of prosecutorial misconduct we discussed, *ante*, rose to the level of constitutional ineffectiveness. Because we have concluded that there was either no misconduct or that no prejudicial prosecutorial misconduct occurred related to the cited comments, we conclude that defendant has failed to establish ineffective assistance for failing to object to these comments.

## VIII. Cumulative Error

Defendant contends that the cumulative effect of the alleged errors warrants reversal. We reject this contention. The premise behind the cumulative error doctrine is that, while a number of errors may be harmless taken individually, their cumulative effect requires reversal. (*Bunyard, supra*, 45 Cal.3d at pp. 1236-1237.) Any of the potential errors identified above "were harmless, whether considered individually or collectively. Defendant was entitled to a fair trial but not a perfect one." (*Cunningham, supra*, 25 Cal.4th at p. 1009.) We have found no prejudice when considering defendant's claims separately. Viewed cumulatively, our conclusion is the same. Defendant was not deprived of a fair trial.

## IX. Ten-Year Gang Enhancement Sentence

Defendant contends, and the People agree, that the 10-year sentence imposed pursuant to section 186.22 must be struck pursuant to subdivision (b)(5) of that section.

115

Under section 186.22, with specified exceptions, any person convicted of a violent felony as defined in section 667.5, subdivision (c), which is found to have been committed "for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members," (§ 186.22, subd. (b)(1)) shall be sentenced to an additional term of 10 years (§ 186.22, subd. (b)(1)(C)). One of the exceptions provides: "Except as provided in paragraph (4), any person who violates this subdivision in the commission of a felony punishable by imprisonment in the state prison for life shall not be paroled until a minimum of 15 calendar years have been served." (§ 186.22, subd. (b)(5).)

In *People v. Lopez* (2005) 34 Cal.4th 1002, 1004, the California Supreme Court determined that first degree murder is a violent felony punishable by imprisonment in state prison for life within the meaning of section 186.22, subdivision (b)(5), and therefore such a conviction is not subject to the 10-year enhancement under subdivision (b)(1)(C). Instead, defendant is subject to the 15-year minimum parole eligibility term set forth in subdivision (b)(5). (*People v. Elizalde* (2015) 61 Cal.4th 523, 539, fn. 10.)

Accordingly, we agree with defendant and the People that the 10-year sentence imposed pursuant to section 186.22 must be stricken. Because we conclude that we must remand the matter to the trial court, *post*, we shall direct the trial court to strike this portion of the sentence.

## X. Section 12022.53, subdivision (f)

Our review of the record reveals a sentencing error related to two of the firearm enhancements. The trial court simply stayed imposition of the sentence on the section 12022.5 and 12022.53, subdivision (b), enhancements. This was error. The trial court should have *imposed a specific sentence* on each enhancement and *then stayed execution of those sentences* pursuant to section 12022.53, subdivision (f).

Section 12022.53, subdivision (f), provides in pertinent part: "Only one additional term of imprisonment under this section shall be imposed per person for each crime. If

116

more than one enhancement per person is found true under this section, the court shall impose upon that person the enhancement that provides the longest term of imprisonment. An enhancement involving a firearm specified in Section 12021.5, 12022, 12022.3, 12022.4, 12022.5, or 12022.55 shall not be imposed on a person in addition to an enhancement imposed pursuant to this section." Our high court has interpreted section 12022.53, subdivision (f), to require trial courts to *impose* a specific sentence on any lesser firearm enhancement *and then stay execution* of that sentence, in the same way a trial court would impose and stay execution of sentence on counts subject to section 654. (*People v. Gonzalez* (2008) 43 Cal.4th 1118, 1122-1123, 1128-1130.) This practice preserves the possibility of executing the stayed sentence of a lesser firearm enhancement should a later reversal by an appellate court eliminate the unstayed sentence on the greater enhancement. (*Id*. at p. 1128.)

At sentencing, the trial court stated, "just for record keeping purposes, I suppose, the 12022.5[, subdivision] (a)[] . . . and 12022.53[, subdivision] (b), the sentence is stayed on that, because it was imposed for the [section 12022.53, subdivision] (d)." The trial court did not impose sentences and then stay execution thereof. Although this issue is not raised by the parties, the trial court's failure to impose sentences on these enhancements was unauthorized.

Because this constituted an unauthorized sentence, it may be corrected at any time. (See *People v. Sanders* (2012) 55 Cal.4th 731, 743, fn. 13 [it is well established that the appellate court can correct a legal error resulting in an unauthorized sentence, including a misapplication of section 654, at any time].)

In *Alford*, a case involving a similarly unauthorized sentence under section 654, this court concluded that the "futility and expense" of remand militated against sending the case back to the trial court for resentencing where this court could determine the sentence that the trial court, in the exercise of its discretion, "undoubtedly" would have imposed. (*Alford, supra*, 180 Cal.App.4th at p. 1473.) However, our statutory authority

117

to modify an unauthorized sentence (§ 1260) does not authorize us to substitute our judgment for that of the trial court with respect to discretionary sentencing decisions. (*People v. Lawley* (2002) 27 Cal.4th 102, 172; *People v. Hines* (1997) 15 Cal.4th 997, 1080.) The section 12022.53, subdivision (b), enhancement poses no issue in this regard because the prescribed sentence to be imposed upon such an enhancement is 10 years. However, the section 12022.5, subdivision (a), enhancement provides for imposition of a sentence of three, four, or ten years. On this record, we cannot say what sentence the trial court "undoubtedly" would have imposed on this enhancement before staying execution of that sentence pursuant to section 12022.53, subdivision (f). (See *Alford*, at p. 1473.) Accordingly, we shall remand the matter to the trial court for resentencing so that the court may select a triad option on the section 12022.5, subdivision (a), enhancement and impose sentence on that enhancement as well as the 10-year sentence on the 12022.53, subdivision (b), enhancement, and then stay execution of those sentences pursuant to section 12022.53, subdivision (f), unless the court exercises its discretion to strike the firearm enhancements altogether (see part XI. of the Discussion, *post*).

## XI. Senate Bill 620

After defendant was convicted but before his case became final, the Governor signed Senate Bill No. 620 (2017-2018 Reg. Sess.) (Senate Bill 620), effective January 1, 2018. Following the enactment of Senate Bill 620, sections 12022.5 and 12022.53 have been amended to include language stating: "The court may, in the interest of justice pursuant to Section 1385 and at the time of sentencing, strike or dismiss an enhancement otherwise required to be imposed by this section. The authority provided by this subdivision applies to any resentencing that may occur pursuant to any other law." (§§ 12022.5, subd. (c), 12022.53, subd. (h).) Prior to the enactment of Senate Bill 620, and when defendant was sentenced, courts did not have discretion to strike or dismiss these enhancements. The former language of these sections explicitly provided that the

courts "shall not strike" enhancement allegations under those sections. (Former §§ 12022.5, subd. (c), 12022.53, subd. (h).)

We granted defendant's request for supplemental briefing on the impact of Senate Bill 620. In his supplemental opening brief, defendant asserts that his case must be remanded to the trial court to permit the court to exercise its newly authorized discretion to strike the firearm enhancements imposed in this case. Defendant asserts that the amendments to sections 12022.5 and 12022.53 which now grant sentencing courts the discretion to strike or dismiss those firearm enhancements apply retroactively to his case based on legislative intent and under the rule in *In re Estrada* (1965) 63 Cal.2d 740.

The People concede that the amendments to sections 12022.5 and 12022.53 should be afforded retroactive application to nonfinal judgments and that they should apply to this case. However, the People further assert that, because it is clear that the trial court would not have exercised its discretion to strike the firearm enhancements, no purpose would be served by remand, and, accordingly, remand is not appropriate. In making this argument, the People rely on the fact that the trial court denied defendant's motion pursuant to *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497 (*Romero*), to dismiss a prior strike allegation, as well as the sentencing court's remarks when it denied the motion.

We accept the People's concession and apply Senate Bill 620 retroactively. (See *People v. Woods* (2018) 19 Cal.App.5th 1080, 1091.) Accordingly, we proceed to consider the People's argument that remand would serve no purpose.

In asserting that remand would be futile, the People rely on *People v. Gutierrez* (1996) 48 Cal.App.4th 1894, 1896 (*Gutierrez*). In *Gutierrez*, the court considered whether it should remand to allow the trial court to decide whether it would dismiss a strike conviction under section 1385 following our high court's decision in *Romero, supra*, 13 Cal.4th 497. The *Gutierrez* court concluded that "no purpose would be served in remanding for reconsideration." (*Gutierrez*, at pp. 1895-1896.) In reaching this

119

conclusion, the *Gutierrez* court noted that the trial court had done the following at sentencing: "indicated that it would not, in any event, have exercised its discretion to lessen the sentence"; stated that imposing the maximum sentence was appropriate; and imposed an upper term sentence on the base term and two discretionary one-year enhancements, which was not required under the three strikes law. (*Gutierrez*, at p. 1896.) We also note that the trial court expressly stated that in declining to strike the discretionary sentences for the one-year enhancements, that " 'there really isn't any good cause' " to do so. Also, the court further stated that the defendant was " 'the kind of individual the law was intended to keep off the street as long as possible.' " (*Ibid*.)

In discussing its reasons for denying the defendant's *Romero* motion, the trial court here said: "[Defendant] has a lengthy criminal history. It stems from . . . when he was not quite 16 years of age as a juvenile. He was sent to the Boy's Ranch approximately at 15 and a half years old for an assault where he struck an adult in the head with a pistol, causing major injuries that required surgery for a fractured eye socket. So a pretty serious offense for a nearly 16-year-old. [¶] Further, he was adjudicated for a second felony of burglary. He's had a number, at least the report of probation details three such probation violations as a juvenile. One including a sustained felony adjudication for purchasing cocaine for sale. [¶] Also, as an adult, when he was approximately 18 years of age, he was convicted whereby he was on a bike, turned, stopped, pointed a sawed-off rifle at a police officer, which necessitated the officer firing a shot at the defendant, which actually struck [defendant] on the right forearm, but [defendant] was convicted of a 12020 for that offense, as well as a 148. [¶] When he was approximately 20 years old is when he was convicted of the attempted robbery, that is now being asked to be stricken for three strikes purposes. [¶] He was committed to state prison for that offense. He was not successful on parole without violations. He was -- one of the violations was a corporal injury to a spouse which was a misdemeanor conviction for 273.5, at least according to the probation report, he threatened his spouse.

120

He said, Why don't you get out of the car? Let me remind you of what I used to do to you, referring to his prior beatings. [¶] When he was nearly 27 years of age, he was convicted of a pandering charge, whereby he used two young girls, 14 and 16-years-old -- [¶] . . . [¶] and coerced them into performing various sex acts with individuals. He was convicted of that offense in 2002, and committed to state prison for that offense for six years. [¶] So his criminal history is significant. It's extensive. And the nature of these convictions involve not only violence, but the pandering is particularly reprehensible, considering it involved young, minor girls." The court also noted that it had received letters "represent[ing] a different side of" defendant which "speak well to the kind of person that he is." Also, in remarking on the letter defendant had written, the court found that defendant acknowledged responsibility and was regretful and that defendant said he was "trying to turn [him]self around."

In *Gutierrez*, there were no other reasons to remand the matter to the trial court other than to consider dismissing the strike allegation. Here, were it not for the fact we must remand this matter with directions to the trial court to select a triad sentence on the section 12022.5 enhancement and then stay execution thereof pursuant to section 12022.53, subdivision (f), we would consider whether the statements the trial court made here at sentencing are comparable to those made by the trial court in *Gutierrez* and make a determination whether no purpose would be served by remanding this matter. However, in light of the fact that remand is required under the circumstances of this case (see part X. of the Discussion, *ante*), and the interests of judicial economy therefore cannot be served by a determination under *Gutierrez*, we need not decide here whether the sentencing court's remarks indicate that remand would serve no purpose.

## DISPOSITION

We remand this matter to the trial court with directions to: (1) strike the 10-year sentence imposed pursuant to section 186.22, subdivision (b)(1)(C); (2) consider whether to exercise its discretion to strike the section 12022.5 and 12022.53 firearm enhancements; and, in the event that the court declines to exercise its discretion to strike the firearm enhancements; (3) impose sentences on the section 12022.5, subdivision (a), and 12022.53, subdivision (b), enhancements and then stay execution of those sentences pursuant to section 12022.53, subdivision (f). The trial court is directed thereafter to prepare an amended abstract of judgment reflecting these modifications and to forward a certified copy of the amended abstract to the Department of Corrections and Rehabilitation.

The judgment is otherwise affirmed.


                                                            MURRAY            , J.



I concur:



        NICHOLSON        , J.*

---

* Retired Associate Justice of the Court of Appeal, Third Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

BLEASE, Acting P.J., Dissenting.

I respectfully dissent. The majority concludes that defendant forfeited his confrontation clause claim by failing to object in the trial court even though the trial court would have been duty bound to overrule any such objection under the governing law in effect at that time. The basis of the forfeiture doctrine is Evidence Code section 353, subdivision (a). It is premised on the requirement that a defendant create a record in support of an objection for use on appeal. Where, as here, the trial court is required to overrule an objection, the record for use on appeal is not enhanced. In other words, had defendant objected below, we would have the same record we have today. The majority's holding that defendant forfeited his confrontation clause claim by failing to object in the trial court renders the futility doctrine futile.

The majority bases its conclusion that defendant forfeited his confrontation clause claim by failing to object in the trial court on its finding that the change in the law effected by *People v. Sanchez* (2016) 63 Cal.4th 665 (*Sanchez*) was reasonably foreseeable at the time of defendant's trial based on the concurring and dissenting opinions in *Williams v. Illinois* (2012) 567 U.S. 50 [183 L.Ed.2d 89] (*Williams*) and *People v. Dungo* (2012) 55 Cal.4th 608 (*Dungo*). To my knowledge, prior to *People v. Perez* (Apr. 18, 2018, E060438) ___ Cal.App.5th ___ [2018 Cal.App. Lexis 321] (*Perez*), cited by the majority in support of its conclusion, no published decision of a California appellate court had held that a defendant forfeited a claim by failing to raise it in the trial court because a change in the governing law was reasonably foreseeable. I decline to join the majority in so holding here. The majority's holding is not only inconsistent with the purpose of Evidence Code section 353, which precludes reversal for erroneous admission of evidence unless there is a timely and specific objection in the trial court, it places an unreasonable burden on defendants to anticipate potential changes in the law based on a view expressed in concurring and dissenting opinions that was not the basis of any judgment. I would hold that defendant's failure to object in the trial court was excused

1

and address the merits of his claim. In doing so, I would conclude that the gang expert's testimony concerning defendant's prior gang activity violated defendant's right to confrontation, and that the People failed to show beyond a reasonable doubt that the error did not contribute to the verdict.

Over 20 years ago in *People v. Gardeley* (1996) 14 Cal.4th 605, 620 (*Gardeley*), our Supreme Court "endorsed evidentiary rules allowing a gang expert to rely upon, and testify to, 'conversations with the defendants and with other Family Crip members, his personal investigations of hundreds of crimes committed by gang members, as well as information from his colleagues and various law enforcement agencies,' " reasoning that "such expert testimony is not admitted for its truth . . . ." (*Sanchez, supra,* 63 Cal.4th at p. 683.) While *Gardeley* predated *Crawford v. Washington* (2004) 541 U.S. 36 [158 L.Ed.2d 177] (*Crawford*) by eight years, cases decided after *Crawford* relied on *Gardeley* and applied similar reasoning in rejecting confrontation clause challenges. (See, e.g., *People v. Hill* (2011) 191 Cal.App.4th 1104, 1127-1128 (*Hill*); *People v. Sisneros* (2009) 174 Cal.App.4th 142, 153-154 (*Sisneros*); *People v. Ramirez* (2007) 153 Cal.App.4th 1422, 1426-1427 (*Ramirez*); *People v. Cooper* (2007) 148 Cal.App.4th 731, 746-747 (*Cooper*); *People v. Fulcher* (2006) 136 Cal.App.4th 41, 57 (*Fulcher*); *People v. Thomas* (2005) 130 Cal.App.4th 1202, 1209-1210 (*Thomas*).)

For example, in *Thomas,* 130 Cal.App.4th at page 1209, our colleagues in Division Two of the Fourth District Court of Appeal, relied on the "long established [rule] in California that experts may testify as to their opinions on relevant matters and, if questioned, may relate the information and sources on which they relied in forming those opinions," including hearsay, in rejecting a claim that the admission of hearsay evidence in the form of a gang expert's conversations with other gang members in which they identified defendant as a gang member ran afoul of *Crawford*. The court held that "*Crawford* does not undermine the established rule that experts can testify to their opinions on relevant matters, and relate the information and sources upon which they rely

2

in forming those opinions.  This is so because an expert is subject to cross-examination about his or her opinions and additionally, the materials on which the expert bases his or her opinion are not elicited for the truth of their contents; they are examined to assess the weight of the expert's opinion."  (*Thomas,* at p. 1210.)

After *Thomas* (and before our Supreme Court's recent decision in *Sanchez*), every division of every district court of appeal to address the issue in a published decision concluded that gang expert basis evidence is not offered for its truth but only to evaluate the expert's opinion to defeat a confrontation clause challenges under *Crawford.*  (See, e.g., *Hill, supra*, 191 Cal.App.4th at p. 1131; *Sisneros, supra*, 174 Cal.App.4th at pp. 153-154; *Ramirez, supra,* 153 Cal.App.4th at p. 1427; *Cooper, supra*, 148 Cal.App.4th at p. 746-747; *Fulcher, supra*, 136 Cal.App.4th at pp. 56-57.)

These cases were binding on the trial court at the time of defendant's trial in May 2013.  (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455 ["Decisions of every division of the District Courts of Appeal are binding upon all the justice and municipal courts and upon all the superior courts of this state."]; see also *Hill, supra,* 191 Cal.App.4th at p. 1131 [disagreeing with *Thomas,* but concluding it was bound by *Gardeley* and similar precedent supporting *Thomas*].)  Accordingly, any objection to the gang expert's testimony on confrontation clause grounds would have been futile.  (See *People v. Jeffrey G.* (2017) 13 Cal.App.5th 501, 507 ["There is little doubt that objecting [to the experts' testimony on hearsay grounds] would have been futile" pre-*Sanchez* "[b]ecause the experts' testimony was unobjectionable under the law prevailing at the time of the hearing."]; *People v. Meraz* (2016) 6 Cal.App.5th 1162, 1170, fn. 7, review granted Mar. 22, 2017, S239442 ["Any objection [on confrontation clause grounds] would likely have been futile because the trial court was bound to follow pre-*Sanchez* decisions holding expert 'basis' evidence does not violate the confrontation clause."]; *People v. Valadez* (2013) 220 Cal.App.4th 16, 32 & fn. 13 [observing that after *Williams* and *Dungo* "[i]f the currently constituted courts were called upon to resolve this issue, it

3

seems likely the holdings in *Thomas*, *Hill,* and other cases extending *Gardeley* . . . will be significantly undermined," but "[t]his does not mean *Gardeley's* holding that an expert may rely on inadmissible hearsay as a matter of state evidentiary law is no longer a viable rule"].)  It is well established that the duty to object is "excused when an 'objection or request for admonition would have been futile or would not have cured the [alleged] harm.' " (*People v. Carrillo* (2004) 119 Cal.App.4th 94, 101, quoting *People v. McDermott* (2002) 28 Cal.4th 946, 1001.)

As the majority notes, the general rule that a party objecting to evidence must make a timely and specific objection in the trial court is found in Evidence Code section 353, subdivision (a).[1]  "The reason for the requirement is manifest: a specifically grounded objection to a defined body of evidence serves to prevent error.  It allows the trial judge to consider excluding the evidence or limiting its admission to avoid possible prejudice.  It also allows the proponent of the evidence to lay additional foundation, modify the offer of proof, or take other steps designed to minimize the prospect of reversal." (*People v. Morris* (1991) 53 Cal.3d 152, 187-188, disapproved on other grounds in *People v. Stansbury* (1995) 9 Cal.4th 824, 930, fn. 1.)  Where, as here, governing law at the time of defendant's trial held that expert basis testimony was not elicited for its truth, but to assess the weight of the expert's opinion, and thus could not give rise to a confrontation clause violation (see, e.g., *Gardeley*, *supra,* 14 Cal.4th at p. 620; *Thomas, supra,* 130 Cal.App.4th at pp. 1209-1210; *Hill*, *supra*, 191 Cal.App.4th at p. 1131), the trial court would have been duty bound to overrule any objection to the gang

---

[1]  Section 353 provides in pertinent part:  "A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous admission of evidence unless:  [¶] (a) There appears of record an objection to or a motion to exclude or to strike the evidence that was timely made and so stated as to make clear the specific ground of the objection or motion."

expert's testimony on confrontation clause grounds.  In other words, such an objection would not have served to prevent the error alleged on appeal.

The majority's suggestion that "faced with the objection defendant makes here on appeal . . . , the prosecutor *could* have decided it prudent to forgo some or all testimony about the prior police contact events the expert related to the jury, or attempt to bring in witnesses who could competently testify to relevant parts of the more pertinent events" is at best wishful thinking.  (Maj. opn. *ante,* at p. 33, italics added.)  The governing law in effect at that time clearly was on the prosecution's side, and it would have been no small feat to find witnesses with first-hand knowledge of the activity in question because, as detailed below, three of the five incidents testified to by the gang expert occurred 20 or more years prior to defendant's trial, and the remaining two occurred over 10 years prior thereto.  The majority also muses that even if the trial court was bound to follow previous precedent, it *might* have exercised its discretion differently when considering the implication of more recent developments in the decisional law, such as "giving greater scrutiny to the number and nature of defendant's previous contacts related to the jury by the prosecution's gang expert."  (Maj. opn. *ante,* at p. 37, fn. omitted.)  Again, this is pure speculation.  Defendant did not object to the challenged testimony as unduly prejudicial under Evidence Code section 352, and as detailed above, the governing law then in effect held that the challenged testimony did not run afoul of the confrontation clause.  Nor would an objection at trial resulted in "the creation of a better record," as the majority asserts.  (Maj. opn. *ante,* at p. 37.)  Had defendant raised a confrontation clause objection, the trial court would have been duty bound to overrule it.  No additional showing would have been necessary, and we would have the same record we have today.

The majority concludes that defendant was required to raise his confrontation clause claim in the trial court because at the time of defendant's trial "the legal writing was on the wall and key changes in the law discussed in *Sanchez* were not unforeseeable" to competent and knowledgeable counsel based on the concurring and dissenting

5

opinions in *Williams* and *Dungo*. (Maj. opn. *ante,* at p. 27, italics omitted.) The common view expressed in the concurring and dissenting opinions in those cases could not be taken as a holding by either court since it was not the basis of any judgment. (See *Dungo*, *supra,* 55 Cal.4th at pp. 627-629 (conc. opn. of Chin, J.) The majority does not contend otherwise. Rather, the majority relies on our Supreme Court's decision in *People v. Rangel* (2016) 62 Cal.4th 1192, (*Rangel*), for the "foreseeability rule" it endorses here, although *Rangel* never mentions such a rule. (Maj. opn. *ante,* at pp. 25-26.)

In *Rangel*, the defendant argued that the trial court's admission of certain statements as adoptive admissions violated his right to confrontation under *Crawford*, which was not decided until after the defendant's trial. (*Rangel, supra*, 62 Cal.4th at p. 1213.) The People asserted that the defendant forfeited his challenge by failing to object on this ground at trial. (*Id.* at p. 1215.) The court held that the defendant's "failure to object on confrontation clause grounds during his 1998 trial ' "was excusable, since governing law at the time . . . afforded scant grounds for objection," ' " noting that at the time of the defendant's trial "governing law in California held that admission of a hearsay statement as an adoptive admission did not implicate the defendant's Sixth Amendment confrontation right." (*Ibid.*) The court further observed: " ' " '[W]e have excused a failure to object where to require defense counsel to raise an objection "would place an unreasonable burden on defendants to anticipate unforeseen changes in the law and encourage fruitless objections in other situations where defendants might hope that an established rule of evidence would be changed on appeal." ' " [Citation.]' " (*Id.* at p. 1215.) Because *Crawford* was " 'flatly inconsistent with the prior governing precedent,' " the court concluded that "in a case tried before *Crawford,* a defendant does not forfeit a *Crawford* challenge by failing to raise a confrontation clause objection at trial." (*Rangel,* at p. 1215.) The court then went on to "clarify that the relevant inquiry is not, as some of our cases might be read to suggest, whether the defendant's *Crawford*

challenge relies on the same facts and legal standards as a challenge made on hearsay or other state law grounds. . . . For present purposes . . . , the relevant question is whether requiring defense counsel to raise an objection ' " ' "would place an unreasonable burden on defendants to anticipate unforeseen changes in the law." ' " ' " (*Id.* at pp. 1216-1217.) Because requiring defense counsel to raise its confrontation clause objection would have placed such a burden on the defendant in that case, the court concluded that the defendant had not forfeited his *Crawford* claim. (*Rangel,* at p. 1217.)

Here, as in *Rangel,* defendant's failure to object on confrontation clause grounds during his trial was excusable because *governing law* at the time held that expert basis testimony was not elicited for its truth, but to assess the weight of the expert's opinion, and thus could not give rise to a confrontation clause violation. (See, e.g., *Gardeley*, *supra,* 14 Cal.4th at p. 620; *Thomas, supra,* 130 Cal.App.4th at pp. 1209-1210; *Hill*, *supra*, 191 Cal.App.4th at p. 1131.) *Sanchez* was "flatly inconsistent" with prior governing precedent insofar as it held that "there is no denying that such facts are being considered by the expert, and offered to the jury, as true." (*Sanchez, supra*, 63 Cal. 4th at p. 684.) While *Williams* and *Dungo* suggested that *if* called upon to decide the issue, a majority of justices on the United States Supreme Court and our Supreme Court, as *then constituted*, would likely find that the extrajudicial basis of an expert's opinion is necessarily considered for its truth for confrontation purposes, there was no indication that either court would reach the issue in the foreseeable future at the time of defendant's trial. The petition for review in *Sanchez* was not granted until May 2014, one year *after* the trial in this case, and the United States Supreme Court has yet to hold that expert basis testimony is necessarily offered for its truth.[2]

---

[2]    The majority cites *People v. Mercado* (2013) 216 Cal.App.4th 67 (*Mercado*) for the proposition that the change in the law effected by *Sanchez* was reasonably foreseeable. In that case, the court disagreed with the People's assertion that " '*Williams* has no

7

In crafting its "foreseeability rule," the majority takes court's statement, " ' " '[W]e have excused a failure to object where to require defense counsel to raise an objection 'would place an unreasonable burden on defendants to anticipate unforeseen changes in the law and encourage fruitless objections in other situations where defendants might hope that an established rule of evidence would be changed on appeal' " ' " (*Rangel, supra*, 62 Cal.4th at p. 1215), and turned it on its head to find that where changes in the law are foreseeable, a defendant must raise a timely and specific objection in the trial court in order to preserve the issue for appeal even where, as here, the governing law in effect at the time of the objection would have required the trial court to overrule it. That is not the law as demonstrated by the Supreme Court's recent decision in *People v. Gallardo* (2017) 4 Cal.5th 120 (*Gallardo*).

In *Gallardo*, the trial court increased the defendant's sentence for second degree robbery and transportation of marijuana based on its finding that her prior conviction for assault with a deadly weapon or with force likely to produce great bodily injury involved

application to the facts here and nothing in *Williams* overrules the longstanding rule in California that experts may rely upon and testify to sources on which they base their opinions,' " noting that "[a]lthough the *Williams* plurality concluded expert basis testimony does not constitute hearsay because it is not admitted for its truth, both Justice Thomas and the *Williams* dissenters rejected that analysis, concluding the evidence at issue had been admitted for its truth." (*Mercado,* at p. 89.) The court ultimately concluded that no confrontation clause violation had occurred because the extrajudicial statements relied on by the expert in reaching his conclusion were not testimonial. (*Ibid.*) To the extent that *Mercado* can be read as holding that *Williams* or *Dungo* overruled *Gardeley, Thomas,* and the numerous other appellate court decisions holding that expert basis evidence is not offered for its truth, it is incorrect. As detailed above, the common view expressed in the concurring and dissenting opinions in *Williams* and *Dungo* did not constitute a holding by either court since it was not the basis of any judgment. (See *Dungo, supra*, 55 Cal.4th at pp. 627-629 (conc. opn. of Chin, J.).) Thus, the majority's reliance on *Williams, Dungo,* and *Mercado* for the proposition "that the confrontation clause analysis had changed since *Gardeley, Thomas,* and *Hill*" is misplaced. (Maj. opn. *ante,* at p. 32.) As detailed above, law did not change until *Sanchez.* If it had, there would have been no reason for the court to expressly disapprove *Gardeley* in *Sanchez.* (*Sanchez, supra,* 63 Cal.4th at p. 686, fn. 13.)

8

an assault with a deadly weapon and thus qualified as a serious felony under Penal Code section 667, subdivision (a). (*Gallardo, supra*, 4 Cal.5th at p. 125.) The trial court based its determination on the transcript of the preliminary hearing in the defendant's assault case. (*Id.* at p. 125-126.) The defendant argued that her increased sentence "rest[ed] on an exercise in judicial factfinding that violated her Sixth Amendment right to a jury trial" as set forth in *Apprendi v. New Jersey* (2000) 530 U.S. 466, 490 [147 L.Ed.2d 435, 455]. (*Gallardo,* at pp. 123-124.) The People asserted that the defendant forfeited her Sixth Amendment challenge by failing to raise it in the trial court. (*Id.* at pp. 127-128.) While our Supreme Court declined to resolve the issue because the People did not make their forfeiture argument in the Court of Appeal (*id.* at p. 128), its analysis and observations are instructive.

At the time of the defendant's sentencing in *Gallardo*, the law was in flux. In *People v. McGee* (2006) 38 Cal.4th 682 (*McGee),* our Supreme Court "held that the Sixth Amendment permits courts to review the record of a defendant's prior conviction to determine whether the crime qualifies as a serious felony for purposes of the sentencing law." (*Gallardo, supra,* 4 Cal.5th at p. 124.) Thereafter, in *Descamps v. United States* (2013) 570 U.S. 254 [186 L.Ed.2d 438] (*Descamps*), the United States Supreme Court "ma[d]e clear that when the criminal law imposes added punishment based on findings about the facts underlying a defendant's prior conviction, '[t]he Sixth Amendment contemplates that a jury--not a sentencing court--will find such facts, unanimously and beyond a reasonable doubt.' " (*Gallardo* at p. 124, quoting *Descamps, supra,* 570 U.S. at p. 269.)

In addressing the People's forfeiture argument, the court in *Gallardo* explained: "At the time defendant was sentenced, California law allowed a trial court to look to a preliminary hearing transcript to determine whether a defendant's prior conviction was 'realistically' a serious felony. To be sure, *Descamps,* which forms the centerpiece of defendant's argument to this court, had been decided by the time of defendant's

9

sentencing.  But *Descamps* did not squarely overrule existing California law; it discussed the relevant Sixth Amendment principles only en route to construing the federal statute at issue to avoid constitutional concerns.  [Citation.]  It is at least questionable whether defendant should be made to bear the burden of anticipating potential changes in the law based on the reasoning of a United States Supreme Court opinion addressed to the proper interpretation of a federal statute not at issue here." (*Id.* at pp. 127-128.)

Unlike *Gallardo,* here there was not a majority opinion calling into question the governing law.  Rather, there were concurring and dissenting opinions in *Williams and Dungo,* and the common view expressed in those opinions could not be taken as a holding by either court since it was not the basis of any judgment.  (See *Dungo, supra*, 55 Cal.4th at pp. 627-629 (conc. opn. of Chin, J.).)  If it is "at least questionable" whether a defendant should be made to bear the burden of anticipating a potential change in the law based on the reasoning of a majority opinion issued by the Unites States Supreme Court, there is no question that a defendant should not be made to bear the burden of anticipating potential changes in the law based on a view expressed in concurring and dissenting opinions that could not be taken as a holding.  (*Gallardo, supra*, 4 Cal.5th at p. 128.)

Until very recently, no published decision of a California court of appeal had held that a defendant forfeited a claim by failing to raise it in the trial court based on the ground that a change in the law was reasonably foreseeable.  To the contrary, in *People v. Meraz*, *supra,* 6 Cal.App.5th at page 1170, footnote 7, a case identical to this one in all relevant respects, our colleagues in Division Eight of the Second Appellate District refused to find that the defendants forfeited their claim that the trial court violated their rights to confrontation by allowing a gang expert to offer opinions based on out-of-court testimonial hearsay by failing to object in the trial court, finding that "[a]ny objection would likely have been futile because the trial court was bound to follow pre-*Sanchez* decisions holding expert 'basis' evidence does not violate the confrontation clause."

Likewise, in *People v. Jeffrey G., supra*, 13 Cal.App.5th at pages 507-508, our colleagues in Division One of the First Appellate District refused to find that a defendant forfeited his claim that the prosecution's experts' testimony at a hearing on his petition for transfer from a state hospital to a conditional release program ran afoul of *Sanchez* by failing to object to the experts' testimony on that ground at the hearing. *Sanchez* was decided less than two weeks after the defendant's hearing in that case. (*Jeffrey G.*, at p. 506.) The court found, "There is little doubt that objecting would have been futile. Because the experts' testimony was unobjectionable under the law prevailing at the time of the hearing, any objection would presumably have been overruled." (*Id.* at p. 507, fn. omitted.) As for the Attorney General's argument that defendant's trial counsel should have "anticipated that *Sanchez* would one day issue and change the law," the court stated: "We decline to require such prescience." (*Id.* at p. 508, fn. omitted.)

More recently, however, our colleagues in Division Two of the Fourth District, reached the opposite conclusion. (*Perez, supra, ___ Cal.App.5th at p. ___ [pp. 2-3].) In *Perez,* the court held that a defendant forfeited his contention that much of the gang expert's testimony in that case consisted of case-specific hearsay by failing to object to such testimony in the trial court, finding that "[e]ven though the case was tried before *Sanchez* was decided, previous cases had already indicated that an expert's testimony to hearsay was objectionable." (*Id.* at p. ___ [p. 3].) The court noted that a majority of the justices in both *Williams* and *Dungo* "expressed the view that, at least for purposes of the confrontation clause, an expert's testimony to the hearsay on which his or her opinion is based is offered for its truth," and found that those cases "alerted competent and knowledgeable counsel to the need to object to such evidence on hearsay and *Crawford* grounds. They also meant that such objections would not have been futile." (*Id.* at p. ___ [p. 59].) I do not find the court's reasoning in *Perez* persuasive.

As previously discussed, the common view expressed in the concurring and dissenting opinions in *Williams* and *Dungo* could not be taken as a holding by either

11

court since it was not the basis of any judgment. (See *Dungo, supra,* 55 Cal.4th at pp. 627-629 (conc. opn. of Chin, J.); see also *People v. Sandoval* (2007) 41 Cal.4th 825, 837 [refusing to apply forfeiture rule to defendant's claim that imposition of upper term violated her right to jury trial where defendant failed to object in trial court even though counsel in other cases had anticipated the change in the law effected by *Cunningham v. California* (2006) 549 U.S. 270 [166 L.Ed.2d 856] and raised the issue in the trial court because binding precedent would have required trial court to overrule the objection].) Moreover, *Perez* inexplicably fails to mention, much less discuss *Gardeley* or the numerous post-*Crawford* court of appeal decisions that held that gang expert basis evidence is not offered for its truth to defeat confrontation clause challenges under *Crawford*, including its own decision in *Thomas*. As explained above, those cases were binding on the trial courts prior to our Supreme Court's decision in *Sanchez*.

I do not dispute that the better practice in this case may have been to raise a confrontation clause objection in the trial court, particularly with the benefit of hindsight. I disagree, however, with the majority that defendant forfeited his confrontation clause claim by failing to do so here where the trial court would have been duty bound to overrule it, and there was no indication that either the United States Supreme Court or California Supreme Court would address the issue in the foreseeable future. Accordingly, I would excuse defendant's failure to object and address the merits of his claim.

Turning to the merits, the People properly concede that much, if not all, of the gang expert's testimony concerning defendant's prior gang activity consists of case-specific testimonial hearsay, and its admission ran afoul of the confrontation clause under *Sanchez*.[3] It is clear from the record that most, if not all, of the expert's testimony

---

[3] The People concede that "[u]nder *Sanchez,* the . . . testimony, in which the gang expert related case-specific, out-of-court statements documenting appellant's prior gang

12

concerning defendant's prior gang activity constituted hearsay in that it consisted of out-of-court statements that were offered for the truth of the matter asserted. (Evid. Code, § 1200, subd. (a); *Sanchez, supra,* 63 Cal.4th at p. 684.) The gang activity testified to by the expert occurred in 1991, 1992, 1993, 1995, and 2002; the expert did not start with the police department until 2000 and was not assigned to the problem-oriented policing team (POP), where he first testified he dealt with gang-related problems, for three years. Thus, his testimony could not have been based on his personal knowledge. The record also makes plain that the expert's testimony was gleaned from police reports or similar materials. When asked if he "had an opportunity to *review* [defendant's] background and a number of the contacts that he's had," the gang expert indicated that he had. (Italics added.) After he testified regarding an incident in October 1992 during which "a female victim . . . was bumped into by a male black subject on a bicycle" who then took her purse, the prosecutor advised the court and the jury that "[t]here was an error to the *report* involving a bicycle incident that we have been referring to" and asked the court and the jury to disregard that incident. (Italics added.) Later, when testifying about a domestic violence incident in 1995, the expert stated that "in the domestic violence *report*, [defendant] was described as wearing burgundy pants and also that he was a Meadowview Bloods at the time." (Italics added.) Because the testimony was based on police reports or similar material, it was testimonial. (*Sanchez, supra,* 63 Cal.4th at p. 694.) Finally, all the incidents to which the expert testified related to defendant, and thus consisted of case-specific facts. (*Id.* at p. 676.) Accordingly, the admission of such evidence violated defendant's rights under the confrontation clause.

Having concluded that the gang expert's testimony concerning defendant's prior gang activity violated defendant's rights under the confrontation clause, I next consider

---

and police contacts, amounted to testimonial hearsay," but argue that the error was harmless beyond a reasonable doubt. The majority accepts the concession.

whether defendant was prejudiced by the violation. "Confrontation clause violations are subject to federal harmless-error analysis under *Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705]." (*People v. Geier* (2007) 41 Cal.4th 555, 608.) This is a much more difficult standard for the People to overcome than the "reasonable probability" standard employed in assessing whether defendant was prejudiced by trial counsel's deficient performance. (*People v. Mesa* (2006) 144 Cal.App.4th 1000, 1008.) Under *Chapman*, the People must prove the errors were harmless beyond a reasonable doubt; that is, the errors did not contribute to the jury's verdict. (*People v. Houston* (2012) 54 Cal.4th 1186, 1233; *Sanchez, supra*, 63 Cal. 4th at p. 699.) " 'To say that an error did not contribute to the ensuing verdict is . . . to find that error unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record.' [Citation.] Thus, the focus is what the jury actually decided and whether the error might have tainted its decision." (*People v. Neal* (2003) 31 Cal.4th 63, 86.) The judgment must be reversed unless it is clear beyond a reasonable doubt that a rational jury would have reached the same verdict absent the error. (*People v. Capistrano* (2014) 59 Cal.4th 830, 873.)

Defendant contends that the confrontation clause violation requires reversal of the entire judgment because the People "cannot establish beyond a reasonable doubt that the improperly admitted evidence did not affect the jury's evaluation of the defense argument that Sisoukchaleun and his companions were the aggressors and [defendant] only obtained the gun and then shot Sisoukchaleun in self-defense." I agree with respect to the murder conviction.

At trial, defendant did not dispute that he shot and killed Sisoukchaleun. Rather, the defense's theory was that defendant acted in self-defense, or at worst, imperfect self-defense. The defense argued that it was Sisoukchaleun, not defendant, who was the aggressor. According to the defense, Sisoukchaleun could not let a rival gang member's statements go, especially when the statements were made in the presence of his friends, at

14

least one of whom was a fellow gang member. The defense claimed that defendant retrieved the gun after being confronted by Sisoukchaleun, and had he not done so, Sisoukchaleun and his friends would be on trial for defendant's murder. The defense urged that defendant shot Sisoukchaleun after Sisoukchaleun took a swing a him because he believed it was his only option.

The prosecutor's gang expert testified about gang-related activities in which defendant participated as part of the basis for his opinion that defendant was a Meadowview Bloods gang member. Those activities included pulling a loaded rifle on a police officer, committing an armed robbery, and attempting to commit a carjacking while armed. The jury was instructed that it could consider evidence of gang activity "for the limited purpose of deciding whether the defendant acted with the intent, purpose and knowledge that are required to prove the gang-related enhancement charged or that the defendant had a motive to commit the crime charged. [¶] . . . [¶] You may not consider this evidence for any other purpose. You may not conclude from this evidence that the defendant is a person of bad character or that he has a disposition to commit crime."

Evidence defendant engaged in gang activity in the past, particularly activity that involved the use of firearms, supported the prosecution's theory that the shooting was gang-motivated, which necessarily undercut the defense's theory that defendant was acting in self-defense. As the majority recognizes, such evidence "supported the prosecution's position that defendant was an active member of the Meadowview Bloods, that, when he shot Sisoukchaleun, he did so for the benefit of that particular criminal street gang, and that he had the specific intent to assist, further, or promote criminal conduct by gang members within the meaning of [Penal Code] section 186.22." (Maj. opn. *ante,* at p. 51.)

While there was substantial evidence in addition to defendant's prior gang activity that supported the prosecution's theory that the shooting was gang-motivated, such as defendant repeatedly calling out Meadowview Bloods, the record did not foreclose a

15

finding that Sisoukchaleun was the aggressor, and that defendant was acting in self-defense when he shot him.

The evidence adduced at trial included the following: Sisoukchaleun and Manivong flashed gang signs as they approached the liquor store, and Sisoukchaleun and Thammavongsa used the word "cuz," which is associated with the Crips street gang. When defendant, who was standing just outside the liquor store, indicated that he was a member of the Meadowview Bloods, Sisoukchaleun responded by invoking the name of the LGC or Lao Gangster Crips, a rival gang with which both he and Thammavongsa were "affiliated." After defendant retrieved the gun, he kept saying "Blood, Meadowview, this and that." Sisoukchaleun "got tired of hearing it," took his shirt off, walked out to the street, and said, "Let's fight." Thammavongsa told Sisoukchaleun to "stop it" and "we just going to leave." Sisoukchaleun and defendant walked into the street, and Thammavongsa followed. According to Thammavongsa, the other guys in their group were "[r]ight there with us," and Thammavongsa confirmed that he would have gotten involved if defendant had gotten the better of Sisoukchaleun in the fight. Sisoukchaleun was saying, "Let's fight," but defendant "didn't really say nothing" and did not square up to fight. Sisoukchaleun took a swing at defendant, and defendant dodged out of the way, pulled out a gun, shot Sisoukchaleun in the face and chest, and fled.

The majority claims that the video evidence of the scene shows that "[i]nstead of getting in his truck and leaving the scene, defendant chose to re-engage Sisoukchaleun's group." (Maj. opn. *ante,* at p. 54.) While that is one interpretation of what is depicted in the video, it is not the only one. The video shows defendant approach the front door of the liquor store, talk to someone inside, and then continue to mill around outside the store before Sisoukchaleun and his friends arrive. When Sisoukchaleun and his friends do arrive, they likewise approach the front door of the store and appear to talk to someone inside. As the majority observes, Sisoukchaleun and his friends remain milling around in

16

recessed entry of the store when defendant leaves to retrieve his gun. After retrieving his gun, defendant returns to the front of the store near where Sisoukchaleun and his friends are standing. While defendant can be seen saying something in an animated fashion, Sisoukchaleun and his friends also appear to be speaking. The video has no sound, so it is unclear what is being said. Before driving off after the shooting, defendant's girlfriend approaches the front door of the store and retrieves a parcel from someone inside. While defendant may have chosen to re-engage Sisoukchaleun and his friends after retrieving his gun, it is also possible that he simply returned to pick up his alcohol and Sisoukchaleun and his friends re-engaged defendant. It is not clear. For that reason, I disagree with the majority's conclusion that the video evidence negates any claim of self-defense or imperfect self-defense. (Maj. opn. *ante,* at p. 71.)

The People assert that the jury's verdict finding defendant guilty of first degree murder shows that "the jury clearly rejected defense counsel's argument that appellant shot the victim in self-defense." As defendant points out, "The [People's] analysis clearly begs the question: has the state shown beyond a reasonable doubt, that the jury *would* have rejected the substantial evidence that the shooting was in self-defense in the absence of the highly prejudicial, improperly admitted case-specific testimonial hearsay about appellant's past gang activity?" Based on the record and the prejudicial nature of the evidence in question, I would find that the People have failed to establish beyond a reasonable doubt that the error did not contribute to the first degree murder verdict.

For the reasons set forth above, I would reverse the judgment for first degree murder and the findings on the gang and firearm enhancements.


      Blease            , Acting P. J.


17